**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ALYSSA WRIGHT | : | |
| 4720 Franklin Circle | : | |
| Pipersville, PA 18947 | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | No.: |
| v. | : | |
| | : | |
| CENTRAL BUCKS SCHOOL DISTRICT | : | **JURY TRIAL DEMANDED** |
| 20 Welden Drive | : | |
| Doylestown, PA 18901 | : | |
| and | : | |
| SUSAN GIBSON, *individually* | : | |
| 20 Welden Drive | : | |
| Doylestown, PA 18901 | : | |
| and | : | |
| KAREN SMITH, individually | : | |
| 20 Welden Drive | : | |
| Doylestown, PA 18901 | : | |
| and | : | |
| ROB DUGGER, individually | : | |
| 20 Welden Drive | : | |
| Doylestown, PA 18901 | : | |
| and | : | |
| RICK HARING, individually | : | |
| 20 Welden Drive | : | |
| Doylestown, PA 18901 | : | |
| and | : | |
| HEATHER REYNOLDS, *individually* | : | |
| 20 Welden Drive | : | |
| Doylestown, PA 18901 | : | |
| and | : | |
| DANA FOLEY, *individually* | : | |
| 20 Welden Drive | : | |
| Doylestown, PA 18901 | : | |
| and | : | |
| DANIEL KIMICATA, *individually* | : | |
| 20 Welden Drive | : | |
| Doylestown, PA 18901 | : | |
| and | : | |
| JENINE ZDANOWICZ | : | |
| 20 Welden Drive | : | |
| Doylestown, PA 18901 | : | |

|                                      | :      |
| ------------------------------------ | ------ |
| Defendants.                          | :      |
|                                      | :      |

## CIVIL ACTION COMPLAINT

Plaintiff, by and through his undersigned counsel, hereby avers as follows:

### I.    INTRODUCTION

1.    This action has been initiated by Alyssa Wright (*hereinafter* referred to as "Plaintiff") against Central Bucks School District, Susan Gibson, Jenine Zdanowicz, Karen Smith, Rob Dugger, Rick Haring, Heather Reynolds, Dana Foley, and Daniel Kimicata (*hereinafter* collectively referred to as "Defendants") for violations of Title VII of the Civil Rights Act of 1964 ("Title VII - 42 U.S.C. §§ 2000, *et. seq.*), for First Amendment Retaliation, for violations of the Pennsylvania's Whistleblower Law ("PWL" - 43 P.S. §§ 1421 *et. seq.*), for breach of contract, and other applicable law(s).

2.    Plaintiff asserts she was wrongfully and/or unlawfully suspended and terminated from her employment by Defendants. As a direct consequence of Defendants' unlawful actions, Plaintiff seeks damages as set forth herein.

### II.    JURISDICTION AND VENUE

2.    This Court, in accordance with 28 U.S.C. § 1331, has jurisdiction over Plaintiff's claims because this civil action arises under laws of the United States.  There lies supplemental jurisdiction over Plaintiff's state-law claims because they arise out of the same common nucleus of operative fact(s) as Plaintiff's federal claims.

3.    This Court may properly maintain personal jurisdiction over Defendants because Defendants' contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial

justice, satisfying the standard set forth by the United States Supreme Court in <u>International Shoe Co. v. Washington</u>, 326 U.S. 310 (1945) and its progeny.

4.      Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district, and in addition, Defendants are deemed to reside where they are subject to personal jurisdiction, rendering Defendants residents of the Easter District of Pennsylvania.

5.      Plaintiff is proceeding herein under the Title VII, and she has properly exhausted her administrative remedies by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and by filing the instant lawsuit within ninety (90) days of receiving a notice of dismissal and/or right to sue letter from the EEOC.

### III.  <u>PARTIES</u>

6.      The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7.      Plaintiff is an adult individual, with an address as set forth in the caption.

8.      The Central Bucks School District, a/k/a CBSD ("Defendant CBSD," where referred to individually) is the third largest school district in Pennsylvania (of more than 500 school districts), spans 120 square miles, operates through 23 schools, and maintains a student census of approximately 17,000 students per annum.

9.      Susan Gibson ("Defendant Gibson") is the President of Defendant CBSD's School Board. Heather Reynolds ("Defendant Reynolds") is the Vice President of Defendant CBSD's School Board. Rob Dugger ("Defendant Dugger"), Rich Haring ("Defendant Haring"), Dana Foley ("Defendant Foley"), Daniel Kimicata ("Defendant Kimicata"), Jenine Zdanowicz

("Defendant Zdanowicz"), and Karen Smith ("Defendant Smith") are Members of Defendant CBSD's School Board.

10.     The eight (8) individuals identified in Paragraph 9 are collectively hereinafter referred to as the "Board Members" and are being sued as to their individual assets and in their individual capacities.

11.     Defendant Board Members specifically orchestrated, undertook, and participated directly in all adverse actions against Plaintiff as outlined in this lawsuit. At all times relevant herein, Defendants acted by and through their agents, servants and employees, each of whom was directly involved in adverse actions taken against Plaintiff as outlined in this lawsuit.

## IV.    FACTUAL BACKGROUND

12.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

### [A] Plaintiff work history and role with Defendant CBSD

13.     Plaintiff was hired by Defendant CBSD in or about June of 2021; and in total, Plaintiff was employed by Defendant CBSD for approximately four (4) years.

14.     Defendant CBSD spans more than 120 miles and is comprised of 23 schools across nine (9) municipalities. This is the third largest school district (of nearly 500) within the Commonwealth of Pennsylvania.

15.     Plaintiff served as the Director of Pupil Services ("DPS") for CBSD during her approximate 4-year tenure.

16.     As a DPS, Plaintiff was responsible for the oversight of all 23 schools in the district, as well as students placed in educational programs *outside of* the district. Her role was global, strategic, and systemwide. Plaintiff did not operate from or report to any individual

school; rather, she was at all times based at the district's administrative office at 16 Welden Drive,  Doylestown, PA 18901 and supervised a vast infrastructure of student support services.

17.     Plaintiff's (global) responsibilities included oversight of all special education services, all gifted education programs, and all students served under Chapter 15 of Pennsylvania law.

18.     Plaintiff directly supervised 11 administrators and a central office support team. The Pupil Services department includes more than 275 teachers and over 460 paraprofessionals and support staff as well as nurses, Central Registration, counselors, behavior analysts, social workers, school psychologists and program specialists.

19.     Plaintiff also served as the Title IX Coordinator for every student within Defendant CBSD, managing issues of sexual harassment, discrimination, and equity in compliance with federal law.

20.     Given the scope and complexity of her responsibilities, it was never Plaintiff's role to monitor the daily activities within a specific classroom in any individual school. There had always been a sizeable network of management overseeing specific schools and classrooms relative to special education at Defendant CBSD.

### [B] <u>Plaintiff had a 5-year employment contract with Defendant CBSD</u>

21.     On June 25, 2023, Plaintiff (and Defendant CBSD) executed a "Director of Pupil Services Employment Contract" (hereinafter, the "Contract"). In accordance with the Contract:

    a.  Plaintiff was to be employed as the DSP "for a term of five (5) years."

    b.  Plaintiff was to receive compensation of "not less than $185,000," which had been increased during her tenure (and which was <u>exclusive of</u> pension or retirement contributions, and other benefits).

    c.  Plaintiff could only be terminated "for cause," as defined in Title 24 P.S. Education § 11-1122. Cause as defined in § 1122 states:

(a) The only valid causes for termination of a contract heretofore or hereafter entered into with a professional employe shall be immorality; incompetency; unsatisfactory teaching performance based on two (2) consecutive ratings of the employe's teaching performance that are to include classroom observations, not less than four (4) months apart, in which the employe's teaching performance is rated as unsatisfactory; intemperance; cruelty; persistent negligence in the performance of duties; wilful neglect of duties; physical or mental disability as documented by competent medical evidence, which after reasonable accommodation of such disability as required by law substantially interferes with the employe's ability to perform the essential functions of his employment; advocation of or participating in un-American or subversive doctrines; conviction of a felony or acceptance of a guilty plea or nolo contendere therefor; persistent and wilful violation of or failure to comply with school laws of this Commonwealth, including official directives and established policy of the board of directors; on the part of the professional employe . . .

*See* Title 24 P.S. Education § 11-1122

**[C] On Saturday, November 16, 2024, at 5:29 PM, an email was sent to school management of Defendant CBSD containing an attachment of an interview summary with a faculty member expressing concerns about the mishandling of children in a special education classroom.**

22.     On Saturday, November 16, 2024, at 5:29 PM, Christine Trawinski ("Trawinski" – HR Manager) sent (and directed) an email to four (4) high-level management personnel: (1) Kathleen Veisz ("Veisz" – Manager of 4 schools, including Jamison Elementary School); (2) Nadine Garvin ("Garvin" – Assistant Superintendent of Defendant CBSD); (3) Robert Freiling ("Freiling" – Director of Human Resources); and (4) Dave Heinman ("Heinman" – Principal of Jamison Elementary School). Trawinski copied two (2) additional people: (5) Steven Yanni ("Yanni" – Superintendent); and (6) Alyssa Wright ("Plaintiff" – Director of Pupil Services).

23.     The aforesaid email contained an attachment of a "Meeting Summary" with Alyssa Klein ("Klein"), an employee who worked with Rachel Ausspring ("Ausspring") and Gabby McDaniel (McDaniel") within a specific classroom in Jamison Elementary School (hereinafter, the "Jamison Classroom").

6

24.    The attachment (to the 11/16/24 email at 5:29 PM) was two pages, and in summary, it identified a student with the initials JP was allowed to sit naked, self-stim, masturbate, was subject to water restrictions, was required to remain in his workstation, was yelled at, did not have his own spit cleaned up around him while he was required to continue working, JP walks on wood chips in the playground hurting his feet, and that – as to some other students – there is excessive hitting, toilet sitting, and crying occurring.  For purposes of brevity, this is the overall gist and points within the meeting summary.[1]

25.    In sum though, Klein, who worked with McDaniel and Aussprung in the Jamison classroom, (according to the 11/16/24 email and attachment) reported concerns that McDaniel and Aussprung were mishandling students (within the Jamison classroom).

**[D] <u>Students within the Jamison classroom were autistic and typically had significant mental health disabilities, creating tremendous challenges to care for such students effectively</u>.**

26.    The type of students in the Jamison classroom and other similar special education classrooms within Defendant CBSD locations often exhibit:

- Limited social skills;
- Difficulty with or an inability to effectively communicate;
- Consistent rocking or hand flapping;
- Spitting, drooling, or other similar verbal behaviors;
- Yelling, screaming or verbal outbursts;
- Self-injurious behavior;
- Self-stimming (masturbation);
- Disrobing (clothing removal);
- Aggression that manifests itself in many ways such as biting, kicking, hitting, or in other ways;
- Extreme anxiety, inability to sleep, cognitive challenges, impulsivity, and a host of other behavioral traits; and

---

[1] Neither the specific classroom, nor the student names are referenced herein for privacy purposes.

- Bladder and bowel dysfunction, underactive bladder, overactive bladder, urological conditions, incontinence, and severe constipation.

27.    The summary of an interview with Klein that Trawinski's attached to her 11/16/24 email had identified some typical behaviors of students within the Jamison classroom (*irrespective of* proper or improper care). And handling such students prone to severe behavioral problems is of course very challenging for faculty (regardless of level of experience or tenure).

### [E] Defendant CBSD's highest levels of human resources management and administration decided (*without* Plaintiff's involvement) to retain McDaniel and Aussprung in teaching capacities (without placing them on leave) pending further investigation.

28.    As part of termination proceedings against Plaintiff, Defendant CBSD obtained a Sworn Declaration from Trawinski. Trawinski (Manager of Human Resources) confirmed under oath that a decision to retain McDaniel and Aussprung was made by high-level management **not involving Plaintiff**. In her sworn declaration, Trawinski wrote:

6. Later in the day, a meeting was held with Ms. McDaniel, Mr. Freiling, Dr. Garvin, Kathleen Veisz, the Supervisor of Special Education, and Principal Heineman. The purpose of the meeting was to allow McDaniel to respond to the allegations made by Ms. Kline. Mr. Freiling's notes from the conversation that occurred during the meeting

7. During the meeting, I read line by line the information as reflected in District Exhibit 5 and provided Ms. McDaniel the opportunity to respond. McDaniel provided an explanation for each of the concerns raised by Ms. Kline. As McDaniel explained her

8. After the meeting, there was a caucus where Mr. Freiling, Dr. Garvin, Principal Heineman, and Ms. Veisz convened to discuss whether McDaniel should be placed on administrative leave. It was unanimously decided that McDaniel should not go on administrative leave at that time until further information was gathered. After the caucus, the Superintendent of Schools, Dr. Steven Yanni, and Ms. Wright were called and provided with an update on the decision to keep Ms. McDaniel in the classroom pending the investigation. Ms. Veisz did not raise any concerns from a special

29.    The three excerpts above from Trawinski's sworn declaration pertained to a meeting on November 15, 2024 (1 day before the 11/16/24 email was circulated) held by Freiling, Garvin, Veisz, and Dave Heinman ("Heinman" – Principal of the Jamison School).[2]

30.    Cathy Rossi ("Rossi") was hired as an interim Human Resources Director. As part of termination proceedings against Plaintiff, Defendant CBSD obtained a Sworn Declaration from Rossi. In her sworn testimony (as to the 11/15/24 meeting with Klein), Rossi testified:

12. After the meeting with McDaniel, Trawinski, Freiling, Veisz, Heineman, and Garvin gathered to decide whether McDaniel should be placed on administrative leave during the investigation. A unanimous decision was made not to place McDaniel on administrative leave until further information was gathered. Afterwards, Wright and the Superintendent of Schools, Dr. Steven Yanni, were called over the phone to update them on the decision not to place McDaniel on administrative leave.

31.    The ***decision*** to retain (and not place McDaniel or Aussprung on administrative leave) was underlined decided by Garvin (the Assistant Superintendent), ***someone who Plaintiff reported to and was managed by*** within Defendant CBSD. Those deciding with (and or giving input to) Garvin included the Jamison Elementary Principal (Heinman), who oversaw the entire elementary school and Freiling (the Director of Human Resources who oversaw nearly 3,000 faculty / management / staff within Defendant CBSD). Plaintiff had **no authority** over *any* of these high-level leaders within Defendant CBSD – and as Trawinski swore under oath – Plaintiff was merely told of their final decision (without her input or involvement).

32.    Moreover, Trawinski – who was actually part of the investigatory interview with Klein – represented that such faculty "provided an explanation for each of the concerns." This ostensibly convinced Heinman, Garvin, and Freiling to not even believe administrative leave was

---

[2] Paragraphs 6 - 8 of the Trawinski Declaration are not recited in full.

necessary for McDaniel or Aussprung (permitting them to continue working in the classroom with students).

        **[F]**  **By mid-November of 2024, Defendant CBSD's human resources department (with the coordination of the Assistant Superintendent, Superintendent, and/or Solicitor) was conducting a "confidential" investigation (not involving Plaintiff or hundreds of other management-level employees).**

33.    Trawinski swore under oath in her Declaration (referenced above) that ***only*** human resources was responsible for and conducting "confidential" investigation. In particular, she testified:

> 11. From November 18, 2024 – November 20, 2024, Mr. Freiling and I interviewed the individuals that had regular contact with the special education classroom as was shared by Ms. Veisz. The decision was made to only have Mr. Freiling and myself conduct the interviews to promote confidentiality and provide an environment where staff would feel comfortable sharing information as a supervisor would not be

34.    Trawinski wholly acknowledged under oath that Plaintiff was not part of any factfinding(s) or interview processes.[3]

        **[G]**  **On Wednesday, November 20, 2024, Plaintiff was informed by Yanni (the Superintendent of all of Defendant CBSD and whom she was managed by) that he made a Childline complaint to report allegations lodged by Klein.**

35.    It is **undisputed** that a Childline report was made **on 11/20/24** by the Superintendent (Yanni) – the (then) Chief Executive Officer of Defendant CBSD – about allegations in the Jamison classroom. This is **only 2-3 business days** after a Saturday night email was disseminated (only days earlier).

36.    Yanni's Childline complaint also prompted a police investigation by the Warwick Police Department. Yanni, Garvin, and Defendant CBSD's human resources department

---

[3] Paragraphs 11 of the Trawinski Declaration is not recited in full.

coordinated and handled all aspects of the Warwick police investigation arising out of the 11/20/24 Childline complaint. Plaintiff **did not participate** in police-related communications.

37.    Pursuant to 23 Pa. C.S.A. § 6311, a Childline complaint must be lodged based upon enumerated suspicions of suspected child abuse (as school employees, faculty, staff, management, and officials are "mandated reporters").[4] This is an agency-based complaint that typically prompts a police investigation (as occurred herein). This was done by Yanni (the Superintendent). Yanni's Childline complaint and the resultant police investigation had become common knowledge and a topic of discussion amongst many.

*38.    Between (Saturday night at 5:29 PM on) 11/16/24 and 11/20/24 (several business days later), Plaintiff had only been informed: (a) Klein raised some concerns; (b) Klein gave explanations to the concerns; (c) higher-level (and other) management not involving Plaintiff made the decision to permit McDaniel and Aussprung to continue working without temporary suspension or leave; (d) that human resources management was conducting its own "confidential" investigation; and (e) the highest-level overseer of Defendant CBSD made a Childline complaint (prompting a police investigation).* This is all incapable of being disputed.

### [H] Defendant CBSD's Human Resources Department Moved Very Slow and Was Very Ineffective.

39.    Defendant CBSD's human resources management concluded its "confidential" investigation on November 22, 2024, **but took 21 days** to prepare and send anyone within Defendant CBSD an update or summary of the investigation concluded nearly three weeks earlier.

---

[4] ChildLine is part of a mandated statewide child protective services program designed to accept child abuse referrals.

40.     In her Sworn Declaration (and testimony), Rossi testified:[5]

> 23. The Jamison Investigation concluded on November 22, 2024. On December 12, 2024, a report with the findings of the investigation was shared with Wright (hereinafter referred to as the "December 12th Report"). The December 12th Report validated that a student was

41.     Rossi's testimony confirms: (a) it took Human Resources nearly three weeks to generate a Memorandum based upon an already-concluded investigation that ended on 11/22/24; **and** (b) that the 12/12/24 Report generated only related to <u>the same prior concerns</u> relayed by Klein (already the subject of a Childline complaint and a Warwick police investigation).

42.     On December 12, 2024, a 5-page (human resources) "Memorandum" about Klein's (mid-November 2024) concerns was prepared and copied <u>to 8 people</u>: (1) Yanni, Superintendent; (2) Garvin, Assistant Superintendent; (3) Plaintiff, Director of Pupil Services; (4) Heineman, Principal for Jamison Elementary School; (5) Theresa Everett ("Everett"), Human Resources Manager; (6) Trawinski, Human Resources Manager; (7) Cara Alderfer ("Alderfer"), CBEA President; and (8) Deneen Dry ("Dry"), Nurse and CBESPA President.

43.     Completely corroborating that Plaintiff had no involvement in any investigation, interviews or factfinding, the 12/12/24 Memorandum confirmed her only involvement was directing an employee (Dry) to mention any concerns she had to human resources (on 11/14/24). Dry's concerns related (only) to Klein feeling like she had interpersonal problems with faculty and the Principal and that her job was in jeopardy (so naturally such issues were an HR matter).

44.     Freiling, the Director of Human Resources (and highest-level HR personnel within Defendant CBSD), identified (in his 12/12/24 Memorandum) ***the only action(s) being undertaken*** as a result of Klein's mid-November 2024 concerns were various policy creation(s),

---

[5] Paragraph 23 of her Declaration is not recited in full.

increased observation(s), and additional training(s). Again, this was <u>without the input</u> or involvement of Plaintiff.

> **[I] <u>By December of 2024 (and thereafter), Plaintiff was questioning the highest-levels of management within Defendant CBSD asking why if there is a criminal investigation faculty the Jamison classroom was not placed on leave.</u>**

45.     Plaintiff talked with numerous management-level employees (whom she did not supervise or who supervised her) such as Yanni and Garvin (the Superintendent and Assistant Superintendent respectively). In such dialogue, she was verbally questioning why during a criminal investigation the Jamison faculty were being permitted to continue teaching (and were not placed on leave).

46.     In addition to verbally raising such issues, Plaintiff was emailing all levels of management about such concerns. Plaintiff for example sent the following emails to Yanni (Superintendent), Garvin (Assistant Superintendent), Edward Diasio (Solicitor), and Freiling (Director of HR):

<u>**Email Example #1**</u>

**WRIGHT, ALYSSA** <ALWRIGHT@cbsd.org>                              Sat, Dec 28, 2024, 9:50 AM

to GARVIN, NADINE, YANNI, STEVEN, Edward Diasio, FREILING, ROBERT ▾

Hi all,

I have a question... Has any consideration been given to keeping Gabby and Rachel out now that there is an open criminal investigation? I don't know how any of that works, but I was thinking about that after reading these emails.

**Email Example # 2**

**WRIGHT, ALYSSA** <ALWRIGHT@cbsd.org>

to VEISZ, KATHLEEN, HEINEMAN, DAVE, GARVIN, NADINE, FREILING, ROBERT, YANNI, STEVEN ▾

Hi all,

I still want to go back to the idea of putting her out.  Is there a reason we aren't?

> **[J]** **Between late December of 2024 through March of 2025, Plaintiff was complaining to Defendant CBSD officials and management about the entity as a whole being inept, moving too slow, and downplaying suspected abuse (among other concerns).**

47.    On December 26, 2024, Klein's actual written submission (from mid-November of 2024) to Defendant CBSD was released to certain management (such as Plaintiff). It was lengthy, *Trawinski had downplayed the allegations in her email summary*, and the sheer breadth of the concerns Plaintiff learned about more fully between 12/12/24 – 12/26/24 troubled her.

48.    Plaintiff believes that Klein submitted a 7-page written complaint of abuse on or about November 17, 2024, to Defendant CBSD's human resources management. Despite that such allegations involved a special education classroom (under Plaintiff's global purview), Defendant CBSD's human resources management did not share the actual written complaint from Klein for nearly 47 days (until 12/26/24).

49.    Between December 2024 – March of 2025, Plaintiff was being very vocal about: (a) her belief(s) that Jamison classroom faculty should have been suspended or placed on leave; (b) her belief(s) that Defendant CBSD was moving too slow and not taking appropriate actions; and (c) that she believed Defendant CBSD higher-level management (with the assistance of the then Solicitor – Edward Diasio) were downplaying and concealing the full extent of "abuse" *that was coming to light* in the Jamison classroom. She made these serious concerns known to *inter alia* Yanni.

14

50.     In the December 2024 – March 2025 timeframe, Plaintiff felt she was being retaliated against, excluded, ostracized, and treated in an antagonistic manner for proverbially making noise and complaining (about illegality, wrongdoing, and child abuse).

**[J] By February of 2024, Plaintiff was trying to meet or talk with Susan Gibson ("Gibson"), the President of Defendant CBSD's Board who refusing to entertain any discussion with Plaintiff.**

51.     On or about February 26, 2025, Plaintiff texted the President of Defendant CBSD's School Board (Susan Gibson – "Gibson"). The text chain was as follows:



52.    As of February 26, 2025, Plaintiff was being retaliated against by Yanni and Freiling (the Superintendent and Director of Human Resources) - - two of the highest officials in all of Defendant CBSD. She had no place to meaningful place to turn, so she sought relief from Defendant CBSD's School Board (which is supposed to oversee matters within Defendant CBSD).

53.    However, *Gibson declined to communicate with Plaintiff on behalf of the Board* and suggested she either complain to the people retaliating against her or talk with Defendant CBSD's lawyer (Peter Amuso – "Amuso") who was simultaneously communicating with the CBSD Board and the management to whom she was complaining. Plaintiff was left in an arena with no meaningful redress. Defendant CBSD as a whole was handling things <u>very poorly</u>.

### [K]  <u>On March 3, 2025, Plaintiff made a formal 13-page written complaint (through counsel) to Defendant CBSD's Board, management, and counsel.</u>

54.    On March 3, 2024, Plaintiff submitted a 13-page whistleblower complaint (through her counsel) directly to the following individuals:

- Yanni (Superintendent);

- Freiling (Director of Human Resources);

- Leigh Dalton, Esq. ("Dalton" - investigator appointed by Defendant CBSD);

- Diasio (Solicitor and counsel of Defendant CBSD); and

- Gibson (President of Defendant CBSD's School Board).

55.    The letter contained explosive and expansive allegations, including but not limited to:

(a) "legal complaints" and threats of "litigation" by Plaintiff;

(b) A request that "CBSD reverse course and promptly cease concealing abuse and neglect;"

(c) Heinman (Principal of Jamison Elementary) was attempting to terminate and "retaliate" against Klein (because she was a whistleblower), which is unlawful;

(d) Defendant CBSD was downplaying and diluting Klein's allegations of abuse to make them seem non-serious;

(e) Heinman had an improper relationship with faculty in the Jamison classroom wherein, leading Heinman to help conceal abuse and shield such faculty;

(f) Investigations into abuse or neglect were being impeded and there was a lack of cooperation;

(g) Defendant CBSD failed to properly investigate or remedy gross misconduct by Defendant CBSD leadership and officials;

(h) Concerns that abuse and neglect had occurred that were not being disclosed, remedied, and which was perpetuated (including by retention of abusive and negligent faculty by not placing them on leave);

(i) Defendant CBSD was letting leadership give input into decisions who had conflicts of interest and inappropriate relationshions;

(j) Yanni (and other management was misleading police in a police investigation and making false statements during legal investigations;

(k) Yanni was lying publicly about what truly transpired within the Jamison classroom, even to an affected parent of an abused or neglected child;

(l) Yanni was blanketly retaliating against Plaintiff for her opposition to his concealment and improprieties (in many specified ways);

(m) Yanni's own husband was engaging in right-to-know requests from Plaintiff's former employer(s) in *what appeared to be a planned effort to smear Plaintiff*; and

(n) Yanni (or others) was attempting to impede Plaintiff's ability to communicate with agencies such as the Pennsylvania Department of Education ("PDE").

56.    Plaintiff's letter also summarized concerns she had of "sexual harassment" and abuse concealment. Her March 3, 2025, whistleblower complaint to Defendant CBSD also stated verbatim:

In the last six (6) months (through today), Wright has engaged in the following statutory or constitutionally protected activities:

**(1)** **Complaints about sexual harassment by Karen Smith ("Smith")**. Wright verbally complained on numerous occasions that Karen Smith (a well-known Board Member who repeatedly conducts herself inappropriately in a public forum) was publicly disparaging her to community members both verbally and in writing and in essence claiming she only obtained her employment contract because of "*quid pro quo*" for alleged sexual favors. Smith publicized numerous iterations of her claims. Wright even memorialized such concerns to you and Freiling dated October 17, 2024. Wright demanded remedial action and District support for what she called "sexual harassment." This is statutorily protected activity under Title VII and Title IX. **No meaningful remedial action was undertaken by CBSD.**

**(2)** **Complaints about sexual harassment by Kevin Marton ("Marton")**. Marton was a principal, charged with 2 felonies (later reduced wherein he was given probation). CBSD permitted Marton to return to work, <u>created</u> a job for him so he could remain paid in full, and let him resume working for CBSD in August of 2024 with an active criminal no contact order. He is Wright's ex-husband who was – from her vantage point – stalking her and wanting to reconcile. Wright complained on numerous occasions that he was not permitted to have contact with her legally and you created opportunities to allow him to be present in the same location as her, and that she viewed this as ongoing sexual harassment. Despite repeated (and ongoing) complaints, **no meaningful remedial action was undertaken by CBSD.** This is statutorily protected activity under Title VII and Title IX (and Wright even complained such action(s) and inaction(s) of CBSD was a "Title IX" violation.

*See* Plaintiff's March 3, 2025, Whistleblower letter, at p. 11, attached hereto as "Exhibit A."

57.    Plaintiff complained about <u>many</u> whistleblowing and First-Amendment protected concerns (explained more *infra*), in addition to concerns she had been the victim of "sexual harassment" (not properly handled, investigated, or remedied by Defendant CBSD). Plaintiff concluded her letter by stating: "This letter is intended to serve as a sweeping indictment of how CBSD has completely mishandled all aspects of the abuse allegations . . .". Plaintiff's March 3, 2025, letter (Exhibit A) is incorporated herein in full by reference, as protected concerns

expressed therein underly her retaliation claims in this lawsuit (in addition to those predating her 3/3/25 letter). This letter is hereinafter referred to as the "3/3/25 whistleblower complaint."

### [L] Plaintiff's 3/3/25 whistleblower complaint caused a significant disruption within Defendant CBSD.

58.    **Prior to** March 3, 2025, Defendant CBSD **and** its Board as a whole could be described as nothing but an utterly slow-moving, inactive failure. In particular, Defendant CBSD **and** its Board:

    (a) Failed to remove 2 accused child abusers, even during the pendency of an investigation (permitting their continued work around and with children).

    (b) Failed to properly oversee its own leadership or management, which lacked any meaningful oversight.

    (c) Was supposedly conducting an investigation, but any investigation should have been prompt, expedited, and effective. To the contrary, Defendants floundered in a purported investigation mode for nearly 6 months.

    (d) And despite numerous complaints about certain leadership engaging retaliation (confirmed by many witnesses), Defendants did nothing and undertook no remedial action(s).

59.    In sum, **prior to** March 3, 2025, Defendants were a do-nothing entity and Board who watched serious problems unfold and continue as if they were an audience in a reality TV show (instead of a Board with oversight obligations to intervene and promptly remedy problems, or to dictate an expedited investigations).

60.    **After** March 3, 2025, Defendants held emergency Board meetings, expanded an "investigation," demanded results of an investigation sooner, and Plaintiff was identified as a whistleblower in communications and publications publicly within Defendants, in the news, and publicly.

**[M]  Plaintiff was placed on administrative leave on or about May 2, 2025 (and ultimately terminated in late August of 2025).**

61.  Plaintiff had dedicated nearly three decades of her life to education at many levels and enjoyed an exemplary career.

62.  In Plaintiff's approximate (total) four (4) years of employment within Defendant CBSD, Plaintiff had never been counseled, disciplined, or subject to any progressive warning(s).

63.  Within approximately 61 calendar days <u>or</u> 45 business days of Plaintiff's 3/3/25 whistleblower letter, Plaintiff was placed on administrative leave (as of May 2, 2025) ***and never permitted*** to return to work (pending termination, which in fact occurred in late August of 2025).

**[N]  The reasons given for Plaintiff's termination from employment are – from an objective standpoint – false, totally unbelievable, and a malicious misapplication of legal text (as explained i*nfra*).**

64.  As aforesaid, Plaintiff was placed on an involuntary leave of absence effective on or about May 2, 2025. At this time, Plaintiff was provided with no information as to why she was being placed on administrative leave.

65.  Defendants' rush to place Plaintiff on involuntary leave was a complete catastrophe and did more harm than good (as was par for the course with Defendant CBSD and its Board). Plaintiff oversaw pending IX investigations, was in the middle of numerous legal matters for and on behalf of Defendant CBSD and was handling time-sensitive special education programs and matters.

66.  Placing Plaintiff on leave abruptly with no warning(s) and no access to information or to communication with staff or management jeopardized the welfare of children, programs, and numerous other matters (even compromising the quality of pending investigations for which Plaintiff was handling from a Title IX standpoint). In fact, Defendant CBSD ***never***

*once* sought information from Plaintiff about any pending matters to transition or facilitate in a rush to get rid of her (letting such matters falter).

67. Plaintiff was then left in the proverbial dark for nearly 48 calendar days (from May 2, 2025) until on or about June 18, 2025, when she was presented with a "Statement of Charges," hereinafter the "SOC." *See* SOC, attached hereto as "Exhibit B."

68. Defendants rushed to retaliate against Plaintiff such that they didn't care about harming everything she was handling at the snapshot in time, didn't care to even get information to transition highly-sensitive matters, and then had to take nearly seven (7) weeks to drum up reasons to purportedly justify Plaintiff's prior removal and potential (anticipated) termination from employment.

### The Specific Reasons Given for Plaintiff's Termination

69. Defendant's SOC listed the sole reasons for which Plaintiff was terminated. *See* Exhibit B. The SOC was comprised of 56 numbered sentences or paragraphs. The SOC can be summarized accurately as <u>three</u> separate categories of allegations of misconduct against Wright:[6]

**Allegation 1** – Plaintiff should have been on notice of potential child abuse in a specific classroom at Jamison Elementary School <u>between October 11, 2024, through November 20, 2024</u>, and should have reported such concerns to Childline. *See* SOC, at ¶¶ 16-43.

**Allegation 2** – Plaintiff received findings from Human Resources on December 12, 2024, validating abuse and restraints in the Jamison Elementary School Classroom and her failure to report unlawful restraints mentioned in the December 12, 2024, to the Pennsylvania Department of Education constituted willful misconduct. *See* SOC, at ¶¶ 44 – 52.

**Allegation 3** – Plaintiff participated in a speaking engagement on March 18, 2025, without approval which was neglect of her duties, and which interfered with her job performance. *See* SOC, at ¶¶ 53-56.

---

[6] Paragraphs 1-15 of the SOC merely identify general legal principles and Wright's job position.

### i. **Allegation # 1 was a complete pretext for Plaintiff's termination.**

70.     Within the SOC, Defendant CBSD expressly relied near exclusively upon purported references to conversations Plaintiff had with <u>three people</u> between 10/11/24 – 11/15/24: (1) Veisz; (2) Vanessa Carey ("Carey" – a Behavioral Analyst); and (3) Dry. The reliance was to supposedly demonstrate that from discussions Plaintiff had with **some of hundreds of her various reports** that she may have been on notice of potential abuse in the Jamison classroom.

71.     All three (3) of these witnesses provided sworn testimony (via lengthy sworn declarations) that the SOC was false and misleading, and they <u>disputed ever discussing</u> such concerns with Plaintiff as alleged in the SOC. *See* Declarations of Veisz, Carey, and Dry (attached hereto respectively as Exhibits "C," "D," and "E").

72.     A review of Declarations from Veisz, Carey, and Dry irrefutably show: (a) no objective person could have been on notice of any possible abuse (in Plaintiff's role); (b) Plaintiff was extremely attentive and proactive about <u>any</u> matters; and (c) witnesses referenced herein went as far to say that assertions in the SOC about alleged conversations with Wright <u>were actually "false</u>."

73.     The Declarations of Veisz, Carey and Dry thus illustrate that Defendants knowingly and intentionally inserted false allegations into the SOC to lodge against Plaintiff for purposes of removal and termination.

74.     Plaintiff was required to have "reasonable cause to suspect that a child is a victim of abuse" where § 6311(b) **focuses on knowledge from** "contact with the child," "direct" care, or when a "specific disclosure" is made "to the mandated reporter that an identifiable child is the

victim of child abuse." This <u>high level</u> of knowledge <u>or</u> contact was not imparted upon Plaintiff, as the crux of the Statute requires.

75.     As explained *supra*: (a) Defendant CBSD received a complaint from Klein directly on or about November 15, 2024; (b) Defendant CBSD's human resources performed a "confidential" investigation; and (c) shared a snippet of some of Klein's concerns with various management on November 16, 2024 (a Saturday night).

76.     As of November 16, 2024, Garvin (Assistant Superintendent), Freiling (Director of HR), and the School Principal (of Jamison Elementary School) decided **with no involvement of Plaintiff** that: (a) they believed there were reasonable explanations by Jamison faculty about abuse allegations; (b) they decided to keep such faculty working (in lieu of temporary leave); and (c) they were going to investigate further before coming to any conclusion. **None of this** involved Plaintiff (or hundreds of other management-level employees overseeing programs or aspects of Defendant CBSD).

77.     Nonetheless, ***within just a few business days*** (on November 20, 2024), a Childline complaint was lodged by Yanni (the Superintendent), which prompted a full police investigation by the Warwick Police Department of allegations lodged by Klein. It is undisputed that Yanni (the Chief Executive Officer of Defendant CBSD and Superintendent) initiated a Childline complaint on November 20, 2024.

78.     In an effort to fabricate a rationale for Plaintiff's termination pretextually, Defendants *intentionally manipulated the text of the mandated reporting law* in the SOC to falsely justify Plaintiff's termination from employment.

79.     In ¶ 12 of the SOC issued by CBSD's counsel and the Board Members, they cite § 6311(c) and the entire section of the law (about mandated reporting) **except for the last**

**sentence** that was **intentionally and maliciously omitted** stating: "***This chapter does not require more than one report from any such institution, school, facility or agency.***" Defendants intentionally deleted the only applicable and relevant sentence in § 6311(c) with the intent to falsely and pretextually terminate Plaintiff.

80.     Defendants also maintained in the SOC that Plaintiff failed to initiate a Childline complaint after Yanni through the issuance of a December 12, 2024, Memorandum by Freiling. But the Memorandum was just an internal recommendation about matters moving forward based upon the same complaint(s) of Klein dating back to mid-November of 2024. Thus, there was nothing new to report to Childline.

81.     Defendant CBSD's SOC reads as if it expected all 3,000-plus approximate staff, supervisors, managers, directors, and leadership of Defendant CBSD to make Childline reports *despite that* the Superintendent did so and despite that there was already a pending police investigation. But that is not legally required, expected, or typical.[7]

82.     It is gravely concerning that Defendants: (1) intentionally deleted or omitted the most critical section of the statute at issue in this case in the SOC; (2) maintained (contrary to law) that Plaintiff failed to initiate a Childline complaint in mid-November through December of 2024 (when the Superintendent already did so, obviating the requirement of mandated reporting **for hundreds of other managers**, including Plaintiff); and (3) never once in its SOC identified there was a Childline complaint already initiated and a police investigation already pending.[8]

---

[7] If a high-level manager makes a report of abuse or neglect in a nursing home setting, dozens of nurses or other staff are not expected to make a repetitive report (as a matter of law).

[8] With the assistance of Amuso, Defendant Board Members thus knowingly, maliciously, and intentionally deleted the only portion of the Statute relevant in its SOC and then falsely claimed Plaintiff failed to initiate a Childline complaint contrary to the specific statutory text while never once referencing in the SOC a pending police investigation or a prior Childline complaint. This conduct is absolutely outrageous and illustrative of a design to railroad Plaintiff under false circumstances.

**ii. <u>Allegation # 2 was a complete pretext for Plaintiff's termination</u>.**

83.     The second categorial assertion by Defendants is that Plaintiff failed to report a "restraint" identified in the 12/12/24 Memorandum from Freiling (along with addressing other matters relative to the IEP of the student(s).

84.     In the SOC (at ¶ 47), Defendant CBSD states:

> 47.     Wright failed to report the unlawful restraints validated in the December 12th Memorandum on December 12, 2024 to the Pennsylvania Department of Education in accordance with 22 Pa. Code Section 133(c)(5), which constitutes incompetency, willful neglect of duties, and persistent and willful violation of District policy and the law.

85.     Defendants' Allegation 2 is verifiably false for **three (3) irrefutable reasons**. First, there was no "unlawful restraint" (or restraint at all *as defined in the law*) identified **in the 12/12/24 Memorandum.** 22 Pa. Code § 14.133 in its entirety only discusses proper use of restraints, what constitutes a "restraint," that use of restraints (as defined therein) should be documented, and that any data of restraints are subject to reporting (**quarterly**) as prescribed by Department of Education ("DOE").

86.     In the 12/12/24 Memorandum, the **<u>only</u>** (1-sentence) reference to restraints was:

> • **Use of Restraints**: Multiple reports indicate the Educational Assistant was observed restraining students by placing a student in their workstation then maneuvering other tables or stations in a manner to limit the student from eloping or violently pushing the tables into other students or staff. Multiple reports indicate that on occasion the Educational Assistant was observed sitting on top of the table or placing their feet upon the legs of the table to achieve this restraint.

87.     Defendants claimed (in the SOC) that this single sentence in the 12/12/24 Memorandum about restraints makes Plaintiff liable for not issuing documentation to the DOE. But, even according to §133, "placing a student in his or her workstation" is not a "restraint." § 133(ii) expressly ***excludes* from the definition of "restraint"** any "brief holding," efforts to

"calm or comfort," and efforts to "guid[e] a student or eligible young child to an appropriate activity" . . . or "to safely escort her from one area to another." ***Bringing a student to his or her work station is not a "restraint" (as a matter of law).***

88.    Additionally, § 133 actually defines a "restraint" as the "**application of physical force**, with or without the use of any device, for the purpose of restraining the free movement **of a** student's or eligible young **child's body**." *See* § 133(b)(i). Moving some furniture so as to avoid a child from attacking another child or faculty sitting on a desk poised to prevent harm to or by an autistic child is also not within a legal definition of a restraint. *By law, a restraint is **only** the use of **force** by a person or with equipment **upon the body of a child***.

89.    There was **never** any "restraint" as defined by law, let alone an "unlawful restraint" *listed or identified in the 12/12/24 Memorandum*. Walking a student to his or the desk and/or moving furniture to avoid injury to another student is unequivocally **not** a restraint under § 133. This can be verified easily by: (a) a review of the aforesaid restraint regulations; or (b) simply looking at the dropdown menu of an online RISC report form which identifies only significant bodily contacts that can constitute a reportable restraint. Thus, nothing in the 12/12/24 Memorandum triggered a reportable "restraint."

90.    One of the very problems with Defendants' inept handling of any investigations and having permitted its human resources to conduct a confidential investigation is that such human resources does not know about, understand, or apply laws or regulations governing children in special education with physical or mental health disabilities. This poor handling prompted Freiling (an HR Director) to identify something as a "restraint" (inarticulately) in the 12/12/24 Memorandum that was not a restraint as defined by reporting regulations.

91.    Findings issued much later than the 12/12/24 Memorandum did indicate that improper restraints may have been used in the Jamison classroom, but nothing in the 12/12/24 Memorandum triggered any DOE reporting for any personnel of Defendants (or included later-revealed restraints).

92.    Second, restraints are not reported when they occur (**if** they do occur). The actual text of §133(c)(5) states: "(5) School entities shall maintain and report data on the use of restraints as prescribed by the Secretary. The report shall be reviewed during cyclical compliance monitoring conducted by the Department."

93.    Reporting of any restraint incidents with schools is done o<u>n a quarterly basis</u>. Plaintiff was a global overseer of 23 schools. It was not her responsibility to report restraints to the DOE on a quarterly basis, or at all. The job is performed by a Program Specialist. Melissa Donofrio ("Donofrio") was the Program Specialist handling district-wide DOE reporting until February of 2025. Then the role was assumed after her departure by Elise Viscuso ("Viscuso"), the new Program Specialist. Plaintiff has <u>never</u> in her four (4) years of employment at Defendant CBSD submitted any reports to the DOE about restraints. It just wasn't her job or role. *And there have been restraints at virtually all of CBSD's schools, **all** reported by the Program Specialist.*

94.    Defendant CBSD disseminated a policy which has nothing to do with Plaintiff regarding collection, compilation and reporting of restraints districtwide. The building supervisor (typically a principal) signs any documentation, and all reporting is done through Viscuso. The CBSD policy (for all of its schools) is as follows (verifying Plaintiff's non-involvement):

 **CENTRAL BUCKS SCHOOL DISTRICT**

### Physical Restraint Report Procedures

Restraints to control acute or episodic aggressive or self-injurious behavior may be used only when a student presents an imminent risk of physical harm to him/herself or others and only when less restrictive measures, including de-escalation techniques, have been used by personnel.

A physical restraint in an educational program occurs when an adult uses physical force for the purpose of restraining the free movement of a student's body.

- ☐ Following the restraint, when the student is safe, have the student evaluated by the nurse. Nurse will document visit in Infinite Campus.
- ☐ At the conclusion of the incident, call the student's parents and provide the following information:
  - ○ Explanation of incident including setting events, behavior, and de-escalation tools
  - ○ Restraint
  - ○ Recovery of the student
- ☐ Offer Parents an IEP meeting or an IEP waiver form
  - ○ *Important:* An IEP meeting needs to be held within 10 school days of the restraint unless the parent signs a waiver form
  - ○ If the parent requests a waiver form, but does not return it signed, *three* documented attempts to get a signed waiver from the parent need to be recorded.  If, after the 3rd attempt, the parent has still failed to return a signed waiver, an IEP meeting *must* be held within 10 school days of the restraint. Invite the parent to the meeting and hold it within the 10 days regardless of response.
  - ○ If the student does not currently have a Positive Behavior Support Plan, the IEP team will convene.
- ☐ Notify building level Administrator and Supervisor
- ☐ Complete a Critical Incident Report (CIR) Form *Note:* requires Administrator/Supervisor signature
- ☐ Scan and email the Critical Incident Report Form and signed IEP waiver (if applicable) to Elise Viscuso at eviscuso@cbsd.org
- ☐ Once you have held the IEP meeting or received back the signed waiver, complete the Physical Restraint Recording Form v2 Updated for CPI in FORMS (this information is submitted to the state).  Be sure the information on the form matches the information on your CIR.  A link to the form can be found here:  https://forms.office.com/r/rxN1pQhhcm

A printout of the Physical Restraint Recording Form, Critical Incident Report Form, and a signed waiver, if applicable, will be placed into the student's cumulative file at the ESC.

02/2025 EV

95.     Defendants falsely alleged that there was a reportable "restraint" as defined by law visible in the 12/12/24 Memorandum. There was no reportable incident in that Memorandum. And Wright would not have been involved in such reporting **even if** there was a reportable incident. Defendants' SOC assertions are tantamount (by analogy) to claiming a Chief Financial Officer ("CFO") was negligent because a payroll clerk (whose job it was to handle payroll) failed to process a check properly for a company employee.

96.     But lastly (and third), Plaintiff *would not have had sufficient information even if there was a restraint* <u>or</u> it was her job to perform DOE reporting. Plaintiff was kept out of any investigation, factfinding, and other details. A RISC online quarterly report is not able to be made <u>unless every single part of the online form is completed for submission</u>. The online form is *very comprehensive* and requires information such as: (1) grade; (2) age; (3) student's disabilities; (4) an explanation of the specific incident(s); (5) the Antecedent explanation; (6) the behavioral concerns at issue; (7) what types of de-escalation techniques were used before a restraint occurred; (8) exact dates of restraints; (9) physical location of restraint; (10) type of restraint used; (11) the exact number of seconds and minutes of any restraints used; (12) all staff present or involved with the restraints; (13) specific injuries from the restraint to the student; (14) a detailed description of injuries to the student; (15) training certifications of involved faculty doing the restraint; (16) whether law enforcement was notified; (17) a contrast of restraints as set forth in the IEP; and (18) other information. The <u>only people</u> who had this information were HR, the Superintendent, and the Assistant Superintendent. There cannot be any reasonable assertion, implicitly or explicitly, that Wright did anything wrong.

### iii.  **Allegation # 3 was a complete pretext for Plaintiff's termination**.

97.     To illustrate the retaliatory nature of Defendants, it lodged within the SOC a kitchen-sink style rationale that one reason for Plaintiff's pretextual termination was her engaging in a speaking engagement <u>on March 18, 2025</u>. The SOC states:

> 53.     Wright's contract states as follows: "The Director shall devote her full time, attention, energy, skills, and labor to her employment as Director of Pupil Services during the term of this Contract and any lawful extensions. The Director may undertake consultative work, speaking engagements, and other services related to her profession, <u>provided that such activities do not interfere with the performance of the duties</u> of the Director of Pupil Services under this Contract, and provided that <u>such activities are approved in advance in writing by the School Board</u>, which approval shall not be unreasonably withheld or delayed."
>
> 54.     Wright engaged in speaking engagements on March 18, 2025 without approval of the Board. **(See Exhibit E, hereinafter referred to as the "March Speaking Engagement").**
>
> 55.     Wright improperly engaged in outside speaking events and commitments while persistently neglecting her duties as the Director of Pupil Services.

98.     Plaintiff did in fact participate in a webinar on "March 18, 2025" at 7:00 PM ET." The webinar was well after work hours, well after any duties she had to perform within Defendant CBSD, and not in conflict with her duties of Defendant CBSD. Moreover, it was a (no-cost) free webinar wherein Plaintiff made no income simply to help mentor or educate fellow educators. Despite this, Defendants continuing in the vein of utter falsity in their SOC implied Plaintiff's activities <u>interfered with</u> her performance of her job duties.

99.     When asserting the kitchen-sink styled rationale for Plaintiff's termination herein, Defendants knowingly provided this false justification for Plaintiff's termination. By way of examples only (and further elaboration):

> (1) Plaintiff never communicated directly with the Board about any employment matters, HR questions, or terms and conditions of my employment. Plaintiff followed the chain of command. The one-time Plaintiff tried to report child abuse concealment to the Board; Plaintiff was rejected from any communication(s) and in fact redirected to HR and Yanni (or counsel for CBSD). Yanni had in fact also instructed that he be the only conduit to the Board for management within CBSD. Claiming Plaintiff was supposed to get direct "approval" from the Board for anything is a blatant fallacy.

(2) Plaintiff was approved in prior years for similar speaking events by a prior Superintendent, just as she was approved for the March 18, 2025, event. Yanni had even signed Plaintiff's professional credentialing certification (on February 20, 2025) to participate in consulting if Plaintiff had desired (wherein he explained it was of no concern).

(3) It has been known throughout Defendant CBSD that Plaintiff was an adjunct professor at the University of Pennsylvania for the past two (2) years. Yani and Plaintiff had discussed this in the past as well. This was not approved by the Board Members directly, as Plaintiff always followed her chain of command.

(4) At any point in time, Plaintiff properly obtained approval from the highest executive of Defendant CBSD (who was a direct liaison to the Board and spoke for the Board, as the Board did not communicate directly with staff, faculty or administrative professionals). In sum, Plaintiff has never done anything wrong. Plaintiff always erred on the side of over disclosure and transparency.

**[O] <u>Plaintiff was singled out for termination in a disparate manner further evidencing blatant retaliation.</u>**

100.    Yanni (Superintendent) and Heinman (Principal) were removed from Defendant CBSD prior to Plaintiff via SOCs (and have termination proceedings pending). Yanni: (a) misled police; (b) concealed abuse or neglect; (c) downplayed allegations; (d) lied to parents about allegations; and (e) handled many aspects of his job improperly. Heinman: (a) intimidated witnesses; (b) tried to conceal abuse or neglect; (c) had an improper relationship with a faculty member accused of abuse attempting to shield her; and (d) impeded cooperation with investigations. A comparison of their conduct is inapposite to that of Plaintiff. These two individuals were of course culpable of misconduct and were justifiably terminated, as they were directly involved in aspects of a child abuse investigation and/or communications with law enforcement.

101.    Plaintiff was however a throw-in *for a retaliatory termination* for made-up and falsified pretextual reasons. This is evidenced by Defendants' s*elective enforcement* and administration of discipline or termination against others. By way of examples only:

(1) Nadine Garvin ("Garvin") was identified by an agency as misleading police, failing to contact Childline, and for other misconduct. Defendants represented that Garvin was involved as a police contact, part of investigations, and knew of allegations of abuse or neglect. Garvin was not disciplined or terminated, and she never received an SOC (as did Plaintiff). And Garvin directly handled all aspects of any investigation and was intimately aware of the "confidential" investigation of human resources. Despite actually engaging in gross misconduct, she was treated far more favorably than Plaintiff.

(2) Defendants <u>claim</u> in their SOC against Plaintiff that Kathleen Veisz (Veisz), a special education manager overseeing four (4) schools (including Jamison), knew of abuse or neglect, was involved in factfinding, and was involved in decision-making relative to retention of Aussprung and McDaniel. Yet, Defendants issued Veisz a warning and required retraining on mandated reporting.

(3) Defendants <u>claim</u> in their SOC against Plaintiff that Deneen Dry (Dry), a staff nurse and Union President, knew of abuse and neglect before Plaintiff (in mid-2024). Yet, Defendants never warned, disciplined, terminated or issued an SOC to Dry for not calling Childline or engaging in mandated reporting.

(4) Trawinski (Human Resources Manager) who was intimately involved with Freiling's investigation, concealment, and coordination with Yanni to cover up abuse (and who failed to make a Childline report) was not issued an SOC, disciplined or terminated. Unlike Plaintiff, she decided to retire with no consequences entitling her to benefits denied to Plaintiff.

(5) Defendants <u>claim</u> Cara Alderfer (a Teacher and CBEA Union President) was on the phone during the fact finding 11/15/24 and was an alleged witness to supposed discussions of abuse allegations by Klein. To Plaintiff's knowledge, she was not disciplined, placed on leave or terminated by CBSD. Nor was she subjected to an SOC.

(6) Defendants <u>claim</u> Kathy Moelter (a Teacher and CBEA Union Representative) was present in the room during the fact finding on 11/15/24 and was a witness to supposed discussions of abuse allegations. To Plaintiff's knowledge, she was not disciplined, placed on leave or terminated. Nor was she subjected to an SOC.

(7) Defendants <u>claim</u> Vanessa Carey ("Carey" - a Behavioral Analyst) was aware of abuse allegations in October and November of 2024 (even within Plaintiff's SOC). She never made a Childline report. She was not disciplined, retrained, terminated or subjected to an SOC.

102.    All of the above individuals knew of abuse allegations directly or before Plaintiff was to learn about anything. Unlike Plaintiff, several of them actually failed to intervene, take any action, or call Childline (as contended by Defendants). Yet, none of them were subjected to termination. And in fact, other than Veisz, none of them were even subjected to retraining or discipline.

103.    To Wright's knowledge, even the Board Members were being updated about abuse allegations. "A mandated reporter" also includes: "An individual paid or unpaid, who, on the basis of the individual's role as an integral part of a regularly scheduled program, activity or service, is a person responsible for the child's welfare or has direct contact with children." *See* § 6311(a)(7)(emphasis added). **Yet, not a single Board Member initiated a Childline complaint**.

104.    Edward Diasio (Solicitor for Defendants) did not contact or make a Childline report despite being involved in discussions about abuse allegations. A "mandated reporter" also includes: "An attorney affiliated with an agency, institution, organization or other entity, including a school or regularly established religious organization that is responsible for the care, supervision, guidance or control of children." *See* § 6311(a)(11) (emphasis added).

105.    Many other people and employees did not make Childline reports despite having **more information** than Plaintiff (and much sooner), yet they were not counseled, terminated, or even so much as retrained. *Plaintiff, a nearly 3-decade consummate professional who chose to speak up (because of who she is) in the face of abuse downplaying and concealment, had her entire career sacked based upon an SOC that is not actually grounded in law or fact.*

> **[O]  The snowball effect of Defendants' retaliatory behaviors continued unmitigated.**

106.    Plaintiff initiated a 3/3/25 whistleblower complaint spanning 13 pages. In the nearly 2 months predating her involuntary leave, Defendants never provided Plaintiff with any

response(s), findings, or conclusion(s) to her complaints. In fact, Plaintiff was denied such a conclusion or finding even through termination (and thereafter).

107.    In Plaintiff's 3/3/25 whistleblower complaint, Plaintiff wrote:

> Complaints about sexual harassment by Karen Smith ("Smith"). Wright verbally complained on numerous occasions that Karen Smith (a well-known Board Member who repeatedly conducts herself inappropriately in a public forum) was publicly disparaging her to community members both verbally and in writing and in essence claiming she only obtained her employment contract because of "quid pro quo" for alleged sexual favors. Smith publicized numerous iterations of her claims. Wright even memorialized such concerns to you and Freiling dated October 17, 2024. Wright demanded remedial action and District support for what she called "sexual harassment." This is statutorily protected activity under Title VII and Title IX. No meaningful remedial action was undertaken by CBSD.

108.    Despite that Plaintiff made repeated complaints of sexual harassment and inappropriate actions by Smith (including within her 3/3/25 whistleblower complaint), Defendants didn't even consider or require having Smith abstain from directly deciding to remove and terminate Plaintiff.

109.    Defendants entirely botched the suspension process, as constitutional principles and protections required Plaintiff ***to be paid until she received hearing***. Yet, Defendants cut off Plaintiff's pay upon charging her in June of 2025 with a fictional SOC, constituting a clear pre-hearing deprivation of due process. *See* Count III *infra*.

110.    Plaintiff was not paid, constituting a pre-hearing deprivation of due process on suspension, and she was retaliatorily removed from her job and terminated (in violation of numerous laws, protections, and contrary to her contract protections).

111.    Defendants had never raised any concerns with Plaintiff's performance or handling of any matter(s) within Defendant CBSD in October, November, or December of 2024, or in January, February, or March of 2025 (a period of 5-6 months predating her whistleblower

complaint). And Plaintiff was removed from work in May of 2025 without so much as a discussion on issues that might be the subject of an SOC.

## Count I
## Violations of Title VII of the Civil Rights Act of 1964 ("Title VII")
### (Retaliation)
### - Against Defendant CBSD Only -

112.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

113.    Plaintiff made internal complaints of "sexual harassment" verbally and again embodied in her 3/3/25 whistleblower complaint.

114.    A determinative factor in Plaintiff's job removal and subsequent termination from employment was such protected activities.

115.    Plaintiff's job removal and subsequent termination constitute violations of Title VII, and Plaintiff properly exhausted her administrative filing(s) with the Equal Employment Opportunity Commission ("EEOC") before timely filing this lawsuit.

## Count II
## Violations of Pennsylvania's Whistleblower Law ("PWL" - 43 P.S. §§ 1421 *et. seq.*)
### (Retaliation)
### - Against All Defendants -

116.    Plaintiff was an "employee" as defined by §1422, as she was "a person who perform[ed] a service for wages or other remuneration under a contract of hire, written or oral, express or implied, for [her] employer."

117.    Defendant CBSD was at all times an "employer" as defined by §1422, as it is a "school district." And "individual liability" is expressly authorized under the Pennsylvania Whistleblower Law. *See Ingram v. Dunbar,* 2024 U.S. Dist. LEXIS 174204, at *13 (W.D. Pa. 2024)("the Pennsylvania Whistleblower Law allows for individual liability").

118. Plaintiff made good-faith reports of "wrongdoing" to protect herself, the public, and children.

119. Plaintiff's original job removal and subsequent termination for reporting "wrongdoing" constitutes violations of the Pennsylvania Whistleblower Law.

**Count III**
**Violations of Due Process Rights**
**(under state and federal constitution), through 42 U.S.C. § 1983**
**(Failure to Pay During Suspension)**
**- Against All Defendants -**

120. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

121. Plaintiff was initially suspended with pay on or about May 2, 2025, but by June of 2025, Defendants ceased paying Plaintiff once they ostensibly figured out what to document as purported reasons for Plaintiff's job removal (via the SOC).

122. Plaintiff was not given the opportunity to assert via brief any response to charges against her until July 15, 2025 (for a decision made via hearing by the Board Members) on August 21, 2025. Plaintiff was then notified of her termination or about August 25, 2025, via email.

123. Plaintiff had property and due process entitlements prior to removal from her job without pay. In *Moorehead v. Sch. Dist. of the City of Allentown*, 2023 U.S. Dist. LEXIS 66450, at *56 (E.D. Pa. 2023), a School District converted an involuntary paid leave to an involuntary leave prior to a hearing. In *Moorehead*, the court explained this is clearly a violation of an employee's due process entitlements and rights. *Id*.

124. In *Moorehead*, the court explained "courts in this Circuit consistently find that absent extraordinary circumstances, a public employee with a property interest in their job **is**

**entitled to a hearing prior to an unpaid suspension or termination**." *Id*, citing *Schmidt v. Creedon*, 639 F.3d 587, 596 (3d Cir. 2011); *Vatner v. Bd. of Trs. of the Univ. of Med. & Dentistry of N.J.*, 2015 U.S. Dist. LEXIS 13135 at *34 (D. N.J. 2015).

125.    Defendants mishandled many aspects of anything related to child abuse allegations and Plaintiff's leave. Defendants' incompetence and intent to retaliate thus culminated in irrefutable due process violations of Plaintiff (in violation of her constitutional rights).[9]

**Count IV**
**First Amendment Retaliation (through 42 U.S.C. § 1983)**
**(Retaliation)**
**- Against All Defendants -**

126.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

127.    Plaintiff engaged in numerous complaints that constitute First Amendment protected activities.

128.    Plaintiff was removed from her job and terminated for engaging in First Amendment Protected Activities.

129.    Defendants' actions constitute violations of Plaintiff's constitutional rights, and in particular, the First Amendment of the United States Constitution.[10]

---

[9] The Board Members specifically participated in and undertook the actions alleged in this Count against Plaintiff. They are individually liable. Plaintiff also asserts Monell liability against Defendant CBSD. An action by Board Members constitutes a representation of "policy" and ratification of "policy" sufficient to hold Defendant CBSD liable in addition to such individual Board Members. See Moorehead v. Sch. Dist. of the City of Allentown, 2023 U.S. Dist. LEXIS 66450, at *24 (E.D. Pa. 2023)(a decision by a School Board is sufficient to invoke Monell liability of the District as a whole).

[10] The Board Members specifically participated in and undertook the actions alleged in this Count against Plaintiff. They are individually liable. Plaintiff also asserts *Monell* liability against Defendant CBSD. An action by Board Members constitutes a representation of "policy" and ratification of "policy" sufficient to hold Defendant CBSD liable in addition to such individual Board Members. *See Moorehead v. Sch. Dist. of the City of Allentown, 2023*

### Count V
### Breach of Contract
### -Against Defendant CBSD only -

130.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

131.    Plaintiff entered into an employment contract whereby Defendant CBSD could only terminate her for "cause" identified statutorily.

132.    In her nearly 3-decade career, Plaintiff was never warned or disciplined, including in 4 years at Defendant CBSD. Plaintiff was not even provided with an opportunity to explain, respond or to even know what allegations were going to be lodged against pre-May 2025 job removal.

133.    § 11-1122 only permits a termination for cause whereby a "professional employee" engages in "immorality, incompetency, intemperance, cruelty, persistent negligence, mental derangement, . . . or persistent and willful violations of the school laws of this Commonwealth."

134.    While Plaintiff contends she **did nothing wrong at all,** the legislature "intended to protect tenure except for serious charges" and even proving negligence requires a District to demonstrate a continued course of conduct "*in the face of warnings by superiors*." *See Lauer v. Millville Area Sch. Dist.*, 657 A.2d 119, 121 (Pa. Commw. Ct. 1995).

135.    Plaintiff was not warned, not given any opportunity to cure, and she engaged in no-caused based rationale for her termination. Plaintiff thus sues herein for breach of contract as to her job removal, non-pay, and termination. *See e.g. Moffitt v. Tunkhannock Area Sch. Dist.*, 2013 U.S. Dist. LEXIS 181603, at *21 (M.D. Pa. 2013)(a plaintiff is permitted to sue a school

---

U.S. Dist. LEXIS 66450, at *24 (E.D. Pa. 2023)(a decision by a School Board is sufficient to invoke *Monell* liability of the District as a whole).

district for breach of contract where her terms of employment are governed by § 1122 and she asserts not having engaged in a cause-based reason for her separation).

136.    Defendant CBSD breached its contract with Plaintiff.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.    Defendants are to promulgate and adhere to a policy retaliation and constitutional violations in their workplace;

B.    Defendants are to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, and benefits.  Plaintiff also expressly seeks reinstatement to her prior job position while being made whole for all losses.

C.    Plaintiff is to be awarded actual damages, as well as damages for the pain, suffering, and humiliation caused by Defendants' actions;

D.    Plaintiff is to be awarded punitive damages as permitted by applicable law in an amount believed by the Court or trier of fact to be appropriate to punish Defendants for their willful, deliberate, malicious, and outrageous conduct and to deter Defendants or other employers from engaging in such misconduct in the future;

E.    Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate;

F.    Plaintiff is to be awarded the costs and expenses of this action and a reasonable attorney's fees as provided by applicable federal and state law; and

G.    Plaintiff is to receive a trial by jury.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By:

Ari R. Karpf, Esq.
Christine E. Burke, Esq.
Eight Neshaminy Interplex, Suite 210
Trevose, PA 19053
215-639-0801 (P)
215-639-4970 (F)

Dated: September 18, 2025

# Exhibit A



# KARPF, KARPF & CERUTTI, P.C.

ATTORNEYS AT LAW

8 Interplex Drive, Suite 210
Trevose, PA 19053
Tel: (215) 639-0801
Fax: (215) 639-4970
akarpf@karpf-law.com

March 3, 2025

**SENT VIA EMAIL ONLY AT**
**syanni@cbsd.org**

Steven Yanni, Superintendent
Central Bucks School District
20 Weldon Drive
Doylestown, PA 18901

**THIS LETTER IS *NOT* FOR**
**SETTLEMENT PURPOSES OR**
**GOVERNED BY R.Evid. 408**

    **Re:**    **Alyssa Wright – Complaint against the CBSD Administration**

Dear Dr. Yanni:

    This Firm had been retained to represent Alyssa Wright ("Wright") during her ongoing employment at Central Bucks School District ("CBSD") *and in anticipation of* potential litigation (should litigation become necessary). On behalf of Wright, I am lodging legal complaints for which Wright seeks <u>immediate remedial action</u> and an independent investigation of her concerns (unless *by expansion of scope,* such further investigation may be effectively accomplished by Dr. Dalton in her ongoing investigation).[1]

    **[A]** <u>Purpose of this Letter</u>

    There are three (3) primary reasons this letter is being submitted: (1) Wright seeks that CBSD reverse course and *promptly cease concealing abuse and neglect (that occurred);* (2) Wright has formed the opinion that you are attempting to create a pretextual basis (inclusive of scapegoating her) in the future to admonish or terminate her for prior legally-protected and statutorily-protected complaints; and (3) Wright seeks that her complaints herein be independently investigated (or included with the scope of Dr. Dalton's more (currently) limited investigation). This letter will take you through a step-by-step (methodical) analysis of Wright's concerns, complaints, requests for investigation, and understanding of abuse concealment.

    **[B]** <u>The Blueprint of Concealment and (Anticipated) Scapegoating</u>

    Both Wright and this Firm have now had the opportunity to extensively investigate, learn about, and understand what transpired with respect to abuse and neglect of students (as outlined *infra*).

---

[1] This letter is not for settlement purposes. This letter is a formal complaint, and it shall be utilized as an exhibit in subsequent litigation in the event any adverse action is taken against Wright.

1. ***Wright works in an exceedingly high-level leadership position, handles matters on a global scale for CBSD, and <u>did not work within the physical location</u> of suspected child abuse.***

CBSD, the third largest school district in Pennsylvania (of more than 500 school districts), spans 120 square miles, operates through more than 20 schools, and maintains a student census of approximately 17,000 students per annum.

Wright physically works at 16 Welden Drive, Doylestown, PA 18901 (an administrative building and the Education Services Center). The alleged child abuse occurred at Jamison Elementary School (hereinafter, referred to as "Jamison"). Jamison is located at 2090 Land Road, Jamison, PA 18929. Jamison is one of 15 elementary schools within CBSD, and there are separately 5 middle schools, and 3 high schools.

Wright's job title is that of "Director of Pupil Services." In this capacity, her department is comprised of five main divisions: (1) Gifted Services; (2) Special Education Services; (3) Health Services; (4) Student Services; and Title IX. Wright (directly and indirectly) oversees administrators, supervisors, and hundreds of special education teachers. She is responsible for thousands of students indirectly in 23 schools of CBSD (as to gifted programs, special education, and other academic programs). She is responsible for approximately 17,000 total students per year concerning any Title IX matter(s) or Title IX investigations, and she oversees central registration, nursing staff, and a host of other personnel. Wright also oversees programming, communications as to accreditation and regulatory oversight, and legal compliance and governance. *Stated differently, she isn't a hall monitor at Jamison.* Wright is a high-level executive of CBSD relying upon proper management, teaching, nursing, and oversight by more than 500 employees under her purview (mostly indirectly).

It would frankly be **<u>outrageous</u>** to insinuate that Wright was <u>negligent in any manner</u> for not noticing some form of abuse within Jamison by staff therein (a physical location she did not even work within).

2. ***The October 11, 2024, isolated concern regarding JP and immediate responsiveness of Wright.***

On October 11, 2024, Wright was contacted by Kathleen (a/k/a Katie") Veisz (hereinafter, "Veisz"). Veisz informed Wright that there had been a report a student ("JP" for privacy purposes) had been seen naked in a classroom. JP is a non-verbal autistic minor child. Veisz is a Supervisor of Special Education. Wright <u>directed</u> Veisz <u>to immediately investigate</u> the matter and to communicate with (and interview) staff in that classroom about the concern (which included primarily Gabby McDaniel – "McDaniel").

Pennsylvania • New Jersey • New York

Unfortunately, self-removal of clothing and disrobing is a common occurrence for many children with autism. Veisz reported back after her investigation to Wright explaining *inter alia*: (a) staff including McDaniel was interviewed; (b) McDaniel indicated JP removed his own clothing to avoid particular classroom tasks; (c) McDaniel permitted JP to remain in class naked for a period of time to demonstrate that such behavior would not going to eliminate JP's participation expectations; and (d) McDaniel attempted to curb a behavior of JP by not immediately redressing him (and letting him remain naked).

McDaniel explained this was an isolated attempt to curb JP's undressing behaviors to avoid a task. Veisz educated and instructed McDaniel she is never to permit a student who disrobes to remain undressed for any period of time, regardless of rationale or attempted education. Veisz shared with Wright that it appeared to be an isolated incident from everything she knew and investigated, McDaniel was fully re-educated on proper handling of dressing and undressing of any student (including JP), and Veisz believed the matter was fully resolved. In fact, McDaniel assured Veisz she would immediately redress any autistic students going forward.

To ensure absolutely and unequivocal transparency, Wright <u>directed</u> Veisz to <u>immediately</u> contact the parents of JP (one of whom also served as a School Board member) and to disclose everything that she and Wright knew had occurred during the incident. The parents of JP explained they totally understood, appreciated the re-education of the staff member, and thanked Veisz for informing them ***so fast and on the same day*** of review and investigation of the matter. To Wright's knowledge (at that time), the matter was: (1) isolated; (2) a single instance; (3) simply a matter of re-education; and (4) the parents of JP were very satisfied with the handling of the matter by Veisz and Wright. **<u>Quite notably, the parents may be contacted (as of today) and will still confirm and testify that they believe Veisz and Wright acted appropriately, honestly, and flawlessly with what they knew at that snapshot in time</u>**.

3.  ***From October 11, 2024, until December 26, 2024, Wright was intentionally kept in the dark about and concerning any known or suspected abuse at Jamison.***

Wright has ***a reputation of***: (a) <u>immediately</u> seeking to protect students; (b) seeking to open and demand <u>full investigations</u> where there are any possible concerns of student health or safety at issue; (c) demanding full transparency to everyone, including parents; and (d) ensuring accountability for those involved.

In light of this reputation – until December 26, 2024 – you and other CBSD administrators attempted to proverbially bury and conceal abuse allegations **<u>without</u>** any meaningful input, knowledge, or notice to (or from) Wright. But by late December of 2024 (and into January of 2025), you were experiencing a containment problem resulting in information spreading throughout the district. <u>CBSD's concealment from Wright, someone entrusted with participating in investigations for and on behalf of CBSD is outrageous</u>.

4. ***To Wright's complete shock, she learned on December 26, 2024, that a detailed report and complaint of child abuse was lodged in writing on November 18, 2024 (47 days or 6-plus weeks earlier) by Alyssa Klein, the Personal Care Assistant ("PCA") working in the classroom with McDaniel.***

As explained more *infra*, Wright would come to learn on December 26, 2024, that 47 days or 6-plus weeks earlier, a full written report (hereinafter, the "Report") alleging eye-witnessed abuses had occurred with students. Alyssa Klein ("Klein"), a PCA, who worked in the very classroom with McDaniel had lodged a written report on November 18, 2024,[2] of abuse to Deneen Dry ("Dry"), CBESPA President. The Report alleged that Gabby McDaniel ("McDaniel") and Rachel Ausspring ("Ausspring"), a Teacher and Educational Assistant (respectively) engaged in numerous student abuses.

The Report (spanning nearly 7 pages) was particularly egregious and extremely concerning, as it outlined:

As to JP:

- He was left in the bathroom for 5 – 30 minutes masturbating (or as described – self stimulating).
- He was frequently left undressed and visible to everyone.
- Faculty laughed and mocked JP as to how he continually took out his penis and would dry hump the tile floor.
- When JP was face down humping the floor clothed or naked, it was joked about that was his "bathroom time."
- JP was sent to the bathroom anytime faculty saw he had a "boner."
- JP would be left naked laying on the floor despite the presence of classmates or staff.
- JP suffered head trauma from aggressive actions by staff.
- JP was dragged throughout the classroom.
- JP was frequently yanked or pulled in aggressive manners.
- JP was refused beverages or water by staff causing him to be thirsty and negatively impacting his ongoing therapy.
- JP was not allowed to use the bathroom when needed at times.
- JP faced abusive punishments such as being placed in the vestibule, having to walk barefoot on woodchips outside, and other aggressive mistreatment. Staff would comment "I bet those wood chips don't feel good."

This is just a summary of some examples given in the Report by Klein. An objective review of the Report would make anyone sick to their stomach.

---

[2] Robert Freiling, Director of Human Resources, issued a Memorandum dated 12/12/24 identifying the date of Klein's "November 14, 2024" report.

Pennsylvania • New Jersey • New York

<u>As to other students</u>:

- Hitting was tolerated amongst students causing injuries (by student-on-student violence).
- Students were left in the bathroom or on the toilet for unreasonable timeframes (even for example for up to 45 minutes).
- Student misbehaviors and violence were ongoing jokes amongst staff, as if the children with autism were some type of zoo animals (and not human beings).
- One child would bang his head, even on the cement ground, and it was not prevented despite being observed by staff.
- Staff would say which children they did not "like."
- Other children were punished, including having to walk barefoot on woodchips.

Overall, there were explicit allegations of violence, improper restraints, water and food deprivation, physically harmful punishments, and perpetuation and exacerbation of disorders resulting from abuse and neglect. <u>These were non-verbal autistic children who were abused and neglected</u> by staff because the students annoyed or frustrated such staff solely for having disabilities.

5. **Despite CBSD having the aforesaid Report as of November 18, 2024, Wright was not part of any investigation(s) or information sharing but still was being <u>very diligent</u> through late December of 2024.**

Dave Heinman ("Heinman") was (and remains) the Principal of Jamison (the physical location of suspected abuse). On November 14, 2024, around 7:30 AM, Heinman contacted Wright (via phone) and inquired about whether he can terminate the Personal Care Assistant ("PCA" - Klein) working with JP because McDaniel was *claiming* the PCA was purportedly rude to McDaniel. Wright advised Heinman that if he had a concern with the PCA's demeanor towards another employee, he should address the concerns to Human Resources management. <u>This will be later referenced (in this letter) as a red flag you (and the administration) chose to ignore - - that Heinman *appeared to be trying to retaliate against a whistleblower (or mandated reporter)*.</u> Heinman's intent was unknown to Wright at the time.

Around 6:30 PM on November 14, 2024, Dry contacted Wright (via phone) and only generally informed Wright that she learned Klein griped about McDaniel not following "classroom protocols." Unaware of any details of what Dry meant, Wright suggested that Klein should raise any concerns with Heinman (overseeing school matters as principal). Dry responded Klein can't speak with Heinman because of a "strange or inappropriate relationship" between him and McDaniel. <u>This will be later referenced (in this letter) as a red flag you (and the administration) chose to ignore - - that Heinman *appeared to be in an inappropriate relationship with McDaniel*.</u> Wright said any concerns then should be reported by Dry immediately to human resources, and Dry acknowledged she would do so.

At the direction of Wright, Veisz went in person to Jamison on November 15, 2024. Despite interacting with staff and observation, Veisz was unable to witness anything about protocols not being followed (the only information shared with Wright or Veisz). Wright just wanted to make sure protocols were being followed albeit not having actual details of anything complained about.

During the afternoon of November 15, 2025, Robert Freiling ("Freiling"), the Human Resources Director of CBSD, stated he was going to conduct a "fact finding." Management at the fact-finding meeting included Freiling, Heinman, Nadine Garvin ("Garvin") - Assistant Superintendent), and Veisz. This management knew Wright was unable to participate in the fact-finding because Wright had a prescheduled Title IX legal meeting. Veisz contacted Wright to update her about what had transpired during the meeting. The meeting involved generalities about mishandling of students or protocols not being followed, and *Freiling* – **leading the meeting** – *determined there was* a consensus *that neither McDaniel or Ausspring needed to be suspended or placed on any type of administrative leave.*[3]

Wright was not included in any fact-finding by Freiling regarding the students, she was not updated by Freiling of any details, and she was not provided with any documents of any allegations by Klein about McDaniel or Ausspring. Instead, on November 18, 2024, during discussions about other topics, Freiling asked Wright if she could make time the following day to observe McDaniel's classroom and let him know if she observes any protocols not being followed. Of course, Wright made time to do so.[4] On November 19, 2024, Wright observed classes conducted by McDaniel. Wright saw nothing concerning, albeit that should come as no surprise when high-level leadership is physically observing a teacher's class. She nonetheless reported her observations promptly to Freiling.

The first actual documentation Wright was privy to (and which was shared with her) was **on December 12, 2024**. Freiling, had taken sole responsibility for handling the aforesaid fact-finding from an HR standpoint. A 5-page "Memorandum" about Klein's concerns was prepared and copied to 8 people: (1) Dr. Steven Yanni, Superintendent; (2) Dr. Nadine Garvin, Assistant Superintendent for Elementary Education; (3) Alyssa Wright, Director of Pupil Services; (4) David Heineman, Principal for Jamison Elementary School; (5) Theresa Everett, Human Resources Manager; (6) Christine Trawinski, Human Resources Manager; (7) Cara Alderfer, CBEA President; and (8) Deneen Dry, CBESPA President.

Completely corroborating that Wright had no involvement in any investigation or factfinding, the 12/12/24 Memorandum confirmed Wright's *only involvement* was directing Dry to mention any concerns she was aware of to Human Resources (on 11/14/24). What however was most concerning about Freiling's 12/12/24 Memorandum was:

(1) Klein's original 7-page complaint with examples was not provided to Wright or others to know what allegations were being made (or to know what to watch for in classes).

---

[3] As of November 14th, and 15th, Freiling was apparently only sharing very limited and generalized information from a verbal complaint by Klein (that was not memorialized by Klein until 11/18/24).

[4] **By this timeframe, Freiling likely had a 7-page chronology of abuses by Klein which he was not disclosing or sharing with Wright (or other important personnel that should have been provided with abuse allegations by Klein). Freiling was likely operating under the perspective that the less people that knew anything, the better and more easily he could contain any fallout (while giving the impression outwardly there were observations by others occurring - - despite that those observing didn't even know the allegations).**

Pennsylvania • New Jersey • New York

(2) Freiling had substantially diluted Klein's allegations (via mere generic, single-sentence summaries) in his 12/12/24 Memorandum *making the allegations seem far less serious than a review of the Klein report would demonstrate*. Wright would only learn about this on December 26, 2024 (explained below).

(3) Freiling identified that the action plan would be just to have more observation, more structure, and more training (of staff members accused of serious abuse).

(4) The 12/12/24 Memorandum **"<u>validated</u>" that: (a) Heinman showed "favoritism," had an "unprofessional relationship," and was too "close" as to his relationship with McDaniel; and (b) "multiple reports" expressed "apprehension" of any "reporting" to Heinman, as well as concerns that Heinman "would not" address complaints.**

Freiling was the highest-level management employee overseeing human resources for all of CBSD. He reported directly to you. Because he wrote a conclusive report that re-training and observation was required **after** conferring with you, Wright immediately prepared performance-improvement plan documentation for execution. **<u>However</u>**, verbally Wright was asking relevant management why this staff was not being placed on leave (or removed) to protect the students. By December 16, 2024, Wright was – ***via email*** – asking you, Heinman, Freiling, and Garvin why this staff is not being removed from their roles at the school. Wright couldn't understand why potentially abusive staff were being kept on premises and only being given educational training (at the risk of children's safety).

**<u>For the first time on December 26, 2024</u>**, Wright was provided with Klein's original 11/18/24 Report (the 7-page statement of abuse and neglect) by Edward Diasio, Esq. (Solicitor for CBSD). Wright had to inquire via email about what she was even looking at and what she was provided. You responded that it was Klein's complaints *previously investigated*. This again prompted Wright (who was now totally shocked) to ask – via email – why this staff was not being removed from their jobs.

**<u>Post-December 26, 2024</u>**, Wright had become **<u>very vocal</u>** that she didn't previously understand or know about specific allegations of abuse (which she found very troubling), that CBSD handled the abuse allegations improperly, and that she was concerned about abuse that occurred was essentially being subject to a cover up. In short, Wright was very distressed that alleged child abusers were also still overseeing students.

6. **As of November of 2024, you and HR management dropped the proverbial ball in <u>very serious</u> and specific ways, failing the students and the District. And Wright strongly believes there was an attempted coverup as well.**

CBSD's unequivocal and irrefutable failures include but are not limited to as follows:

**As to Heinman**:

(1) There had become widespread rumors that Heinman had an inappropriate romantic relationship with McDaniel, but <u>at the very least</u> had an extremely inappropriate relationship with substantial favoritism. Such concerns were even identified as "validated" in factfinding by Freiling. **Despite this, CBSD did not investigate this relationship <u>and</u> took no action towards Heinman for such gross misconduct.**

(2) On the same day Klein was presenting as a whistleblower (11/15/24) reporting abuse by McDaniel, Heinman was attempting to (ostensibly) retaliatorily terminate Klein (and was communicating with HR about how to terminate Klein). **Despite Heinman's apparent attempts at retaliation <u>to protect McDaniel</u>, CBSD did not investigate or take any action against Heinman for such gross misconduct.**

(3) All of the alleged abuse and neglect towards autistic students occurred in Jamison wherein Heinman was the Principal. He oversaw operations, interacted with faculty, and was responsible for what occurred on premises. **No investigation of Heinman took place for his lack of oversight and neglect.**

(4) The 12/12/24 Memorandum validated that Heinman did not address legitimate "concerns" of faculty on premises and that people were apprehensive about making any complaints out of fear of retaliation. **No investigation of Heinman took place, and he was not counseled or disciplined for his gross misconduct in this regard.**

(5) The District permitted Heinman, who had an inappropriate relationship with McDaniel, *to participate in giving input including keeping her employed* and merely giving additional education while such abuse allegations were pending (**<u>even counting his vote in a fact-finding meeting to keep such staff employed</u>**). **No investigation or exclusion of Heinman as having a conflict of interest took place by CBSD.**

There is simply no other conclusion than that Heinman was directly responsible for not stopping or preventing abuse within his own elementary school (Jamison). **Yet, CBSD never once investigated him or contemplated any disciplinary action of him.**

**As to McDaniel and Ausspring**:

(1) By 11/18/24, Freiling and other higher-level leadership of CBSD (<u>not</u> Wright) knew of a 7-page outline of specific physical, mental and potentially sexual abuse of JP. The allegations were very serious. **Yet, neither Ausspring nor McDaniel were ever removed from work even for a single day (being permitted to continue abuse (or potential abuse) day after day).**

(2) In late December 2024, Ausspring decided to take a medical leave. In mid-January of 2025, McDaniel decided to take medical leave. **Neither returned, but they were permitted to work for 1.5 months and 2.5 months respectively despite ongoing allegations of serious abuse and "validated" concerns of abuse and neglect. In fact, the only way students of CBSD wound up actually being protected from these 2 staff members is by virtue of their own voluntary decisions to cease working for CBSD (taking leaves of absences). Why would such staff members not be removed from work (as requested by Wright)** *pending* **retraining or education (**<u>if</u>** they are retained) so that no further abuse or neglect occurs (as to misunderstanding how to handle autistic, non-verbal children with disabilities)?**

<u>**As to You (Yanni), Freiling, and Garvin (collectively "You"):**</u>

(1) You concealed the specific allegations for approximately 6 weeks (from 11/18/24 – 12/26/24) of abuse and neglect from numerous members of leadership, including Wright.

(2) You diluted and synthesized allegations of abuse and neglect to leadership, the Board, parents, and to the Police Department.

(3) You, in my opinion, misled local police by downplaying the nature of allegations and minimizing concerns during a police investigation. *Did you actually keep the 2 staff members employed who were abusing children (at the risk of such children) just to further the optical impression that nothing serious happened in the district?* **Because this is the only conclusion I can draw from such retention**.

(4) You failed to remove, suspend or place on administrative leave 2 staff members accused of very egregious abuse.

(5) You failed to engage in an iota of investigation for gross misconduct of Heinman or to engage in discipline or termination of Heinman, despite validated concerns with his misconduct and non-oversight of his school.

(6) Jim Pepper (a Board Member and licensed attorney himself) will even confirm that you (Yanni) **directly lied to him** about scope of the abuse, the nature of the allegations, and downplayed what transpired until he would later see the 11/18/24 memo from Klein. Pepper would also confirm that you (Yanni) curated and marginalized allegations to minimize any police involvement in CBSD.

(7) You have failed to properly communicate to third parties, parents and others that the PDE has founded negligence and abuse of children under the care of CBSD.

(8) Your own 12/12/2024 factfinding memorandum concluded (among other conclusions) that children were subjected to restraint, had tables "violently pushed" into them and this was later confirmed by the Pennsylvania Department of Education ("PDE"). In addition to keeping this type of staff working, they were not recommended by CBSD for more severe discipline (other than additional education, observation, and a plan for better performance).

**In sum, as a relatively new Superintendent, you put a preference towards optics of having an unblemished entry into your role at CBSD over protecting children and students**.

7. ***Despite Wright being excellent at her role, a vocal protector of students, and a very thorough investigator and overseer of her divisions - - you appear to be targeting her as a "scapegoat" for all the above-referenced failures*** <u>***by You***</u>.

As a result of complaining about the handling of the investigation and opposing further concealment:

(1) You have sought to find ammunition <u>to smear</u> Wright by having your husband (Kevin) submit right-to-know requests to Wright's former employer(s), which is grossly inappropriate and frankly outrageous. *There is no reasonable explanation for this behavior.*

(2) You have excluded Wright from decision making, matters, meetings, communications, and issues that involve her own department. You have created a tiered system within your own leadership team, one in which Wright is almost always excluded. This is despite that Wright is supposed to have an investigatory component to her role in many types of situations affecting CBSD.

(3) You directed Wright to cancel all communications with the Pennsylvania Department of Education ("PDE") *purportedly to get clarification* regarding the corrective action plan that concluded there was abuse and neglect within CBSD. However, this could objectively viewed as an intent to stall or not cooperate entirely (consistent with further efforts of containment and concealment).

(4) You are meeting with the solicitor in matters (or cases) involving Wright, without her involvement.

(5) You have been hostile in demeanor and communications towards Wright, as if you are searching for a pretext within which to blame someone for your own neglectful and deceitful oversight of CBSD.

**[C]** **In what appears to be a witch-hunt to redirect blame and to feign pretext for mistreatment, ostracism or potential termination of Wright - - you are engaging in retaliation for her previously engaging in statutorily or constitutionally protected activities.**

In the last six (6) months (through today), Wright has engaged in the following statutory or constitutionally protected activities:

**(1)** <u>**Complaints about sexual harassment by Karen Smith ("Smith")**</u>. Wright verbally complained on numerous occasions that Karen Smith (a well-known Board Member who repeatedly conducts herself inappropriately in a public forum) was publicly disparaging her to community members both verbally and in writing and in essence claiming she only obtained her employment contract because of "*quid pro quo*" for alleged sexual favors. Smith publicized numerous iterations of her claims. Wright even memorialized such concerns to you and Freiling dated October 17, 2024. Wright demanded remedial action and District support for what she called "sexual harassment." This is statutorily protected activity under Title VII and Title IX. **No meaningful remedial action was undertaken by CBSD.**

**(2)** <u>**Complaints about sexual harassment by Kevin Marton ("Marton")**</u>. Marton was a principal, charged with 2 felonies (later reduced wherein he was given probation). CBSD permitted Marton to return to work, <u>created</u> a job for him so he could remain paid in full, and let him resume working for CBSD in August of 2024 with an active criminal no contact order. He is Wright's ex-husband who was – from her vantage point – stalking her and wanting to reconcile. Wright complained on numerous occasions that he was not permitted to have contact with her legally and you created opportunities to allow him to be present in the same location as her, and that she viewed this as ongoing sexual harassment. Despite repeated (and ongoing) complaints, **no meaningful remedial action was undertaken by CBSD.** This is statutorily protected activity under Title VII and Title IX (and Wright even complained such action(s) and inaction(s) of CBSD was a "Title IX" violation.

**(3)** <u>**Complaints about non-inclusion in investigation, abuse concealment, and mishandling of 2024-2025 investigation of non-verbal autistic students at Jamison**</u>.

Wright specifically told you (Yanni) that she believed there were concerns and mishandling of the investigation. In particular, Wright has objected to concealment, impropriety, mishandling, and a host of administration negligence. She herself has engaged in whistleblowing and First Amendment Protected Activity.

This is not intended to serve as an all-inclusive or exhaustive list of state or federally-protected concerns expressed by Wright in the last approximate six (6) months, but rather, a summary of some clear (and recent) examples.

**[D] Because Wright believes You are attempting to fabricate a pretext for scapegoating her for her aforesaid protected activities, she offers *some* examples of comparators to illustrate any action towards her would be viewed as discriminatory and retaliatory.**

I provide examples below where staff or faculty have engaged in very serious misconduct, yet **no** supervisor, principal, or management-level employee was held accountable, disciplined, or terminated. CBSD has *a long history* of only terminating offending staff members and never counseling, disciplining, or terminating management or leadership-level employees. To do so with Wright would be both pretextual and completely discriminatory in light of CBSD's established record.

**(1) Dave Heinman**. This principal permitted abuse under his watch, had an inappropriate relationship with the abuser, has a record of retaliation and failing to resolve employee concerns – and yet – CBSD has taken no action with respect to him. *He has not been held accountable for his failures or lack of oversight within his own building*.

**(2) Kate Mallon**. This guidance counselor repeatedly came to work intoxicated. There were many complaints about her acting erratic, smelling of alcohol, and being inappropriate. After years of such impropriety, a principal was finally compelled to approach her at which time she ran from the building and abandoned her job. *Despite failing oversight and gross neglect of the administration, no supervisor or management-level employee faced consequences or was terminated.*

**(3) Joe Ohrt.** This former music was known or suspected of ongoing sexual abuse, corruption of minors, and other impropriety. He was criminally charged and sentenced to 2.5 – 5 years in prison. *Despite concerns of Ohrt's impropriety for years and his subsequent arrest and conviction, no supervisor or management-level employee faced consequences or was terminated for poor oversight.*

**(4) Michael London**. This former math teacher was criminally charged with corruption and sexual conversations with a minor. *Despite ongoing concerns with his inappropriate behavior for a long time, no supervisor or management-level employee was held accountable for a lack of oversight.*

I am just providing herein a short sampling of examples wherein staff or faculty engage in gross misconduct, and **no supervisor or management was held accountable**. There are a multitude of other examples, including a custodian crashing into the Lenape Middle School causing repairs for months to be necessary while under the influence of drugs or alcohol. Despite being aware of ongoing problems with the custodian, management (such as the Director of Operations) was not held accountable. If litigation becomes necessary, other examples will be provided. In sum, singling out Wright for adverse action or a termination for something that happened in 1 of over 20 schools she indirectly had oversight of would be: (a) false; (b) retaliatory; and (c) contrary to established CBSD practices.

## <u>CONCLUSION</u>

This letter is intended to serve as a sweeping indictment of how CBSD has completely mishandled all aspects of the abuse allegations outlined *ad nauseum supra* and to serve as an **EXHIBIT** (in litigation, if necessary) of a formal complaint that Wright is lodging as of this date in the event that she is disciplined, blamed, terminated, or faces any other adverse action impacting her career. As explained early in this correspondence, Wright seeks inclusion of her complaints in this letter to be part of an independent and neutral investigation. She remains prepared to continue cooperating with any and all investigations (related or unrelated to her concerns herein).


Very Truly Yours,

**KARPF, KARPF & CERUTTI, P.C.**

*/s/ Ari R. Karpf*
Ari R. Karpf


cc:    Robert Freiling (via email only at rfreiling@cbsd.org)
       Leigh E. Dalton (via email only at ldalton@stockandleader.com)
       Edward A. Diasio, Esq. (via email only at ediasio@wispearl.com)
       Susan Gibson (via email only at sgibson@cbsd.org)

Pennsylvania • New Jersey • New York

# Exhibit B

# CENTRAL BUCKS SCHOOL DISTRICT

## 16 Welden Drive
## Doylestown, PA 18901

## June 18, 2025

## STATEMENT OF CHARGES

TO:    **VIA CERTIFIED MAIL/RETURN RECEIPT REQUESTED**

**VIA EMAIL**
Alyssa Wright
4720 Franklin Circle
Pipersville, PA 18947

This is to inform you that at a meeting of the Board of School Directors of the Central Bucks School District held on June 18, 2025, the School Board passed a motion charging you with violations of the Code of Professional Practice and Conduct for Educators, the Individuals with Disabilities Education Act ("IDEA"), American with Disabilities Act ("ADA"), and Child Protective Services Law, as well as incompetency, persistent negligence in the performance of duties, willful neglect of duties, and persistent and willful violation of or failure to comply with the school laws of this Commonwealth, including established policy of the board of directors. A copy of that Resolution is attached hereto, made a part hereof, and marked **Exhibit "A"**.

You will have a public hearing before the Board of School Directors within the time limits specified in § 11-1127 of the Public School Code, unless otherwise agreed upon. **This is not a final determination of the status of your employment. You remain employed, but on unpaid administrative leave pending a final decision on the District's recommendation of dismissal.**

The Charges that form the basis of this Statement of Charges are based upon the following:

## BACKGROUND

1.    Alyssa Wright is a professional employee employed as the Director of Pupil Services for the Central Bucks School District.

1

## LEGAL BASIS FOR TERMINATION OF PROFESSIONAL EMPLOYEE

2.      The Public School Code, 24 P.S. § 11-1122(a), provides that:

> *"(a) The only valid causes for termination of a contract heretofore or hereafter entered into with a professional employe shall be...incompetency; ...persistent negligence in the performance of duties; wilful neglect of duties...; persistent and wilful violation of or failure to comply with school laws of this Commonwealth, including official directives and established policy of the board of directors..."* 24 P.S. § 11-1122(a)

3.      The Code of Conduct for Educators embodied in 22 Pa. Code Chapter 235 requires all professional educators to abide by the Public School Code of 1949 and further provides, in part, in §235.5a and §235.5c as follows:

> *In fulfillment of the commitment to students, educators under Section 235.5a: "(1) Shall exercise their rights and powers in good faith and for the benefit of the student."*
>
> *In fulfillment of the commitment to the profession, educators under Section 235.5c: "(1) Shall comply with all Federal, State, and local laws and regulations and with written school entity policies," and "(6) Shall accurately report all information required by the local school board or governing board, state education agency, Federal agency or State or Federal law."*

4.      Policy 113.1 of the Central Bucks School District provides in its pertinent parts:

> *"The district shall develop and implement Positive Behavior Support Plans and programs for students eligible for Special Education services who require specific interventions to address behaviors that interfere with learning."*

5.      Policy 113.2 of the Central Bucks School District provides in its pertinent parts that:

> *"The Superintendent or designee shall maintain and report data on the use of restraints, as required."*

6.      Policy 317 of the Central Bucks School District provides in its pertinent parts that:

> *"When engaged in assigned duties, district employees shall not participate in activities that include but are not limited to the following: "(8) Failure to comply with directives of district officials, security*

2

*officers, or law enforcement officers," and "(12) Conduct that may obstruct, disrupt, or interfere with teaching, research, service, operations, administrative or disciplinary functions of the district, or any activity sponsored or approved by the Board."*

7.    Policy 340 of the Central Bucks School District provides in its pertinent parts that:

**"Each employee shall maintain a standard of care and concern for supervision, control and protection of students, commensurate with assigned duties and responsibilities."**

8.    § 35.160(a)(1) of the American with Disabilities Act provides in its pertinent parts that:

*"(1) A public entity shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others."*

9.    22 Pa. Code 14.133 provides in its pertinent parts that:

*"School entities shall maintain and report data on the use of restraints as prescribed by the Secretary."*

*"The use of restraints to control the aggressive behavior of an individual student or eligible young child shall cause the school entity to notify the parent of the use of restraint and shall cause a meeting of the IEP team within 10 school days of the inappropriate behavior causing the use of restraints, unless the parent, after written notice, agrees in writing to waive the meeting."*

*"(e) The following aversive techniques of handling behavior are considered inappropriate and may not be used by agencies in educational programs: (2) Punishment for a manifestation of a student's disability, (3) Locked rooms, locked boxes or other structures or spaces from which the student cannot readily exit, … (5) Deprivation of basic human rights, such as withholding meals, water or fresh air,(7) Treatment of a demeaning nature..."*

10.   23 Pa.C.S.A. § 6303(b.1) provides in its pertinent parts:

*"(b.1) Child abuse.--The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following: (1) Causing bodily injury to a child through any recent act or failure to act…; (3) Causing or substantially contributing to serious mental injury to a child through*

*any act or failure to act or a series of such acts or failures to act... (5) Creating a reasonable likelihood of bodily injury to a child through any recent act or failure to act...; (7) Causing serious physical neglect of a child; (8) Engaging in any of the following recent acts: (ii) Unreasonably restraining or confining a child, based on consideration of the method, location or the duration of the restraint or confinement..."*

11.   23 Pa.C.S.A. §  6311(a)(4) provides in its pertinent parts:

*"(a)  Mandated reporters.-- The following adults shall make a report of suspected child abuse, subject to subsection (b), if the person has reasonable cause to suspect that a child is a victim of child abuse: (4) A school employee."*

12.   23 Pa.C.S.A. § 6311(b) and (c) provides in its pertinent parts:

*"Basis to report.-- (1)  A mandated reporter enumerated in subsection (a) shall make a report of suspected child abuse in accordance with section 6313 (relating to reporting procedure), if the mandated reporter has reasonable cause to suspect that a child is a victim of child abuse"*

*"(c)  Staff members of institutions, etc.--Whenever a person is required to report under subsection (b) in the capacity as a member of the staff of a medical or other public or private institution, school, facility or agency, that person shall report immediately in accordance with section 6313 and shall immediately thereafter notify the person in charge of the institution, school, facility or agency or the designated agent of the person in charge. Upon notification, the person in charge or the designated agent, if any, shall facilitate the cooperation of the institution, school, facility or agency with the investigation of the report. Any intimidation, retaliation or obstruction in the investigation of the report is subject to the provisions of 18 Pa.C.S. § 4958 (relating to intimidation, retaliation or obstruction in child abuse cases)."*

13.   23 Pa.C.S.A. § 6313 provides in its pertinent parts:

*"(a)  Report by mandated reporter.-- (1)  A mandated reporter shall immediately make an oral report of suspected child abuse to the department via the Statewide toll-free telephone number under section 6332 (relating to establishment of Statewide toll-free telephone number) or a written report using electronic technologies under section 6305 (relating to electronic reporting)."*

4

## FACTUAL HISTORY

14.  Alyssa Wright ("Wright") is employed as the Director of Pupil Services for the Central Bucks School District (the "District").

15.  Mandated reporters are legally required to immediately report suspected child abuse if the person has reasonable cause to suspect that a child is a victim of child abuse. See 23 Pa.C.S.A. § 6313.

16.  Wright's status as a school employee makes her a mandated reporter in accordance with 23 Pa.C.S.A. § 6311(a)(4).

17.  On October 11, 2024, Kathleen Veisz ("Veisz"), a District Supervisor of Special Education, informed Wright that a student in a special education classroom (hereinafter referred to as "Jamison Classroom") at Jamison Elementary School was kept naked during instruction while Teacher and the Education Assistant ("EA") were present. Wright was informed that the Teacher made the decision to not cover the student.

18.  Wright was informed by Vanessa Carey ("Carey"), a Board Certified Behavior Analyst, of multiple ongoing concerns with Teacher in Jamison Classroom.

19.  Specifically, Carey informed Wright that a student was allowed to remain naked and masturbate in the classroom, a student was allowed to sit on the toilet for 45 minutes, and an EA moved a table towards a student to get him to focus on work restricting the student's movement.

20.  Carey communicated on an ongoing basis with Wright about her concerns with the roughness of approaches the Teacher and EA implemented in Jamison Classroom.

21.  On November 14, 2024, Deneen Dry ("Dry"), CBESPA President, called Wright to inform her that PCA Alyssa Kline ("Kline") raised concerns of neglect and abuse in Jamison Classroom.

22.  The concerns expressed by Dry during the phone call with Wright were the same concerns of the neglectful and abusive treatment of students in Jamison Classroom that were raised by Carey.

23.  Specifically, Wright was alerted that students were made to sit in the toilet until a red ring appeared on their skin, students' bodily movement were restricted to their workstations, a student was left masturbating in the bathroom while the PCA watched, and a student regularly hit other students in the classroom.

24.  The concerns communicated with Wright on November 14, 2024 raised reasonable suspicion that students in Jamison Classroom may have been subjected to abuse and unlawful restraints.

5

25.     Wright willfully and negligently failed to file a Childline report on November 14th, 2024, which constitutes incompetency, willful neglect of duties, and persistent and willful violation of the law.

26.     In light of the conversation described above, Wright asked the Special Education Supervisor Katie Veisz to observe Jamison Classroom on November 15, 2024.

27.     On November 15, 2024, Veisz observed Jamison Classroom but did not see any concerning behaviors during her observation.

28.     The fact that Veisz did not observe any concerning behaviors on November 15, 2024 is not dispositive that the allegations of neglect and abuse were not truthful as staff change their behavior when high-level leadership is physically observing a class.

29.     On November 15, 2024, Rob Freiling ("Freiling"), the Director of Human Resources, and Christine Trawinski ("Trawinski"), Human Resources Manager, met with Kline and Dry concerning the allegations of neglect and abuse in Jamison Classroom.

30.     The allegations accused the Teacher and Education Assistant ("EA") of Jamison Classroom of allowing a student to remain naked in the classroom, publicly masturbate in the classroom, mocking students, depriving students access to water, tampering with a non-verbal student's communication device, failing to regularly implement the communication device to allow the non-verbal student to communicate, and physically restraining multiple students in their workstation.

31.     Freiling informed Wright that the allegations made by Kline were serious.

32.     On the same day, Freiling, Trawinski, Kline, Dry, Veisz, Nadine Garvin, the District Assistant Superintendent of Elementary Education, and David Heineman, Principal of Jamison Elementary School, met with Teacher to allow her to respond to the allegations.

33.     During the meeting with Teacher, the specific allegations of abuse and neglect raised by Kline were discussed.

34.     After the meeting with Teacher on November 15, 2024, Veisz and Garvin informed Wright of the specific allegations of abuse described in the meeting.

35.     Wright knew that Teacher utilized inappropriate aversive techniques for handling behavior by denying a student access to water and placing students in spaces they could not readily exit to deter them from hitting and disrobing. These techniques are prohibited under 22 Pa. Code §14.133(e). (**See Exhibit B, hereinafter referred to as "PDE RISC Report").**

36.     Depriving access to water is a deprivation of a basic human right and it is an inappropriate aversive technique to utilize in a special education classroom under 22 Pa. Code 14.133.

6

37.     Restraining students in spaces from which they cannot readily exit is prohibited by 22 Pa. Code 14.133(e).

38.     Wright willfully, negligently, and unlawfully failed to file a Childline report on November 15th, 2024 despite being a mandated reporter, which constitutes incompetency, willful neglect of duties, and persistent and willful violation of the law.

39.     Wright failed to assure the safety of students in Jamison Classroom by willfully and persistently failing to alert Human Resources of the seriousness of the abusive techniques Teacher was utilizing against the students in Jamison Classroom and failing to persistently supervise Jamison Classroom to ensure that the proper techniques were implemented.

40.     On November 19, 2024, Wright observed Jamison Classroom and found no evidence of improper behavior by Teacher or EA. However, Wright is aware that Teacher behavior may have been influenced by the presence of a high-level administrator observing her classroom.

41.     Therefore, the observation conducted by Wright on November 19, 2024 was not sufficient to ensure that adequate procedures and techniques were practiced in Jamison Classroom. The observation alone was an insufficient response to the allegations of neglect and abuse conveyed to Wright on November 14, 2024 and November 15, 2024 as it failed to critically address the significant allegations of unlawful restraints, deprivation of water, tampering with a non-verbal student's communication device, disrobing and public masturbation concerns, as well as other concerns with the Teacher's rough implementation of aversive techniques.

42.     On November 20, 2024, Wright spoke with Rob Freiling, the District's Director of Human Resources. Wright confirmed during the phone conversation that she was aware of the allegations of abuse in Jamison Classroom, yet Wright declined to provide her input stating that Freiling and Veisz spoke enough about the matter, which constitutes incompetency and persistent and willful neglect of her duties.

43.     On November 20, 2024, Wright willfully and negligently failed to engage with the HR investigation into the allegations of abuse despite her input being specifically requested by Freiling.

44.     On December 12, 2024, Wright received the findings of the Human Resources investigation into the allegations of abuse. The findings validated that a student was allowed to remain undressed and masturbate in the classroom and in the bathroom, a student was restricted from accessing water, and that students were restrained in their workstation. **(See Exhibit C, hereinafter referred to as the "December 12th Memorandum").**

45.     On the same day, Carey communicated with Wright about ongoing concerns with how Teacher and EA treat students in Jamison Classroom. **(See Exhibit D, hereinafter referred to as the "E-Mail From Vanessa Carey to Alyssa Wright, dated December 12, 2024").**

7

46.     In the e-mail from Vanessa Carey to Alyssa Wright, dated December 12, 2024, Carey explicitly stated: "I am very concerned about the way [Student] is being treated...I am concerned with [Teacher] around children period." Id.

47.     Wright failed to report the unlawful restraints validated in the December 12th Memorandum on December 12, 2024 to the Pennsylvania Department of Education in accordance with 22 Pa. Code Section 133(c)(5), which constitutes incompetency, willful neglect of duties, and persistent and willful violation of District policy and the law.

48.     Wright failed to report the specific allegations of abuse and neglect despite acknowledging the significant concerns validated in the December 12th Memorandum and the ongoing concerns with Teacher's treatment of students in Jamison Classroom.

49.     Although Wright raised the question as to why the Teacher and EA were still in Jamison Classroom, Wright agreed that an action to remove Teacher from Jamison Classroom should be taken only after another documented issue of Teacher ignoring plans and directives.

50.     Wright failed to ensure that the IEP plan of a student in Jamison Classroom was timely revised to address his increase in negative behaviors as a result of the inappropriate aversive techniques that were utilized as required under 22 Pa. Code §14.133(c)(1).

51.     Wright persistently, willfully, and negligently disregarded her duties by failing to involve herself in the fact-finding investigation into the allegations of abuse, failing to immediately file a Childline report despite being aware of allegations of abuse on November 14, 2024 and November 15, 2024, failing to report the validated findings of unlawful restraints on December 12, 2024 to the Pennsylvania Department of Education, failing to file a Childline report in light of the validated concerns present in the December 12th Memorandum, and failing to supervise and ensure adequate techniques in Jamison Classroom were being followed.

52.     Wright's response to the severe allegations of abuse and neglect falls below the standard of care and concern for supervision, control, and protection of her students in Jamison Classroom.

53.     Wright's contract states as follows: "The Director shall devote her full time, attention, energy, skills, and labor to her employment as Director of Pupil Services during the term of this Contract and any lawful extensions. The Director may undertake consultative work, speaking engagements, and other services related to her profession, provided that such activities do not interfere with the performance of the duties of the Director of Pupil Services under this Contract, and provided that such activities are approved in advance in writing by the School Board, which approval shall not be unreasonably withheld or delayed."

54.     Wright engaged in speaking engagements on March 18, 2025 without approval of the Board. **(See Exhibit E, hereinafter referred to as the "March Speaking Engagement").**

55.     Wright improperly engaged in outside speaking events and commitments while persistently neglecting her duties as the Director of Pupil Services.

8

56.    As a result of its investigation, the District recommended Alyssa Wright be terminated from her position as the Director of Pupil Services.

## GENERAL INFORMATION

The Board of School Directors and the District Administration will be represented by separate counsel in this proceeding.

YOU HAVE THE RIGHT TO ATTEND THE BOARD HEARING. YOU HAVE THE RIGHT TO BE REPRESENTED BY COUNSEL. BY WAY OF THIS LETTER, WE ARE INFORMING YOU THAT YOU SHOULD REMIT THIS LETTER IMMEDIATELY TO YOUR LEGAL COUNSEL. YOU AND YOUR COUNSEL WILL HAVE THE RIGHT TO HEAR ALL TESTIMONY CONCERNING THE CHARGES AGAINST YOU, TO EXAMINE ALL WITNESSES TESTIFYING AT THE HEARING, AND TO OFFER TESTIMONY ON YOUR OWN BEHALF. ALL TESTIMONY AT THE HEARING WILL BE TRANSCRIBED BY A COMPETENT, DISINTERESTED PUBLIC STENOGRAPHER AT THE BOARD'S EXPENSE.

THE HEARING WILL BE HELD AT 16 WELDEN DRIVE, DOYLESTOWN, PA 18901. THE BOARD WILL ULTIMATELY RULE ON YOUR STATUS AFTER STUDYING AND REVIEWING THE TESTIMONY OFFERED AT THE HEARING.

BOARD OF SCHOOL DIRECTORS OF THE CENTRAL BUCKS SCHOOL DISTRICT

By: _____
Board President

Attested By: _____
Board Secretary

DATED: 10/19/205

9

# Exhibit C

## SWORN DECLARATION OF KATHLEEN VEISZ

I, Kathleen Veisz, am an adult individual and I make this Sworn Declaration ("Declaration") under penalties of perjury and subject to false swearing. I am also aware that this Declaration may be used in future legal proceedings.

1.      I joined the Central Bucks School District ("CBSD") in August 2008 and have proudly served in a variety of roles over the past 17 years.

2.      For the first ten years of my career, I was a special education teacher at Doyle and Butler Elementary Schools. In 2018, I transitioned to the role of Special Education Program Specialist, which I held for approximately three years before becoming a Supervisor of Special Education in 2021. In my current role as a supervisor, I am not based in any one school; my office is located at the district administration building at 16 Welden Drive in Doylestown. I have been responsible for overseeing special education programming across four elementary schools - Jamison, Pine Run, Titus, and Warwick - encompassing roughly 32 special education teachers, 71 support staff, and more than 400 students with Individualized Education Programs (IEPs).

3.      I have also managed K–12 occupational therapy and physical therapy services in partnership with Austill's Educational Services. My responsibilities have extended to several district-wide initiatives, including serving on the district MTSS Leadership team, the district Teaching and Learning Team, and representing elementary special education supervisors in the district's math and writing initiatives.  As an elementary supervisor, I have also played an integral role in facilitating the transition process from Early Intervention to school-age services for new families coming into the district across all the schools I supervise.

4.      Until on or about Friday, May 2, 2025, I was supervised by Alyssa Wright ("Wright"). I stopped being supervised by Wright on this date for – among other reasons – she was placed on an involuntary (indefinite) leave pending termination by CBSD.

5.      Prior to May 2, 2025, Wright had been employed by CBSD as the Director of Pupil Services. It is my understanding that - in this capacity – Wright oversaw five main divisions: (1) Gifted Services; (2) Special Education Services; (3) Health Services; (4) Student Services; and (5) Title IX. Moreover, from my knowledge, communications, and direct work experience, it was my general understanding that:

(a) Wright (both directly and indirectly) oversaw administrators, supervisors, hundreds of special education teachers, counselors, psychologists, social workers, behavior analysts, and support staff;

(b) Wright was responsible for thousands of students indirectly in 23 schools of CBSD (as to gifted programs, special education, and other academic programs);

(c) Wright was responsible for approximately 17,000 total students per year concerning any Title IX matter(s) or Title IX investigations, and she oversaw central registration, nursing staff, and a host of other personnel; and

(d) Wright also oversaw programming, communications as to accreditation and regulatory oversight, and legal compliance or governance.

6.       From consistent interaction and work with Wright on a daily and weekly basis with her as my manager, I stated the following about her:

(a) She was (and remains) known for having a reputation of honesty and integrity;

(b) She was an excellent manager who was very responsive, addressed concerns promptly, exhibited an amazing level of knowledge and passion, and served as an excellent mentor;

(c) She was very well liked and respected by peers, staff, and colleagues, as well as by parents, third parties, and our administration as a whole; and

(d) She was what I refer to as a no non-sense Director of CBSD who demanded immediate reviews, immediate investigations, proper documentation, and any potential concerns to be addressed fast and correctly.

7.       I am aware that on or about March 3, 2025, Wright - through legal counsel - sent a letter (the "3/3/25 Whistleblower Letter") to the highest level of CBSD administration, its Board, its legal counsel, and to a third-party investigator. I am aware that within the 3/3/25 Whistleblower Letter, Wright complained that: (a) child abuse had occurred with Jamison Elementary School ("Jamison"); (b) there was abuse concealment and an attempted coverup by CBSD; and (c) there was an inappropriate relationship with then principal (Dave Heineman – "Heineman") and abusive faculty; and (d) *numerous other concerns*.

8.       To my knowledge, Wright had blown the whistle on numerous legal concerns as of March 2025, which in turn: (a) prompted a pattern of retaliation against her and myself; and (b) prompted CBSD additional investigation(s) by a third-party investigator. It was Wright's courage in this regard that served as a catalyst for ultimate remedial action that had not previously taken place; and which unfortunately led – in my opinion - to her retaliatory removal from her role in May of 2025.

9.      I was asked by Wright's legal counsel (Ari Karpf - "Karpf") to review a "Statement of Charges" against Wright dated June 18, 2025. This Statement of Charges contained approximately four (4) pages of (claimed) "Factual History." I was completely shocked at how skewed asserted facts were, as well as misleading.

10.      The Statement of Charges at Paragraph 17 states:

> 17.      On October 11, 2024, Kathleen Veisz ("Veisz"), a District Supervisor of Special Education, informed Wright that a student in a special education classroom (hereinafter referred to as "Jamison Classroom") at Jamison Elementary School was kept naked during instruction while Teacher and the Education Assistant ("EA") were present. Wright was informed that the Teacher made the decision to not cover the student.

11.      Paragraph 17 is, in my opinion, falsely and misleadingly included to give the untrue impression that Wright should have been aware of suspected or potential child abuse as of "October 11, 2024." The actual truth (and reality) was:

(a) I informed Wright that a non-verbal autistic child was seen naked in the classroom (within Jamison).

(b) This would not put anyone on notice of abuse or suspected abuse. It is common knowledge and can be easily reviewed in a matter of minutes with a simple google or online search that a large percentage of autistic children have "disrobing behavior," also known as "undressing behavior." Such children unfortunately continually remove their clothing habitually. Our faculty have dealt with such concerns on an ongoing basis within CBSD as to autistic children, as aforesaid, it is a common characteristic of autism.

(c) Instead of just shrugging her shoulders and saying that is what autistic children do at many of our schools, Wright requested me to immediately investigate and communicate with the classroom faculty. I did so. And I formed the opinion based upon my conversation with the faculty that the issue was an isolated incident (as would anyone with the information available at the time). I further re-educated the faculty to ensure knowledge of processes (acknowledged by such faculty).

(d) I believe many high-level managers in Wright's role would have done nothing, not even requiring me to investigate. Again, this is because it is common knowledge that autistic children undress, sometimes run around naked making a teacher give chase, and faculty have to continually redress such students. Yet, Wright asked me

to immediately check out the issue and to re-educate the faculty member on proper prompt redressing.

(e) Not only did Wright direct investigation and re-education (as to what most would ignore), but she also required me to also ensure full transparency with the parents of the student. In this vein, Wright directed me to contact the child's parents and to explain that their child was seen naked and what had transpired. The parents were very thankful, acknowledged their child was prone to undressing, and expressed appreciation for the promptness of the contact.

12.     I am so troubled by how misleading the Statement of Facts is in reference to the October 11, 2024, timeframe.

13.     The Statement of Charges at Paragraphs 26-28 state:

26.     In light of the conversation described above, Wright asked the Special Education Supervisor Katie Veisz to observe Jamison Classroom on November 15, 2024.

27.     On November 15, 2024, Veisz observed Jamison Classroom but did not see any concerning behaviors during her observation.

28.     The fact that Veisz did not observe any concerning behaviors on November 15, 2024 is not dispositive that the allegations of neglect and abuse were not truthful as staff change their behavior when high-level leadership is physically observing a class.

14.     In paragraphs of the Statement of Charges leading up to Paragraphs 26-28, CBSD attempts to portray Wright as having knowledge of "ongoing" abuse in the weeks or month preceding November 15, 2024. Such assertions are grossly distorted, inaccurate, and contrary to my beliefs. The actual truth (and reality) was:

(a) Wright told me she was contacted by Heineman on or about November 14, 2025, saying he was expressing an interest or intent to potentially terminate Alyssa Klein ("Klein"), a Personal Care Assistance ("PCA"). Wright had the impression from Heineman there was friction in the classroom amongst faculty at the school from her short communication with Heineman. She shared this with me.

(b) Wright told me she was also contacted by Deneen Dry ("Dry"), CBESPA President, who informed Wright a faculty member (Klein) appears to have raised some type of issues with classroom protocols. She shared this with me.

(c) From my communications with Wright, it was very apparent and clear to me that Wright was unaware of any suspected or actual abuse occurring in the weeks or month preceding November 15, 2024.

(d) Within less than 24 hours of hearing from Dry and Heineman, Wright directed me to observe the classroom in Jamison (during the very next classroom sessions). I did so, and I observed nothing concerning, protocols were followed, and I reported to Wright the absence of any concerns from my vantage point.

15.      I am honestly so troubled by how misleading the Statement of Charges is in reference to claiming Wright knew of actual or suspected abuse by November 15, 2024. Indeed, I was involved with communications regularly and more closely overseeing the Jamison location than Wright. I was unaware of any actual or suspected abuse as of November 15, 2024.

16.      During the afternoon of November 15, 2025, Robert Freiling ("Freiling"), the Human Resources Director of CBSD, stated he was going to conduct a "fact finding." Management at the fact-finding meeting included Freiling, Heineman, Nadine Garvin ("Garvin" - Assistant Superintendent), Christine Trawinski ("Trawinski") and me. We all knew Wright had a prescheduled (unrelated) Title IX legal meeting, as she handled other legal investigations simultaneously. I contacted Wright to update her about what had transpired during the meeting. The meeting involved generalities about potential mishandling of students or protocols not being followed. Dialogue amongst these managers couched potential concerns as "personality conflicts" or a possible need for further instruction of staff.

17.      To my knowledge, Wright was not included in any fact-finding by Freiling regarding the students, she was not updated by Freiling of any details, and she was not provided with any documents of any allegations by Klein about McDaniel or Rachel Ausspring ("Ausspring")," the other faculty member working with Klein (within Klein's classroom).

18.      Heineman concealed anything occurring in Jamison from myself, Wright, and others. Freiling identified he was solely handling any fact-finding, and he did not involve Wright in that to my knowledge. In fact, as I will mention below, the Superintendent of CBSD was representing there was no abuse that had occurred. *How could I or Wright know anything about suspected or actual abuse by mid-November of 2024?*

19.      I was informed by Wright she had been asked by Freiling (ostensibly as part of Freiling's private fact-finding) to observe the Jamison classroom and let him know if she saw any protocols not being followed. Wright shared with me that she saw nothing concerning, and protocols seemed to have been followed. It's my understanding she explained her observations to

Freiling who continued to conduct his own private fact-finding investigation. She shared this with me.

20. As of November 20, 2024, it is my understanding Steve Yanni (Superintendent of CBSD) initiated a Childline Report. I learned this later. But below is an excerpt from a police report memorializing discussions with Yanni that has been shared with me (in conjunction with providing this Declaration):

> that classroom but is still currently employed by the school district. Dr. Yanni advised that there were no concerns of abuse. The Childline was made as a precautionary measure. On 11/22/24, I emailed Dr. Yanni (drsteveyanni@gmail.com) asking for a report of the school district's investigation. On 11/25/24, I called Dr. Yanni and left a voicemail asking for a copy of their investigative report for this incident. On 11/22/24 I called and spoke to Jim Pepper regarding the childline we received regarding his son. He was notified of an incident, but he was not given the details we were provided on the CY104. I explained to him that the school had done their own investigation and learned the allegations were unfounded. Pepper told

21. To my knowledge: (1) Wright was not provided with a single document as of November of 2024 illustrating any concern whatsoever of suspected or actual abuse; (2) Wright was not part of any fact-finding investigation, which was conducted solely by Freiling; and (3) the Superintendent who was <u>overseeing our entire District</u> (and the highest executive in Charge of CBSD) *who was coordinating with Freiling* was representing to the police even as of November 22, 2024 that "there were no concerns of abuse" and "the school had done their own investigation and learned the allegations were unfounded."[1]

22. A "Memorandum" was issued by Freiling dated December 12, 2024. It was, from what I understand, a comprehensive summary of his own fact-finding investigation which involved nobody but himself. For the first time, he referenced "validated concerns" of nudity, water restriction, and use of restraints (among other complaints). The Memorandum indicates the first report(s) of any concerns of potential abuse occurred on "November 14, 2024" (not earlier in October or the first half of November 2024).

23. To be crystal clear, Wright and I were kept in the proverbial dark about any actual investigation, any actual allegations, or anything that had been specifically reported (pertaining to abuse concerns). It was not until December 12, 2024, that either Wright or I learned of any detailed allegations (from a memorandum). I formed the opinion that Heineman, Freiling, Yanni, and Garvin, were concealing anything that occurred (or any complaints) from just about everyone

---

[1] Yanni had represented to the DRP that as of 11/20/24, he made a "report" to Childline "as a precaution or 'belt an suspenders' approach" (as there just appeared to be some minor concerns of mistreatment. *See* DRP Report, at p. 18, ¶ 14.

(including people like Wright who was known to be vocal and demand immediate redress of any situation).

24.     In light of the above, I am utterly shocked, disgusted, and appalled by the manner in which CBSD put together a story that is so knowingly and verifiably untrue about Wright being aware of actual or suspected abuse prior to December 12, 2024.

25.     By March 2025, it had become widely known publicly and internally that Wright was the whistleblower who reported and complained about many violations, including "abuse concealment." CBSD is, in my opinion, weaving a false narrative to get rid of Wright for retaliatory reasons claiming she did not timely report such matters to Childline. But the following comparisons cannot go unnoticed:

(1) The DRP concluded that "District Administrators, including Dr. Yanni, HR Director Freiling, <u>and Dr. Garvin</u>, withheld relevant information from Childline and then the police." The DRP also concluded they failed to properly report to Childline at all. **To my knowledge, despite that Garvin assisted with information falsification and failed to report to Childline, she was not disciplined, placed on leave, or terminated by CBSD**.

(2) Deneen Dry ("Dry") is a staff nurse and elected union official. She is identified in the Statement of Charges as supposedly discussing allegations of abuse with others. **<u>To my knowledge, she was not disciplined, placed on leave or terminated by CBSD</u>**.

(3) I believe I was retaliatory placed on leave with false discipline as a result of me participating in whistleblowing and supporting Wright. **<u>But despite me being accused (falsely) of knowing about actual or suspected abuse, I am not being terminated</u>**.

(4) Trawinski (Human Resources Manager) who was ostensibly intimately involved with Freiling's investigation, concealment, and coordination with Yanni to cover up abuse (and who failed to make a Childline report) **<u>is simply retiring without consequence (instead of being terminated unlike Wright at a loss to Wright's contractual and retirement benefits)</u>**.

(5) Cara Alderfer (CBEA Union President) was on the phone during the fact finding on November 15th and was witness to supposed discussions of abuse. To my knowledge, **<u>she was not disciplined, placed on leave or terminated by CBSD</u>**.

(6) Kathy Moelter (CBEA Union Representative) was present in the room during the fact finding on November 15th and was a witness to supposed discussions of abuse. **To my knowledge, she was not disciplined, placed on leave or terminated by CBSD**.

26.    The above examples are just more prominent, but there are certainly others who would have been more likely to know of suspected or actual abuse than Wright - - yet they did not face discipline, leave, or termination.

27.    In Paragraph 51 of the Statement of Charges, it states:

> 51.    Wright persistently, willfully, and negligently disregarded her duties by failing to involve herself in the fact-finding investigation into the allegations of abuse, failing to immediately file a Childline report despite being aware of allegations of abuse on November 14, 2024 and November 15, 2024, failing to report the validated findings of unlawful restraints on December 12, 2024 to the Pennsylvania Department of Education, failing to file a Childline report in light of the validated concerns present in the December 12th Memorandum, and failing to supervise and ensure adequate techniques in Jamison Classroom were being followed.

28.    I am truly at a loss in understanding the contents of Paragraph 51 for reasons including but not limited to:

(a) The superintendent (Yanni), the Assistant Superintendent (Garvin), the HR Director (Freiling), and the CBSD HR Team: (a) declined to include anyone in fact-finding; (b) indicated they were conducting fact-finding; and (c) were claiming they were responsible for overseeing any investigation.

(b) Wright didn't even know the details of any allegations or specifics about what or who to investigate (nor had been privy to an actual complaint in writing made by Klein).

(c) Was Wright supposed to be insubordinate to her management or co-management such as Yanni, Freiling, and others who claimed to be working with the Solicitor (counsel for CBSD) by starting her own investigation and possibly compromising or causing harm to a pending investigation?

(d) HR is supposed to conduct certain investigations, and I certainly would never refuse to listen to HR if I am told it is conducting a private investigation (or simply taking the lead on an investigation).

(e) Yanni had made a Childline complaint already (as of 11/20/24) and Warwick police were investigating any concerns initiated to Childline. As long as we as mandated reporters know the complaint is initiated about the issue or incident at hand, it is not my understanding *that for example 50 school employees* have to make the same complaint if they learn of the issue and know such a complaint was made to Childline already.

29.    In sum, I don't understand – except for blatant retaliation – why Wright would be accused of wrongdoing when it is so glaringly obvious that the Superintendent (who had the benefit of the solicitor as counsel) was coordinating with the highest levels of human resources to hide everything, conceal any abuse, and was lying to the police and DRP. Anyone who knows Wright would know that she would have immediately called Childline or taken the reigns of an investigation if she were afforded any details or had knowledge of suspected child abuse.

30.    I know Wright has a 25-plus year career in education. I have seen her passion for what she does and how much she cares about children, especially with special needs. It makes me so sad to know what Wright is experiencing is just such blatant reprisal and smearing of her career with completely contorted claims that are simply not accurate when I was no less intertwined in the entire scenario for which she is being pretextually released (allowing the benefit of contemporaneous knowledge of all circumstances).

*Kathleen Veisz*

_____
Kathleen Veisz

Date: 6/30/2025
      _____

# Exhibit D

## <u>SWORN DECLARATION OF VANESSA CAREY</u>

I, Vanessa Carey, am an adult individual and I make this Sworn Declaration ("Declaration") under penalties of perjury and subject to false swearing. I am also aware that this Declaration may be used in future legal proceedings.

1.    I have been employed by the Central Bucks School District ("CBSD") since around August of 2023. In the timeframe of September 2024, I began working at Jamison Elementary School ("Jamison"). I generally worked about 3 days per week at Jamison while working 1-2 days per week (or more) at another assigned school (or schools). During my entire duration of employment, I have worked for CBSD as a Board-Certified Behavioral Analyst ("BCBA").

2.    I am aware that Alyssa Wright ("Wright") worked at CBSD as a Director of Pupil Services, and that her tenure predated my hire. Having worked with Wright and having conferred with her on many occasions on work-related matters, I formed the opinion that: (1)

- She is very smart;

- She is very driven, technical, hard-working, and extremely caring and passionate about her job and students; and

- An all-around amazing Director, and highly qualified as simultaneously being a Certified Behavioral Analyst.

3.    In September of 2024, I was initially assigned to work at Jamison primarily and Central Bucks West High School ("CB West") 1-2 days per week. By October of 2024, I was assigned another school, Central Bucks East ("CB East"). One classroom at Jamison was overseen by Gabby McDaniel ("McDaniel) and Rachel Ausspring ("Ausspring"), a Teacher and Educational Assistant (respectively). This classroom is hereinafter referred to as the "McDaniel Classroom."

4.    Until (approximately) mid-November of 2025, I averaged spending about 2-4 hours per week in the McDaniel Classroom. By (approximately) mid-November of 2025, I had begun spending more time in the McDaniel Classroom because a faculty member in that classroom (Alyssa Klein – "Klein") ceased working in that classroom. Hence, additional assistance was required at times.

5.    A Statement of Charges ("the Charges") was provided to me where it appears that Alyssa Wright ("Wright") is accused of terminable offenses by CBSD. The Charges at Paragraphs 17 – 24 state:

17.    On October 11, 2024, Kathleen Veisz ("Veisz"), a District Supervisor of Special Education, informed Wright that a student in a special education classroom (hereinafter referred to as "Jamison Classroom") at Jamison Elementary School was kept naked during instruction while Teacher and the Education Assistant ("EA") were present. Wright was informed that the Teacher made the decision to not cover the student.

18.    Wright was informed by Vanessa Carey ("Carey"), a Board Certified Behavior Analyst, of multiple <u>ongoing</u> concerns with Teacher in Jamison Classroom.

19.    Specifically, Carey informed Wright that a student was allowed to remain naked and masturbate in the classroom, a student was allowed to sit on the toilet for 45 minutes, and an EA moved a table towards a student to get him to focus on work restricting the student's movement.

20.    Carey communicated <u>on an ongoing basis</u> with Wright about her concerns with the roughness of approaches the Teacher and EA implemented in Jamison Classroom.

21.    On November 14, 2024, Deneen Dry ("Dry"), CBESPA President, called Wright to inform her that PCA Alyssa Kline ("Kline") raised concerns of neglect and abuse in Jamison Classroom.

22.    The concerns expressed by Dry during the phone call with Wright were the <u>same</u> concerns of the neglectful and abusive treatment of students in Jamison Classroom that were raised by Carey.

23.    Specifically, Wright was alerted that students were made to sit in the toilet until a red ring appeared on their skin, students' bodily movement were restricted to their workstations, a student was left masturbating in the bathroom while the PCA watched, and a student regularly hit other students in the classroom.

24.    The concerns communicated with Wright on November 14, 2024 raised reasonable suspicion that students in Jamison Classroom may have been subjected to abuse and unlawful restraints.

6.    Paragraphs 44 - 45 of the Charges state:

44.    On December 12, 2024, Wright received the findings of the Human Resources investigation into the allegations of abuse. The findings validated that a student was allowed to remain undressed and masturbate in the classroom and in the bathroom, a student was restricted from accessing water, and that students were restrained in their workstation. (**<u>See</u> Exhibit C, hereinafter referred to as the "December 12th Memorandum"**).

45.    On the same day, Carey communicated with Wright about <u>ongoing</u> concerns with how Teacher and EA treat students in Jamison Classroom. (**<u>See</u> Exhibit D, hereinafter referred to as the "E-Mail From Vanessa Carey to Alyssa Wright, dated December 12, 2024"**).

7.    I take issue with the alleged facts, conclusions, and summary pertaining to my communications specified in the Charges. To be blunt, I not only disagree but believe them to be inaccurate and false. By way of example, I never even knew about the content listed in paragraph 19. Nor did I witness such incident(s). I believe that may have been an observation of Alyssa Klein ("Klein"), as she informed me of such an observation in late December 2024 when she told me of concerns she previously lodged to CBSD.

8.    First of all, between September to mid-November of 2024, I had very limited involvement within the McDaniel classroom. As aforesaid, I only worked therein several hours per week. Second, prior to December 12, 2024, I **<u>never once</u>** mentioned anything about "abuse" or

"neglect" in the McDaniel classroom. I am not using the 12/12/24 date to indicate I did in fact mention abuse or neglect on 12/12/24. I am just addressing each timeframe and date separately in this Declaration in reference to dates specified in the Charges (and I will address 12/12/24 date / email later in my Declaration).

9.      I have two (2) primary concerns with the Charges, which in my opinion, render them completely flawed: (1) they characterize ordinary communications about an autistic classroom (and autistic children) as if they are somehow ***notice*** of abuse or neglect; and (2) they represent I made statements or conclusions to Wright, which I did not make.

10.     Obviously, certain behaviors exist with some autistic children that do not exist with others. But in general, autistic children can exhibit the following types (or range) of behaviors:

- Biting;
- Self-harm or self-injury;
- Hitting;
- Avoiding eye contact;
- Rocking or swaying;
- Urinating or defecating on themselves;
- Smearing of feces on their body;
- Extreme gastrointestinal problems, such as constipation, diarrhea, and other complications requiring frequent or prolonged bathroom / toilet usage;
- Masturbation or self-stimming;
- Screaming;
- Extreme panic or distress symptoms;
- Sensory sensitivities;
- Impaired social interaction; and
- Many other complications, symptoms or behaviors including extreme aggression.

11.     The Charges against Wright are written as if any of these (bullet-point) symptoms or actions have occurred, anyone seeing them must be on notice of possible abuse or neglect. This doesn't make any sense, it is wrong and exhibits a complete misunderstanding of special education or autistic classrooms. Even assuming the most experienced professionals operate following every possible protocol and best practice, autistic children still disrobe, scream, require response blocking for acts of aggression or for the student's safety, and still may hit or bite and engage in many behavioral problems, self-injure, and endure significant gastrointestinal complications or toilet needs.

12.     My job is that of a BCBA wherein I review, observe, give feedback, and help teachers or faculty improve, give constructive recommendations, follow behavioral plans properly, and help increase the integrity of the behavioral plans being carried out by staff through behavioral skills training. That is my role, and many teachers in all classrooms I observe need ongoing support, recommendations, or feedback on best practices for managing student behavior.

13.     I have over 20 years of experience; and just in my role at CBSD alone, I have worked at approximately 8-9 schools so far. I have given feedback, constructive criticism,

corrective measures, and registered concerns at many of these schools to ensure best practices are followed (as well as supporting individual needs). Doing so in the McDaniel Classroom was no exception. If correcting faculty for not following or adhering to plans properly for some kids was tantamount to abuse, then CBSD would have abuse in all of the schools I worked within. There is a need for continuing education, continuing support, and continuing direction with respect to plans for autistic (and other disabled) children.

14.    We were so short staffed in September, October and November of 2024 that monthly meetings were being canceled for BCBAs to ensure we could provide necessary attention and review(s) in classrooms (to avoid compromising care). I was so busy basically running from classroom to classroom and school to school that I barely had any opportunity to have meaningful discussions with management, such as Wright during this timeframe.

15.    The Charges claim I told Wright of matters that rise to the level of "abuse" or "neglect" in October and November of 2024. That is simply not true. I never mentioned such concerns to Wright. First, I barely talked to Wright at all in the timeframe except for a few minutes here or there. Second, I didn't form any opinions in this time frame of neglect or abuse myself. Third, I had insufficient time in the McDaniel classroom during such a timeframe to discern abuse or neglect. Not only didn't I share with Wright anything that could be even reasonably construed as "abuse" or "neglect," I certainly did not do so on an "ongoing basis."

16.    I am troubled that my actual concerns are being distorted. I would be called to the McDaniel Classroom via walkie talkie to help with crisis management from time to time (especially after mid-November of 2025). Whether I was naturally in the classroom (when I expected to be) or called to the classroom, the autistic children therein had significant toilet usage complications, undressed at times, began self-stimming, and acted out in other ways. My goal was to train, critique, and support faculty in helping to either reduce or manage such behaviors through specific-care needs and sometimes student-specific approaches.

17.    Prior to December 12, 2024, I never once shared any feedback, comments, or observations with Wright that would enable her to discern the possibility of abuse or neglect. Again, she could not have discerned abuse or neglect as I had no such view of this at the time.

18.    While quite a while ago, my belief is I was seeking guidance on care of children with serious behavioral complications in my 12/12/24 email. Sometimes handling of particular children may require re-training of faculty or other directives, even counseling by their management. I did not construe my email as a report of "abuse."

19.    What I think is very important to mention and which has been identified within the Charges is that I believe Wright acted promptly and appropriately. In the weeks that followed my 12/12/24 email, Wright, Garvin, and Veisz were spending significant time (even hours) on different days coming into the McDaniel Classroom to observe, verify handling and care, and to witness if any protocols were not being followed. I thought the responsiveness and observations were prompt and comprehensive by such management based upon information available to us.

20.    The Charges, as framed against Wright, exhibit a lack of fundamental comprehension and understanding of (even the basics of) autistic children or oversight over them.

And the Charges put words in my mouth that were never spoken. I am thus compelled to set the record straight.

*Vanessa Carey*
_____
Vanessa Carey

Date: 7/2/2025

# Exhibit E

**SWORN DECLARATION OF DENEEN DRY**

I, Deneen Dry, make this Sworn Declaration ("Declaration") to the best of my recollection, based on events that occurred more than nine months ago. I am providing this statement in my capacity as President of CBESPA, and I understand that it may be used in future legal proceedings.

1. I am currently employed by Central Bucks School District ("CBSD") and have worked for the district for approximately fourteen (14) years. I serve as a full-time staff nurse and have also held the position of CBESPA (union) President for the past seven (7) years. I was given the opportunity to review the "Statement of Charges" ("the Statement") filed against Alyssa Wright ("Wright"), specifically Charges 21 through 24, which reference me with communication made in my role as union president.

> 21.    On November 14, 2024, Deneen Dry ("Dry"), CBESPA President, called Wright to inform her that PCA Alyssa Kline ("Kline") raised concerns of neglect and abuse in Jamison Classroom.
>
> 22.    The concerns expressed by Dry during the phone call with Wright were the <u>same</u> concerns of the neglectful and abusive treatment of students in Jamison Classroom that were raised by Carey.
>
> 23.    Specifically, Wright was alerted that students were made to sit in the toilet until a red ring appeared on their skin, students' bodily movement were restricted to their workstations, a student was left masturbating in the bathroom while the PCA watched, and a student regularly hit other students in the classroom.
>
> 24.    The concerns communicated with Wright on November 14, 2024 raised reasonable suspicion that students in Jamison Classroom may have been subjected to abuse and unlawful restraints.

2. Charge 21. It is incorrect that I informed Wright that Alyssa Kline raised concerns of "neglect" and "abuse" in the Jamison Classroom. I conveyed concerns shared by Kline but did not use the terms "neglect" or "abuse."

3. Charge 22. The concerns I expressed to Wright were based solely on what Kline shared with me and were not the same concerns raised by Carey; I did not confirm or corroborate any other allegations.

4. Charge 23. While the concerns described in Charge 23 are somewhat consistent with what Kline mentioned, they were relayed in a more confused and emotional narrative that included both student-related and employment concerns.

5. Charge 24. To my knowledge, I did not communicate any suspicion of abuse or unlawful restraints to Wright on November 14, 2024; I sought Wright's professional opinion regarding the concerns relayed to me.

6. During my call with Alyssa Klein, she intermixed the conversation back and forth between employment-related and student concerns that are listed below.

- She said she was sent home that morning on paid leave and believed that Dave Heineman (Heineman), the principal at Jamison, was going to try to fire her.
- She felt she had no one to go to and didn't trust Heineman.
- She said she felt mistreated by the teacher and aide in the classroom.
- She believed that the teacher and aide were making false complaints about her to Heineman.
- She expressed concern that a student would hit other students when they were near him.

- She said a student had been on the toilet for a while and had a red ring on the back of her thighs and buttocks.
- She said a student was seated at a desk that was pushed up against him while he sat in a chair with arms.
- She mentioned a student experiencing self-stimming episodes and said she had been told the parents were aware.

7. I am not quoting the conversation word-for-word because that wouldn't be possible. Most of what Klein said was hard to understand, unclear, and all over the place; however, it was very clear she was upset. It was difficult to determine what the main point was because she jumped between student issues and concerns about her employment. I ended the call by telling her to write things down, that I needed to make some calls, and would get back to her. She agreed, and the call ended. I was very confused when we hung up.

8. After the call ended with Klein, I called Wright to relay the information received by Klein to seek understanding of special education classroom behaviors/protocols. I explained that Klein was very upset and was all over the place. I informed her of the items listed in number 7 of this declaration. Wright said these student concerns could be, but she'd need to look at the students' plans. She told me she would send Katie Veisz to the classroom the next morning. Wright advised me to call Human Resources regarding the employment concerns.

Deneen M. Dry
CBESPA President
July 9, 2025

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

<u>**CASE MANAGEMENT TRACK DESIGNATION FORM**</u>

| | | |
|---|---|---|
| Alyssa Wright | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| Central Bucks School District, et al. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.     ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.     ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.     ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.     ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)     ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.     (x )

| | | |
|---|---|---|
| 9/18/2025 | | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-639-0801 | 215-639-4970 | akarpf@karpf-law.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

10/2024

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**

Place of Accident, Incident, or Transaction:  Defendants place of business

---

***RELATED CASE IF ANY:***  Case Number:_____  Judge:_____

1. Does this case involve property included in an earlier numbered suit?                                          Yes ☐

2. Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit?          Yes ☐

3. Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit?  Yes ☐

4. Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual?  Yes ☐

5. Is this case related to an earlier numbered suit even though none of the above categories apply?  Yes ☐
   If yes, attach an explanation.

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☒ **is not** related to any pending or previously terminated action in this court.

---

**Civil Litigation Categories**

*A.* *Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts)
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Wage and Hour Class Action/Collective Action
- ☐ 6. Patent
- ☐ 7. Copyright/Trademark
- ☐ 8. Employment
- ☐ 9. Labor-Management Relations
- ☒ 10. Civil Rights
- ☐ 11. Habeas Corpus
- ☐ 12. Securities Cases
- ☐ 13. Social Security Review Cases
- ☐ 14. Qui Tam Cases
- ☐ 15. Cases Seeking Systemic Relief **\*see certification below\***
- ☐ 16. All Other Federal Question Cases. *(Please specify)*:_____

*B.* *Diversity Jurisdiction Cases:*

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify)*:_____
- ☐ 7. Products Liability
- ☐ 8. All Other Diversity Cases: *(Please specify)*:_____

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☒ **does not** have implications beyond the parties before the court and ☐ **does** / ☒ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

---

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

☒  Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐  None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

WRIGHT, ALYSSA

**DEFENDANTS**

CENTRAL BUCKS SCHOOL DISTRICT, ET AL.

**(b)** County of Residence of First Listed Plaintiff    Bucks
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Bucks
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Ari R. Karpf, Esq.; Karpf, Karpf & Cerutti, P.C., 8 Interplex Drive, Suite 210, Feasterville-Trevose, PA 19053; 215-639-0801; akarpf@karpf-law.com

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury – | [ ] 690 Other | [ ] 423 Withdrawal | [ ] 376 Qui Tam (31 USC |
| [ ] 130 Miller Act | [ ] 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| [ ] 140 Negotiable Instrument | Liability | [ ] 367 Health Care/ | | **INTELLECTUAL** | [ ] 400 State Reapportionment |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' | Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted | Liability | [ ] 368 Asbestos Personal | | [ ] 835 Patent - Abbreviated | [ ] 460 Deportation |
| Student Loans | [ ] 340 Marine | Injury Product | | New Drug Application | [ ] 470 Racketeer Influenced and |
| (Excludes Veterans) | [ ] 345 Marine Product | Liability | | [ ] 840 Trademark | Corrupt Organizations |
| [ ] 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | | [ ] 880 Defend Trade Secrets | [ ] 480 Consumer Credit |
| of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | **LABOR** | Act of 2016 | (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle | [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards | | [ ] 485 Telephone Consumer |
| [ ] 190 Other Contract | Product Liability | [ ] 380 Other Personal | Act | **SOCIAL SECURITY** | Protection Act |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal | Property Damage | [ ] 720 Labor/Management | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | Injury | [ ] 385 Property Damage | Relations | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ |
| | [ ] 362 Personal Injury - | Product Liability | [ ] 740 Railway Labor Act | [ ] 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | [ ] 751 Family and Medical | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | Leave Act | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | [ ] 790 Other Labor Litigation | | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | [ ] 791 Employee Retirement | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information |
| [ ] 230 Rent Lease & Ejectment | [x] 442 Employment | [ ] 510 Motions to Vacate | Income Security Act | [ ] 870 Taxes (U.S. Plaintiff | Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ | Sentence | | or Defendant) | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | Accommodations | [ ] 530 General | | [ ] 871 IRS—Third Party | [ ] 899 Administrative Procedure |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities - | [ ] 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment | **Other:** | [ ] 462 Naturalization Application | | Agency Decision |
| | [ ] 446 Amer. w/Disabilities - | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration | | [ ] 950 Constitutionality of |
| | Other | [ ] 550 Civil Rights | Actions | | State Statutes |
| | [ ] 448 Education | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee – | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title VII (42USC2000)

Brief description of cause:
Violations of Title VII, First Amendment Retaliation, PA Whistle blower Law, Breach of Contract and other applicable law(s).

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____

DOCKET NUMBER _____

DATE    9/18/2025

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____