**BEFORE THE CENTRAL BUCKS SCHOOL DISTRICT BOARD OF DIRECTORS**

In the Matter of:  **ALYSSA WRIGHT**          :
                                              : Prepared by Special Counsel
                                              : Jonathan M. Huerta, Esquire

## ADJUDICATION

I.     PROCEDURAL HISTORY

On June 18, 2025, the Board of School Directors of the Central Bucks School District

(District) voted to approve a Resolution to issue a Statement of Charges to Alyssa Wright,

Director of Pupil Services, pursuant to Section 1127 of the Public School Code of 1949, as

amended, 24 P.S. §11-1127 ("School Code").  As Director of Pupil Services, Ms. Wright has

oversight of five main areas of responsibility for the District:  (1) Gifted Services, (2) Special

Education Services, (3) Student Services, (4) Health Services and (5) she is the District's Title

IX Coordinator.

On or about June 1, 2025, a written Statement of Charges was issued by the District's Board

of Directors to Alyssa Wright, pursuant to Section 1122 of the School Code,  charging Ms.

Wright with engaging in activity and failing or refusing to engage in activity which constitutes

(1) willful neglect of duties, (2) persistent negligence in the performance of duties, (3) persistent

and willful violation of or failure to comply with school laws of the Commonwealth, including

official directives and established policy of the board of directors, and (4) incompetency. 24 P.S.

§11-1122(a).  The Statement of Charges informed Ms. Wright that she has the right to a hearing

before the District's Board of Directors which would be convened for her within the time limits

set forth in Section 1127, unless otherwise agreed upon.  24 P.S. §11-1127.

In a written document entitled "Stipulation by Parties To Record for Final Determination of

Alyssa Wright's Employment on a Written Record," dated July 15, 2025, Alyssa Wright, by and

through her attorney, Ari R. Karpf, Esquire,  and the District, by and through its attorney, Peter

C. Amuso, Esquire, agreed that in lieu of a live hearing, they would submit the matter to the

District's Board on a written record.  In the Stipulation, the Parties agreed that no information or

documents other than the Exhibits submitted by each Party on or before July 28, 2025, shall be

considered by the Board to make the final determination as to whether Ms. Wright's employment

shall be terminated.  The Parties also agreed to submit their briefs containing argument, proposed

findings of fact and conclusions of law, on or before August 8, 2025.  (Stipulation of Parties,

July 15, 2025)

On August 11, 2025, also by the agreement of the Parties, the record closed.  Additionally,

the  Parties have agreed that the entire procedure set forth in their Stipulation complies with

Section 1122 of the School Code, *et seq*.  The Board's final determination is scheduled to be

issued on August 21, 2025. (Stipulation of Parties, July 15, 2025)

II.     STATEMENT OF CHARGES

In the Statement of Charges, Ms. Wright is charged with the following:  (1) willful neglect of

duties, (2) persistent negligence in the performance of duties, (3) persistent and willful violation

of or failure to comply with school laws of the Commonwealth, including official directives and

established policy of the board of directors, and (4) incompetency, which are charges provided in

Section 1122(a) of the School Code, 24 P.S. §11-1122.  If proven, the charged misconduct will

provide valid cause for termination of Ms. Wright's employment.

In the Statement of Charges, the District Administration identifies the following knowledge,

information, actions and inactions of Ms. Wright in support the charges listed above.

First, Ms. Wright knew, as early as October 11, 2024, that Kathleen Viesz, Supervisor of Special Education, had learned that a special education student, who will be referred to as Student No. 1, to protect the privacy of the young boy (Grade 2), was allowed to remain naked and unclothed in the classroom by a conscious decision of the classroom teacher.  (Statement of Charges, at P. 5, No. 17).

More information came to Ms. Wright, initially on November 14, 2024, after Alyssa Kline, Personal Care Assistant, who worked in the Autistic Support classroom at Jamison Elementary School ("AS classroom"), contacted her union representative, Deneen Dry, President, Central Bucks School District Educational Support Professionals Association ("CBESPA"), and reported concerns relating to handling of students as well as employment concerns.

On the same day, November 14, 2024, Deneen Dry contacted Ms. Wright to share what she could understand of Ms. Kline's allegations.  After the conversation with Ms. Dry, Ms. Wright directed Ms. Viesz to go to the AS classroom the  next day and observe what occurred there. (Statement of Charges, at P. 6, No. 26).  Ms. Wright did not telephone Childline to report that any physical injury or serious mental harm had occurred in the AS classroom.

On November 15, 2024, Rob Freiling, Director of Human Resources, and Christine Trawinski, Human Resources Manager, met with Ms. Kline and Ms. Dry to discuss the activity Ms. Kline reported to be occurring in the AS classroom. (Statement of Charges, P. 6, at No. 29).

On the same day, November 15, 2024, Mr. Freiling and Ms. Trawinski, along with Nadine Garvin, Assistant Superintendent of Elementary Education, David Heineman, Principal, Jamison Elementary School, Ms. Dry, Ms. Kline and Ms. Viesz met with the Teacher from the AS classroom to discuss Ms. Kline's allegations to allow the Teacher to respond to the allegations.

(Statement of Charges, at P. 6, No. 32). After the meeting, Ms. Veisz and Dr. Garvin contacted

Ms. Wright to inform her of the allegations discussed in the meeting. (Statement of Charges, at

P. 6, No. 34. After the meeting with the Teacher, Dr Garvin and Ms. Viesz contacted Ms.

Wright to inform her of what occurred in the meeting. (Statement of Charges, at P. 6, No. 34).

Ms. Wright did not make any report to Childline on November 15, 2024, or thereafter.

(Statement of Charges, at P. 6, No. 34).

On November 20, 2024, Mr. Freiling asked Ms. Wright if she wanted to provide any

information in his investigation of the allegations of Ms. Kline, and she declined to do so.

(Statement of Charges, at P. 7, No. 42). Ms. Wright did not inform Human Resources personnel,

including Mr. Freiling, about the seriousness of the requirement that aversive methods or

techniques must not be used in special education classrooms. (Statement of Charges, at P. 7, No.

39). Positive behavior support plans and measures must be used. (Statement of Charges, Exhibit

B, RISC Report, at P. 2, citing 22 Pa. Code 14.133(a)).

On December 12, 2024, Ms. Wright received the written report authored by Mr. Freiling, in

which he set forth his findings of fact and recommendations for future action.    (Statement of

Charges. at P. 7, No. 44 and Exhibit C).   In the report, Mr. Freiling identified some "validated"

concerns based on what Ms. Kline reported, including that Student No. 1's access to water was

restricted by the Teacher and the Educational Assistant, and that the Educational Assistant was

restraining students by placing them in their work stations and using other furniture in the room

or her body weight to immobilize the students (Statement of Charges, at p. 7, No. 43). Ms.

Wright did not report any known or suspected physical injury or serious mental harm to students

based on the concerns expressed by Ms. Carey on December 12, 2024. (Statement of Charges, at

Pp. 6-8, Nos. 25, 38, 48, 51)

Restraints to control student behavior may be used only when the student is acting in a manner that presents a clear and present danger to the student, to other students or to employees, and only when less restrictive measures and techniques have proven to be or are less effective. Additionally, data or information about the use of a restraints must be maintained and reported by to the Pennsylvania Department of Education (Statement of Charges, at P. 2, and Exhibit B, RISC Report, quoting 22 Pa. Code 114.133(c)(5) that "school entities shall maintain and report data on the use of restraints as prescribed by the Secretary [of Education]") (Statement of Charges, Exhibit B, at P. 3). Ms. Wright did not report the use of the restraints set forth in Mr. Freiling's findings of December 12, 2024, as required under 22 Pa. Code 14.133 (Statement of Charges, at P. 8, No. 47, and Exhibit B).

On December 12, 2024, Ms. Wright received a letter from Vanessa Carey, Board Certified Behavioral Analyst ("BCBA"), via email, in which Ms. Carey reported a number of concerns that Ms. Carey had observed in the treatment of the students by the Teacher in the AS classroom. (Statement of Charges, at P. 7, No. 45, and Exhibit D). In her letter, Ms. Carey told Ms. Wright that she was very concerned about the way that the Teacher and the Educational Assistant treating Student No. 1, and that she was very concerned about the Teacher being "around children period." (Statement of Charges, P. 8, at No. 46, and Exhibit D).

Ms. Wright did not educate or inform Mr. Freiling or the other administrators that the allegations of Ms. Kline included actions taken by the Teacher and the Educational Assistant that are not permitted under Special Education regulation or District policy, she did not actively participate in the investigation or the recommended action to be taken in response to Mr. Freiling's findings, including neglecting the reporting required to be provided to the Department of Education and Childline, and she did not take action to ensure that Student No. 1's IEP was

being properly noted or updated as required to address Student No. 1's behavior changes. (Statement of Charges, at Pages 7-8, Nos. 42, 47 48 and 50)

Ms. Wright has an employment contract with the District which contains a provision requiring that she obtain the approval of the District's Board of School Directors before she engages in any speaking engagement outside of her duties as Director of Pupil Services. On March 18, 2025, Ms. Wright was listed as the featured speaker on a website operated by an organization, Moms for America, in a live webinar entitled, "Removing Disruptive and Violent Students from Your School." The webinar was recorded and Ms. Wright can be heard and seen speaking on the topic of the webinar. No Board approval was requested or obtained by Ms. Wright for this speaking engagement. (Statement of Charges, at P. 8, Nos. 53-55).

III.    FINDINGS OF FACT

First, Ms. Wright knew, as early as October 11, 2024, that Kathleen Viesz, Supervisor of Special Education, had learned that a special education student, who will be referred to as Student No. 1 to protect the privacy of the young boy (Grade 2), was allowed to remain naked and unclothed in the classroom by a conscious decision of the classroom teacher. (Wright Exhibit A, at P. 2). At that time, Ms. Wright directed Ms. Viesz to investigate the matter, and to speak with or interview the staff in the classroom, primarily the teacher. *Id.*

Ms. Viesz interviewed the teacher and informed Ms. Wright that Student No. 1 had disrobed in class, that the Teacher believed that Student No 1 disrobed to avoid particular tasks, that the teacher permitted the student to remain unclothed because she (teacher) wanted to show him that disrobing would not eliminate the need to participate in classwork, and she (teacher ) wanted to

curb the disrobing by allowing him to remain naked and not to immediately reclothe him. (Wright Exhibit No. 1, at P. 2, No. 6).

Ms. Viesz also reported that, according to the teacher, the student's disrobing was an isolated incident. (Wright Exhibit No. 1, at P. 2, No. 7). Ms. Viesz told Ms. Wright that the teacher was "fully re-educated on the proper handling of disrobing and clothing a student, including Student No. 1, by Ms. Viesz, and that Ms. Veisz believed that the matter was fully resolved. Ms. Viesz also informed Ms. Wright that the teacher assured Ms. Viesz that she would immediately clothe any autistic students who disrobe in the future. (Wright Exhibit No., at P. 2, No. 7).

On November 14, 2024, Alyssa Kline telephoned her union representative, Deneen Dry, President, Central Bucks Educational Support Professionals Association ("CBESPA"), to report some concerns. On the same evening, Ms. Dry telephoned Ms. Wright and reported to Ms. Wright that she had been contacted by Ms. Kline who verbally reported concerns about treatment of students and employment related concerns. Ms. Dry reported to Ms. Wright that she was seeking Ms. Wright's professional opinion about concerns related by Ms. Kline. (Wright Exhibit D., at No. 8). Ms. Wright's response to Ms. Dry is a bit truncated from Wright Exhibit D, but Ms. Dry reported that Ms. Wright said the student concerns "could be" but Ms. Wright would need to look at the students' plans. (Wright Exhibit D., at No. 8). Ms. Wright directed Kathleen Viesz, Special Education Supervisor, to go to the classroom on the next day and conduct an observation. Ms. Viesz did as directed, and contacted Ms. Wright after her observation to discuss what she observed in the AS classroom.[1]

---

[1] Earlier on November 14, 2024, David Heineman, Principal, Jamison Elementary School, contacted Alyssa Wright and asked if he could terminate Ms. Kline because the classroom teacher had reported that Ms. Kline was rude to her (teacher). (Wright Exhibit No. 1). Ms. Wright had suggested that Mr. Heineman contact the Human Resources Department with this concern.

Robert Freiling, Director of Human Resources, and Christine Trawinski, Human Resources

Manager, met with Ms. Dry and Ms. Kline on November 15, 2024, to interview Ms. Kline about

her concerns. At the conclusion of the interview, Ms. Trawinski prepared a written list of the

concerns reported by Ms. Kline (District Exhibit No. 10). On the following day, November 16,

2024, Ms. Trawinski emailed the written summary of the interview of Ms. Kline to Mr. Freiling,

Kathleen Viesz, Supervisor of Special Education, Dr. Nadine Garvin, Assistant Superintendent

of Elementary Education and David Heineman, Principal, Jamison Elementary School, and

copied the email with the attached written summary to Dr. Steven Yanni, Superintendent, and

Ms. Wright.

The written summary prepared by Ms. Trawinski states the following: Ms. Kline reported all

of the following allegations: (1) that a special education student ("Student No. 1") in the

classroom was allowed to sit on the rug, to stand by the window, and to sit at his work station

while unclothed, to walk from his work station to the bathroom while unclothed, (2) to self-

stimulate his genitals at his workstation, sometimes by using his own saliva on his genitals, and

to go to the bathroom to disrobe and to masturbate, or self-stimulate using his genitals,

sometimes three or four times per day; (3) Student No. 1's water bottle was taken away from him

by other classroom staff and he is not permitted to use the water fountain, (4) the Educational

Assistant used a desk to block Student No. 1 from moving from his workstation as a punishment,

(5) Student No. 1 gagged himself and spread spit all over himself at the table and was made to sit

in the spit for approximately 30 minutes to finish a lesson, (6) the teacher pulled a chair out from

under Student No. 1's face when the student lays with his face down on one chair and with the

rest of his body resting on another chair to force the student to roll over, that (7) the Teacher and

the Educational Assistant frequently scream loudly at Student No. 1, that (8) Ms. Kline was required to accompany Student No. 1 to the bathroom when he self-stimulates, and watch him while he is engaged in self-stimulating his genitals and then clean him up and reclothe him afterwards, (9) that Student No. 1 removes his shoes on the playground and the Educational Assistant moves Student No. 1's shoes away, thereby requiring the student to walk across wood chips barefoot to get the shoes back. Ms. Kline reported that the Educational Assistant said, "that will teach him to take his shoes off." Student No. 1 is a second grade student who was identified as autistic, and he is non-verbal and uses a device referred to as a talker to speak. (District Exhibit 10, attachment to Email dated November 16, 2024).

In the same summary, Ms. Trawinski noted that Ms. Kline reported concerns about other students in the classroom: (1) one girl was required to sit on the toilet for as long as 45 minutes as part of the teacher's toilet training and was not allowed to go to recess; (2) Another student was crying for so long that the student vomited and the teacher reported to the student's parent only that the student vomited, not that she had been crying for a prolonged period of time, (3) another student was crying uncontrollably for 35 minutes and when Ms. Kline picked this student up and rubbed her back to comfort her the child stopped crying, but Ms. Kline was reprimanded for picking the child up; (4) Student No. 1 and another boy, Student 2, were hitting other students in the classroom when the passed nearby the two boys and one student was hit so hard that it left a red hand mark on the student's back. Ms. Kline does not believe that the action was reported.

Ms. Trawinski's report shows that Ms. Kline reported concerns about the actions of the teacher, including but not limited to: (1) that the teacher allows the Educational Assistant to talk on her cell phone continuously during the day but reprimanded Ms. Kline for taking a one

minute phone call from her husband in the presence of "everyone in the room;" (2) that the

teacher and the Educational Assistant spend a lot of time socializing as opposed to working with

students; (3) that the teacher told the classroom staff that Mr. Heineman, the Principal, told her

(the teacher) that aides are nothing but bodies and they are to do exactly what the teacher says;

(4) that other Educational Assistants have said that when they report anything to Mr. Heineman,

he tells the teacher, and therefore, they will not report anything to Mr. Heineman. (District

Exhibit 10, Attachment to Email dated November 16, 2024).

Ms. Viesz also reported to Mr. Freiling that she had learned that Mr. Heineman had an

unusual relationship with the Teacher in the AS classroom in that he showed favoritism toward

her above the other teachers. Mr. Heineman has asked Ms. Wright that the previous Supervisor

of Special Education, Maria, to be transferred or reassigned, because of conflict with the

Teacher. (District Exhibit 13, at P. 7).

On November 18, 2024, interviews of employees were conducted by Mr. Freiling and others,

with employees at the elementary school, some of whom had occasion to be in the classroom and

observe what occurred in it, including Kathleen Viesz, (2) Cindy Leonard-Rodgriguez,

Occupational Therapist, (3) Anjli Toole, Physical Therapist, (4) Jackie Nazisi, Speech Therapist,

Felicia Bibus, Occupational Therapist, (5) Mackenzie Carpenter, Special Education Teacher, (6)

Alison Clark, Special Education Teacher, (7) Vanessa Carey, Board Certified Behavior Analyst,

(8) Melissa Donofrio, Program Specialist, (9) Brittany Ruggeri, Special Education Teacher, (10)

Gianna Krozzi, Substitute Teacher, (11) Rachel Ausspring, Educational Assistant in the AS

classroom, and (12) Christie T., Learning Support Educational Assistant. (Distric: Exhibit No.

13).

On November 18, 2024, Mr. Freiling also telephoned Ms. Wright to ask if she wanted to provide information to Mr. Freiling, and Ms. Wright declined to do so. Mr. Freiling also spoke with her about some of what was reported. Mr. Freiling asked Ms. Wright to go to the classroom on November 19, 2024, and make an observation, which she agreed to do. (District Exhibit 14). Ms. Wright wrote up a summary of what she observed in the classroom on November 19, 2024, from 9:39 a.m. to 10:15 a.m.

Just as Ms. Viesz's observation of the classroom had shown no objectionable actions being taken by the Teacher or the Educational Assistant, Ms. Wright's observation did not reveal any objectionable actions being taken by these two employees on that occasion in the approximately 40 minutes observed by Ms. Wright. (District Exhibit No. 16). None of the concerns reported by Ms. Kline about the treatment of students were noted in Ms. Wright's observation. (District Exhibit No. 16). According to Mr. Freiling's notes, Ms. Wright stated with confidence that not one staff member did anything wrong. (District Exhibit No. 17). It is unclear from Mr. Freiling's notes whether Ms. Wright was referring to her own observation of the classroom on November 19, 2024, in which Ms. Wright described nothing that appeared to constitute wrongdoing, or if she was referring to Ms. Viesz's observation on November 15, 2024.

On November 20, 2024, Mr. Freiling again telephoned Ms. Wright, and this time asked her if she wanted to speak to him without her supervisor present. Mr. Freiling's summary of the call shows that Ms. Wright declined the invitation to speak regarding any concerns or issues raised by Ms. Kline.

On December 12, 2024, Mr. Freiling issued a written memorandum of his investigation of the allegations of Ms. Kline, which is entitled "Jamison Fact-Finding Summary & Recommended Action." (District Exhibit 18). Mr. Freiling's memorandum was addressed to

Ms. Wright as well as some others who had participated in the investigation. (District Exhibit 18, at P. 1)

On the same day, December 12, 2024, Ms. Carey sent a letter to Ms. Viesz and copied Ms. Wright on the letter. In the letter, Ms. Carey states the following: Ms. Carey suggested at the last meeting with Student No. 1's parents that the skills that the Physical Therapist and the Occupational Therapist are working on with Student No. 1 be included in the classroom during breaks, as Student No. 1 disrobes the most during breaks. Ms. Carey did not state when the last meeting with the parents occurred, but she added that the Teacher had not yet implemented her direction. In fact, the Teacher asked Ms. Carey what to do about Student No. 1's disrobing, and that the disrobing is getting worse. Ms. Carey had written up a plan designed to address this behavior and had emailed it to the Teacher, but the Teacher had not followed the plan. Ms. Carey also reported that the PCA in the classroom, Rachel,[2] is "miserable" and is emotionless and curt with Student No. 1 and he is not receiving any positive attention from her.

Ms. Carey stated in her letter, "I am very concerned about the way [Student No. 1] is being treated. Both [the Teacher and the Educational Assistant] appear angry, unhappy, burnt out, short fused, snappy, irritable and this is observed around all the children and most of the day as I am in and out some days. I am concerned about my role as her supervisor for the BACB,[3] she is not showing any improvement and I am concerned with her around children period." (District Exhibit 19). The record does not show that Ms. Wright took any action in response to Ms. Carey's letter, to protect the students in the AS classroom from the teacher. Rather, she and

---

[2] In fact, Rachel is the first name of the Educational Assistant in the classroom. To clarify, Rachel's job title was Educational Assistant, not Personal Care Assistant or PCA.
[3] At the time, Ms. Carey was supervising the teacher in the Jamison autistic support classroom in a course of study that the teacher was in the process of completing to become a Board Certified Behavior Analyst. This what Ms. Carey is referring to as "my role as her supervisor for the BACB."

some of the other individuals were concerned with what, if any, obligation they had to give Ms. Carey direction in her capacity as a supervisor of the Teacher in the Teacher's coursework to become a BCBA.

Ms. Carey's letter elaborated on the plan, which was to give Student No. 1 attention in his preferred way, by laughing close to his face and holding his hands doing squeezes. Ms. Carey had identified Student No. 1's disrobing behavior as attention-seeking and she modeled the plan several times with Student No. 1 as he had gotten to know her better. (District Exhibit No.1 19) Ms. Carey also directed the Teacher not to use the sensory room until they get Student No. 1's behavior back to 'baseline,' but Ms. Carey stated that the Teacher undermined this plan and directed the classroom staff to take Student No. 1 to the sensory room, where he disrobed. Ms. Carey closed the letter stating that she would speak with Ms. Wright on the following day, December 13, 2024, because HR, or Human Resources, told Ms. Carey to keep Ms. Wright updated. (District Exhibit 19). Ms. Wright forwarded the letter of Ms. Carey to Mr. Freiling, who asked Ms. Wright to let him (Mr. Freiling) know what the next steps are for addressing Ms. Carey's reported concerns.

On December 13, Mr. Freiling met with Dr. Garvin, Ms. Wright and Ms. Veisz. Ms. Wright stated that the letter of Ms. Carey had not identified any new concerns. Ms. Carey was reporting concerns relating to Ms. Carey's supervision of the teacher in the BCBA course of study, according to Ms. Wright. (District Exhibit 20).  Ms. Wright added that Ms. Carey had attempted to give the Teacher a copy of the Code of Ethics for Board Certified Behavior Analysts with some areas of concern highlighted, and the Teacher refused to take it. *Id.* Conspicuously absent from this response is the mention of any concern for the Teacher, who has by now repeatedly

demonstrated that she will not follow direction concerning what actions to use to address Student No.1's behaviors in the classroom, remaining in the classroom with the students.

In the December 13 meeting, Ms. Viesz stated that her own availability to be in the classroom to work with the teacher on a regular basis does not exist and that she has not been in the classroom since earlier in the school year. (District Exhibit No. 20).

On December 16, 2024, Ms. Viesz emailed Mr. Heineman, Dr. Garvin, Mr. Freiling, and Ms. Wright that she and Mr. Heineman had met with the Teacher at 12:30 p.m. Ms. Viesz informed the group that the Teacher reported that she had been using the replacement chew tools and found them to be helping. Ms. Viesz reported that the Teacher's claim to be using the chew tools was contradicted by the concerns emailed by Ms. Carey on December 16, 2024. Ms. Viesz asked Mr. Freiling if this information would trigger another fact finding.

Ms. Wright sent an email to the same group later on the same day, December 16, 2024, which stated, "Hi all. I still want to go back to the idea of putting her out. Is there a reason we aren't?" Dr. Garvin sent an email approximately 15 minutes later stating, "I would agree. If we have another documented issue where she ignored plans and directives, I would think she should at least be suspended for a period of time and then return to the PIP. On December 16, 2024, approximately four minutes later, Ms. Wright stated, "My thoughts exactly." Ms. Wright provided another email showing that she had questioned if consideration was being given to "keeping [the Teacher and Educational Assistant in the AS classroom] out" now that there is an ongoing criminal investigation, but the date that she sent this email is marked as December 28, 2024. (Wright Exhibit L). It is unclear, and Ms. Wright does not provide any information to clarify, whether by the expression "keeping [them] out" Ms. Wright meant a permanent removal

or a temporary removal.  In fact, the employees had not been removed form the AS classroom either during or after the investigation of Ms. Kline's allegations.

Mr. Freiling's notes show that he, Ms. Wright and Dr. Garvin discussed next steps to be taken toward the teacher. (District Exhibit 20)  It appears that Ms. Wright was to (1) draft a form or checklist for classroom observations that can be used so that all observers can use the same tool. The form drafted by Ms. Wright was entitled "Autistic Support Classroom Observation Form."  The other task assigned to Ms. Wright was to draft the special education components of a Performance Improvement Plan ("PIP") to be issued to the teacher.  It also appears that Mr. Heineman would be directed to issue a verbal warning to the teacher for her failure to follow a directive (the directive appears to be a directive Mr. Heineman gave to the teacher on November 21, 2024 that is unrelated to Ms. Kline's allegations and the investigation completed by Mr. Freiling). (District Exhibit 20).  No mention is made of any corrective action to be taken with respect to the Teacher's continued choices to follow direction in handling student behavior from Ms. Carey.

On February 10, 2025, a Restraint Information System Collection (RISC) Investigation Report ("RISC Report"), was issued by the Pennsylvania Department of Education.  According to the RISC Report, the Department's Bureau of Special Education ("Bureau" or "BSE") initiated an on-site fact-finding investigation at the District on Wednesday, January 22, 2025 and Thursday, January 23, 2025.  The Report states that the Bureau's investigation was prompted by media reports of alleged inappropriate restraints conducted by a teacher and Paraeducator in a low incidence Autism Classroom (Room 119, also referred to as "AS Classroom") at Jamison Elementary School during the 2024-2025 school year.   (Statement of Charges, Exhibit B, at P. 1).

In the RISC Report, the Bureau made findings that "restraints" were used by classroom staff in Room 119 AS Classroom, when the staff used desks to wedge Student No. 1 and Student 2[4] in their chairs against the wall, thereby applying physical force to restrain the students' free movement. (Statement of Charges, Exhibit B, RISC Report, at P. 5, Findings, at No. 1). In the Report, the Bureau also found that the District failed to report the restraints that were used in the Room 119, the AS Classroom, to the Bureau of Special Education, as required by 22 Pa. Code §14.133(c)(5). *Id.* at P. 5. The RISC Report further stated that the District failed to follow appropriate procedures, including conducting an IEP meeting within 10 school days of the restraints or obtaining a waiver from the parents' of the parents' right to the IEP meeting, as is required by 22 Pa. Code §14.133(c)(1). *Id.* The RISC Report findings provided that the District failed to implement the positive behavior support plans (PBSPs) of Student No. 1 and Student 2, as required by 34 CFR §300.17, when the students were restrained. *Id.* The District also failed to ensure that Student No. 1's IEP team revised his IEP as appropriate to address the behaviors he displayed, as required by 34 CFR ¶300.324(b)(1)(ii), when the IEP team discussed the student's progress during their monthly communication meetings but did not revise the student's IEP. (Statement of Charges, Exhibit B, at P. 5, Findings at Nos. 1-6).

The RISC Report directed the District Superintendent or Designee to take corrective action by reporting the restraints that occurred in Room 119, the AS classroom, that have not yet been reported to the Bureau of Special Education in RISC, the system used by the Bureau for such reporting. (Statement of Charges, Exhibit B, at P. 5, Corrective Action,

---

[4] The two young students were referred to as Student No. 1 and Student No. 2 to protect the students' privacy.

at No. 1. Additional corrective actions directed by the Bureau included (1) training of

staff in the use of positive behavior supports and de-escalation techniques, (2) required

procedures following the use of restraint and (3) training in RISC reporting, among other

corrective actions. The Bureau gave a deadline of April 25, 2025, by which the

Superintendent or Designee was required to provide documentation to verify that all

corrective action was completed. (District Exhibit No. 23)

On March 18, 2025, Ms. Wright gave a presentation in the form of a live webinar to an

organization identified as Moms for America. (District Exhibit 24). Ms. Wright's employment

contract with the District requires her to obtain approval from the School Boad if she wishes to

give a presentation or speaking engagement to any outside organization. The employment

contract provides in relevant part as follows:

> "The Director may undertake consultative work, speaking engagements,
> and other services related to her profession, provided that such activities do not
> interfere with the performance of the duties of the Director of Pupil Services
> under this Contract, and provided that such activities are approved in advance in
> writing by the School Board, are approved in advance in writing by the School
> Board, which approval shall not be unreasonably withheld or delayed." (District
> Exhibit 25, at P. 2).

Ms. Wright did not seek or obtain the approval of the Board for the March 18, 2025

speaking engagement.

IV.    DISCUSSION

   A.    Applicable Legal Principles

Section 1122 of the School Code provides that cause for termination of the

employment of a professional employee exists when the employee has engaged in action

or inaction that constitutes one of the charges provided thereunder. Before addressing

the merits of the charges, it is useful to consider the purpose of Section 1122, as articulated by the Commonwealth Court.

The Commonwealth Court has held that the purpose of Section 1122 of the School Code, 24 P.S. §11-1122 is to provide the greatest possible protection against dismissal. *McFerren v. Farrell Area School District*, 993 A.2d 344, 353 (Pa. Cmwlth. 2010), quoting *Lauer v. Millville Area School District*, 657 A.2d 119, 121 (Pa. Cmwlth. 1995). In *Lauer*, the Court reasoned that the dismissal of a professional employee requires a serious reason, not picayune and unwarranted criticisms. *Lauer*, 657 A.2d at 123. This suggests that the grounds for dismissal listed in Section 1122 must be strictly construed in favor of the professional employee and against the school district. *Cutler v. Bellefonte Area School District*, 105 A.3d 856, 2014 Pa. Commw. Unpub. LEXIS 746 (2014) (cited for persuasive value only).

By far the most serious charges levelled against Ms. Wright by the District Administration are that Ms. Wright's course of conduct from November 14, 2024 through March 18, 2025 constitutes a violation of all four charges. Ms. Wright's defense, which is that she was a high-ranking administrator with global responsibilities who cannot be expected to know every detail of what is occurring in every one of the many special education classrooms in the District, shows that a lack of realization that more is expected of a person at her level, not less. As Director charged with overall responsibility for special education, she is expected to be alert, to be able to read between the lines when necessary and to take active and effective steps to verify the information being received, especially when it is unclear, to determine whether any prohibited use of aversive techniques are being used with young vulnerable students and to take firm and decisive action to stop such action and ensure that all District obligations are met, including to

report it if required and to take remedial action to train employees when they must report such action and to whom.

The course of conduct that Ms. Wright consciously engaged in from November 14, 2024 through February 10, 2024, will be examined to determine whether it supports the two charges of (1) persistent negligence in the performance of duties and (2) persistent and willful violation of or failure to comply with School laws of the Commonwealth including District policies, because these charges are related.

B.  <u>Persistent Negligence in the Performance of Duties and Persistent and Willful violation of School laws including School District Policies and directives</u>.

The term 'persistent' has been defined as continuing or constant. *Strinich v. Clairton School District*, 494 Pa. 297, 431 A.2d 267 (1981). A violation under the charge of persistent negligence in the performance of duties may occur either as a series of individual incidences or as one incident carried on for a substantial period of time. *Lucciola v. Secretary of Education*, 360 A.2d 310, 312 (1976). A violation of this charge does not necessarily involve any violation of law or policy, but a conscious abdication of responsibility or choice to avoid job duties or responsibilities they are reasonably expected to fulfill.

The Commonwealth Court has held that to determine whether a persistent and willful violation of school law has occurred, three elements must be examined: (1) persistency, (2) willfulness, and (3) violation of a school law [or policy or official directive]. See, e.g., *Sweda v. Upper Bucks County Technical School (Department of Education)*, 320 A.3d 166 (Pa. Cmwlth. 2023) (unpublished opinion cited only for its persuasive value), citing *Horton v. Jefferson County-Dubois Area Vocational Technical School*, 630 A.2d 481, 484 (Pa. Cmwlth. 1993).

Persistency may exist when the violation occurs as either a series of individual incidents or one incident carried on for a substantial period of time. *Id.* at 484. Willfulness requires the presence of intention and at least some power of choice. *Id.* A violation of a school law includes not only a violation of law but also a violation of a school district's policies, rules and orders. *Id.*

The facts, as developed here from the exhibits provided by both the District and Ms. Wright, show that Ms. Wright knew, as early as October 11, 2024, from the report of Ms. Viesz, that the classroom teacher in the AS classroom had allowed a student to remain naked and unclothed in the classroom for a period some time without making any attempt to shield or cover the student. Ms. Viesz re-educated the teacher on that occasion to inform the teacher that she cannot allow the student to remain unclothed in the classroom for any period of time. This is the first indication shown on the record that the Teacher had, on at least one occasion, failed to use a positive behavior support that protected the dignity of a student in the classroom.

Next, on November 14, Ms. Wright receives a report from Ms. Dry, CBESPA President, who was approached by Ms. Kline about activity occurring in the AS classroom. (Wright Exhibit D ). Ms. Dry called Ms. Wright to relay the following information reported by Ms. Kline: (1) a student has been on the toilet for a while and had a red ring on the back of her thighs and buttocks, (2) a student was seated at a desk which was pushed up against him while he sat in a chair with arms, (3) a student hit other students when they were near him, and (4) a student was experiencing self- stimming episodes and the parents were made aware. (Wright Exhibit D). Ms. Wright contends that the conversation with Ms. Dry was brief and convoluted. Although this conversation may not have informed Ms. Wright as to whether the Teacher and any other staff were acting contrary to law or policy with any definiteness, it should have alerted her to the fact that the employee's complaint includes some concerns about student behavior and it would

be wise to find out exactly what these were and whether the behavior was being handled properly by the staff in the classroom. Even if Ms. Wright believed that there was an issue or some conflict among employees in the classroom, such an issue should not mean that she did not need to pay attention, because mishandling of student behavior may certainly occur when employees are at odds with each other.

It strikes us as somewhat curious that Ms. Wright did not ask Ms. Dry whether Ms. Kline had made a report to Childline about any of her concerns relating to children, as this would have been a logical and useful question to ask even if all she could have gotten was that Ms. Dry did not know if a report was made or if the activity was of the kind required to be reported to Childline.

Fortunately, Ms. Wright did not simply refer Ms. Dry to the Human Resources Office, but also informed Ms. Dry that she would send Ms. Viesz to the AS classroom on November 15, 2024, to observe the activity there. Ms. Viesz made the observation, and reported to Ms. Wright that she did not observe any activity of concern. Ms. Viesz's observation does nothing to negate anything reported by Ms. Kline, because the activity that would have been reported by Ms. Kline would have occurred before Ms. Viesz's observation.

Also on November 15, 2024, Mr. Freiling and Ms. Trawinski met with Ms. Kline and Ms. Dry and captured a list of allegations about the mistreatment of the students in the classroom by the Teacher and the Educational Assistant, which were later put into writing by Ms. Trawinski, no later than November 16, 2024 but the list was undoubtedly developed from notes taken during the interview of Ms. Kline on November 15, 2024.

Next on November 15, 2024, Mr. Freiling, Ms. Trawinski, Ms. Kline, Ms. Dry, Dr. Garvin, and Ms. Viesz met with the AS classroom Teacher to communicate Ms. Kline's allegations to

the Teacher and to obtain the Teacher's response to the allegations.    After this meeting, Ms.

Viesz and Dr. Garvin contacted Ms. Wright to "update" her about what occurred in the interview

with the teacher.   The exact content of what was reported by them to Ms. Wright is not stated in

the record, although the District Administration may suspect that Ms. Wright was informed of all

of the allegations reported by Ms. Kline to Ms. Trawinski and Mr. Freiling.  For purposes of this

decision, we cannot assume that all allegations were reported to Ms Wright, although we can

opine that they should have been reported to her.

Although Ms. Wright declined and thereby chose not to participate in the investigation of

what was occurring the AS classroom even after November 15, the day she had another meeting

scheduled, Ms. Wright took one action on November 15, 2024.  Ms. Wright had asked Melissa

Donfrio, Program  Specialist, and Ms. Carey to the AS classroom to provide some "much-needed

support to the students" by email directive on November 15, 2024, and she asked them to be

available for a half day.  (District Exhibit No. 9)  The email sent does not specify any more, but

later Ms. Carey provided a letter outlining what she was observing about the actions of the

Teacher and Educational Assistant in the AS classroom and why she was very concerned about

it.  (District Exhibit No. 19)

However, on November 16, 2024, Ms. Trawinski shared her written summary of the

interview of Ms. Kline with others, including Ms. Wright.  (District Exhibit No. 10).  The

allegations included that the Teacher and Educational Assistant allowed Student No. 1 to remain

naked in the classroom, that they restricted Student No. 1's intake of water by taking away his

water bottle and not allowing him to drink water from the water fountain, that the Educational

Assistant was using her body weight and a table to prevent Student No. 1 from moving, that the

Teacher and Educational Assistant screamed very loudly at Student No. 1, that the Educational

Assistant took away his shoes and Student No. 1 had to walk barefoot on top of wood chips to get his shoes back, among other things. These are all prohibited methods of handling behaviors, as the RISC Report subsequently revealed.

Surprisingly, Ms. Wright responds that she may have missed the attachment to the email and that she does not recall seeing the written document prepared by Ms. Trawinski before seeing the District's exhibits in this matter. Unfortunately, this response does not help Ms. Wright. On the contrary, it supports the District's assertion that she was negligent in the performance of her duties. Even if she had not had time to read it immediately, it would have been a good way for Ms. Wright to confirm that any information she received from Dr. Garvin and Ms. Viesz was consistent with what Ms. Trawinski noted.

This is not to say that Ms. Wright should not have believed anything Dr. Garvin or Ms. Viesz may have told her about Ms. Kline's allegations regarding Teacher and Educational Assistant handling of student behavior in the AS classroom, but it is to say that she had an opportunity to obtain additional information to either confirm or contradict what they reported to her, and she should have recognized that an email of Ms. Trawinski might have shown more information about what Ms. Kline reported about activity in the AS classroom, and that she should have been astute enough not to overlook it. If this was not a conscious choice on the part of Ms. Wright, it was neglectful and constituted failure to be diligent in trying to learn about what was going in the AS classroom and to find out if the Teacher had repeated any of the negative behavior she had engaged in earlier, such as leaving Student No. 1 naked and unclothed in class.

On November 18, 2024, Mr. Freiling had a conversation with Ms. Wright. (District Exhibit 14). Ms. Wright agreed to go to the AS classroom and observe the activity within it. On

November 19, Ms. Wright sent a written summary of what she observed in the AS classroom to Mr. Freiling. The observation was conducted from 9:39 a.m. to 10:15 a.m. and Ms. Wright did not observe any activity of the type reported by Ms. Kline. (District Exhibit 16). Notably, Ms. Wright shared with Mr. Freiling that she believed that the AS classroom staff was adjusting their instruction/approach when being observed. (District Exhibit No. 14).

Fortunately, on and after December 12, 2024, Ms. Wright did not fail to perceive from Mr. Freiling's report that the Teacher and Educational Assistant were not using positive behavior support methods in the AS classroom and had in fact engaged in conduct that would have warranted a call to Childline. On December 12, 2024, Mr. Freiling issued a written memorandum of his investigation of the allegations of Ms. Kline, which is entitled "Jamison Fact-Finding Summary & Recommended Action." (District Exhibit No. 18). Nothing is stated in the report about whether a report to Childline was made, but the report shows that one action step was to provide training to the support staff in the AS classroom to better inform them about mandated reporter obligations and the reporting required. (District Exhibit No. 18)

On December 12, 2024, Ms. Carey, who had been in the AS classroom more frequently after mid-November in the course of performing her job duties as BCBA sent a letter to Ms. Viesz and Ms Wright. (District Exhibit No. 19). Ms. Carey reported that the Teacher was choosing not to follow the direction as to how to handle a student who was disrobing in class, that she did not follow plan for addressing this behavior provided by Ms. Carey. Ms. Carey also reported that the PCA in the classroom, Rachel, is "miserable" and is emotionless and curt with Student No. 1 and he is not receiving any positive attention from her. In addition, Ms. Carey informed Ms. Wright, "I am very concerned about the way [Student No. 1] is being treated. Both [the Teacher and the Educational Assistant] appear angry, unhappy, burnt out, short fused, snappy, irritable

and this is observed around all the children and most of the day as I am in and out some days.  I am concerned about my role as her supervisor for the BACB,[5] she is not showing any improvement and I am concerned with her around children period." (District Exhibit 19).

At this point, Ms. Wright had more than enough knowledge to ask Ms. Viesz and/or any other staff who may have supervisory authority over the special education in the AS classroom questions about whether the Teacher was properly recording information as required in the students' IEPs, and thereby complying with the requirements for the IEPs, or whether she was concealing the information as Ms. Wright had suspected when observations were conducted in the AS classroom.   The record fails to show that Ms. Wright took any action after reading Ms. Freiling's report and Ms. Carey's letter to ensure that Ms. Viesz, who seemed to be short of time to be in the AS classroom, was able to properly monitor the Teacher's obligation to properly record information on the IEP.  As the RISC Report shows, no one at the District, including Ms. Wright, bothered to check to see whether the Teacher updated the IEP as required.  (District Exhibit No. 23, at P. 5, at Nos. 405)

If this was not a conscious choice, it was a failure to take action that Ms. Wright should have known that someone needed to take.  As Director it is expected of her that she at least make inquiries and ensure that the Supervisor adequately communicated to the Teacher that an IEP meeting must be held with the parents and the IEP must be revised as appropriate to address the student's behaviors.  The RISC Report shows that these actions were not taken, and Ms. Wright does not contend that she asked about the updating of the IEP.  (District Exhibit No. 23, at P. 5). The regulation, 22 Pa. Code §14.133, is cited in the report entitled "Restraint Information

---

[5] At the time, Ms. Carey was supervising the teacher in the Jamison autistic support classroom in a course of study that the teacher was in the process of completing to become a Board Certified Behavior Analyst.  This what Ms. Carey is referring to as "my role as her supervisor for the BACB."

System Collection (RISC) Investigation Report" of the Department of Education, dated February 10, 2025 ("RISC Report"). Under this regulation, positive measures must be used to address behavior of students rather than negative behaviors, and all young children must be free from demeaning treatment, the use of aversive techniques and the unreasonable use of restraints. (Statement of Charges, Exhibit B).

Notwithstanding that the use of improper restraints was noted in Mr. Freiling's report, Ms. Wright failed to ensure that Ms Donofrio, who was new to the obligation of performing the reporting, was aware of the need to include the information about the restraints in the report and had accomplished this task. Mr. Freiling's report indicates that it was sent to Ms Wright, and not to Ms. Donofrio. Thus, it appears that if Ms. Wright wanted to be sure that Ms. Donofrio reported the restraints, and suspected that the Teacher could not be trusted to disclose the use of the improper restraining method, it was up to her to take some kind of action to ensure that the reporting occurred. As the RISC Report shows, the reporting did not occur, and it was in violation of 22 Pa. Code §14.133. (District Exhibit No. 23, at P. 5)

Ms. Wright contends that she personally was not the individual who was supposed to report the use of the restraints to the Department of Education, but in using this as her defense, Ms. Wright fails to perceive that when she comes into information because of her high ranking position, and it is information required to be reported that Ms. Donofrio might have no reason to know, it is incumbent on her to make sure Ms. Donofrio knows that the restraints were used, and that they must be reported to the Department of Education. To say that she had no responsibility because she did not effectuate the electronic reporting, is not a defense when she is ultimately responsible for reporting of such information and data, according to her job description (District Exhibit No. 25, Job Description following Employment Contract).

26

The final phase of the investigation lead by Mr. Freiling was the "recommended action" section." (District Exhibit No. 18, at P. 4) Ms. Wright was tasked by Mr. Freiling to be a part of this phase, but Ms. Wright's actions show that she stopped well short of taking action that would have effectively prohibited any repeat of the prohibited and other undesirable conduct of the Teacher and the Education Assistant. The Teacher ignored Ms. Carey's direction to use positive behavior supports, apparently choosing to use her own ideas which had been shown to be prohibited by law and perhaps even harmful to the students in the classroom, physically or mentally. Even if there was doubt about the harm they could cause, the two employees' actions, but in particular the actions of the Teacher, were prohibited by law, 22 Pa. Code §14.133, and District Policy 340, which requires every District employee to maintain a standard of care and concern to the supervision, control and protection of students, and the Teacher and Educational Assistant had shown themselves to be acting below an acceptable standard as early as in Mr. Freiling's investigation. They compounded their misconduct in December, as described by Ms. Carey, because they were continuing to avoid use of positive behavior support methods in violation of 22 Pa. Code §14.133.

A person well-educated about child behavior and special education, such as Ms. Wright, can reasonably be expected to know that it posed a risk to both the students and the District to allow the Teacher's activity to continue in the AS classroom. Not only this, but she also can be reasonably expected to know that Human Resources professionals who have no reason to have any training in special education law and compliance, would not know this and would need input from her to better understand that the course of conduct they had outlined, a PIP and a 30 day check-in to determine progress with monitoring thereafter, was probably going to take too long to end the Teacher's prohibited misconduct. The record shows that Ms. Wright questioned

why the two employees were not being removed from the classroom but there is nothing to show that Ms. Wright did what was required to educate the others involved, especially Mr. Freiling, about the risk posed to the students and the District by the Teacher's continued refusal to follow direction and use positive behavior support methods.

Therefore, the course of conduct that Ms. Wright engaged in from November 14, 2024, through February 10, 2025, when the RISC Report was issued, making it clear that at least one authority determined that the restraints used by the Teacher and Educational Assistant constituted violations of law and so did the failure to report them. These actions and failure to take more effective actions, which actins were not all proven to be made by conscious choice, certainly constituted a continuing pattern of neglect and failure to comply with School laws and District Policy, along with the actions that show that she did make some of the choices and decisions discussed above consciously, which constitutes action that is persistent and willful violation of School laws and District Policy. The two charges were proven by the District.

### C. Willful Neglect of Duties

This charge may be proven by showing that the professional employee has engaged in, on at least one occasion, action in the nature of non-performance of duty that is willful or intentional, as is the circumstance when an individual chooses not to do something that is one of their responsibilities or job duties. See e.g., *Flickinger v. Lebanon School District*, 898 A.2d 62 (Pa. Cmwlth. 2006).

As the facts of record show, Ms. Wright was a signatory to an employment contract with the District. (District Exhibit 25). On the second page of that employment contract, the requirement that she obtain approval from the Board before giving any speaking engagements is stated.

Notably, the employment contract also states that the approval of the Board "shall not be unreasonably withheld or delayed." (District Exhibit 25, at P. 2).

Speaking engagements include speaking on a topic in a live webinar. The electronic method used to enable others to hear and see Ms. Wright while she was speaking does not alter the character of the presentation as an engagement involving speaking. The topic identified in the announcement of the webinar was "Removing Disruptive and Violent Students from Your School," and Ms. Wright was identified as the featured speaker. (District Exhibit 24). Thus, the live webinar can be considered a speaking engagement as that term is used in her employment contract.

Ms. Wright does not dispute that she did not seek or obtain the approval of the Board. Rather, she contends that the Superintendent, Dr. Yanni, had given direction that he be "the only conduit for management to the Board." (Wright Exhibit A, at P. 13, No. 53). This contention is beside the point. Any directive from Dr. Yanni or the previous superintendent that Ms. Wright bring her request for approval to the Board through the Superintendent is not tantamount to a directive that the Superintendent's approval is all that is needed for the speaking engagement. It is entirely possible to first inform the Superintendent that Ms. Wright would like to obtain Board approval for the March 18, 2025, speaking engagement, and to ask the Superintendent if she can proceed to make a request for approval of her speaking at the live webinar on March 18, 2025. Ms. Wright chose not to do this, for reasons best known to her.

Ms. Wright also argues that the webinar was given at 7.00 p.m., which is not during the school day. Ms. Wright also asserts that she did not receive any remuneration for the webinar. However, the time of day and the lack of monetary compensation are no defense to this charge

because neither are reasons why she would have any reason to believe that she did not need Board approval.

She also contends that she did not seek the Board's approval in the past to do speaking engagements outside of the District and instead sought the approval of the Superintendent. This, too, is an unconvincing defense which shows only that Ms. Wright did not honor her contractual obligation in the past. This statement does not establish that the Board ever gave permission to the Superintendent to exercise this approval on the Board's behalf, and it does not establish that there was a widespread practice among employees who had similar clauses in their employment contracts of obtaining approval from the Superintendent only, and that the Board knew of this practice and accepted it.

Employment contracts are not intended to set forth every obligation or job duty that an employee must meet, but they generally include all of the important obligations expected of the employee. To be clear, Ms. Wright's choice to ignore this contractual obligation and to not seek and obtain Board approval prior to the March 18, 2025 speaking engagement, if it were the only poor choice made by Ms. Wright in the 2024-25 school year, might not, in and of itself, have motivated the District to seek Board approval to terminate her employment. However, this choice was not Ms. Wright's only poor decision, as discussed above.

The requirement that Ms. Wright obtain Board approval of speaking engagements in advance was put set forth in her employment contract. No contractual obligation is unimportant. The Board, as the policy making body of the School District, is legitimately interested in ensuring that its employees fulfill all of their contractual obligations, including this one.

All that is left to add is that it would not have been difficult for Ms. Wright to make the right choice and to approach the Superintendent to make a request for such approval to the Board. A short letter or memorandum could have been used for this purpose.

The District has sustained its burden of proving that Ms. Wright engaged in a willful neglect of duties, as charged, by showing that Ms. Wright chose to obtain the Superintendent's approval and not the Board's prior to the March 18, 2025, speaking engagement that she gave.

D. Incompetency

The term 'incompetency' is not specifically defined in the School Code. It is the case law that has been handed down in the form of decisions of the Secretary of Education and the Courts of the Commonwealth that has helped define what incompetence is. In *Horosko v. Mount Pleasant Township School District*, 335 Pa. 369, 6 A.2d 866, (1939), the Supreme Court held that that incompetence means "disqualification, inability, incapacity, lack of ability, legal qualifications, or fitness to discharge the required duty." *Horosko*, 335 Pa. at 374, 6 A.2d at 869.

There is no evidence in the record that would support a finding that Ms. Wright lacked the ability or mental capacity to do the job duties required of the Director of Pupil Services. She failed to understand that oversight of a Department frequently does require finding out what is occurring in a particular classroom and if the misconduct is serious enough, as the legal and policy violations were in this matter, it requires decisive action to put a stop to it even if that means educating others who may not be as fully informed of special education requirements as Ms. Wright must be. For this reason, we must conclude that the charge of incompetency, though often repeated in the Statement of Charges, has not been proven.

V.    SUMMARY

The School District has proven that Ms. Wright engaged in willful neglect of duties by failing to obtain the approval of the Board before she gave a webinar presentation on March 18, 2025,  and that she engaged in persistent negligence in the performance of duties and persistent and willful violation of or failure to comply with the School laws of the Commonwealth, including school policy when she engaged in the course of conduct between November 14, 2024 and February 10, 2025, in which she chose initially not to take decisive and effective action to find out whether what the Teacher and Educational Assistant were doing to handle student behavior in the AS classroom was compliant with law, including the students' IEPs and PBSPs. Next, when she learned of the allegations of Ms. Kline as reported by Ms. Trawinski and Mr. Freiling in their written documentation dated November 16, 2024 and December 12, 2024, respectively, she chose to avoid the obligation to ensure that such activity was reported as required by law.  Following this bad choice, Ms. Wright made a choice to avoid getting involved in the investigation of what was occurring in the AS classroom and to avoid any participation or exercise of authority to correct them.  Finally, the record shows that Ms. Wright had no apparent desire to engage meaningfully in the process of correcting the actions taken by the Teacher and Educational Assistant in the AS classroom so that they do not reoccur in the future, including reporting the inappropriate use of aversive techniques as found by the Bureau of Special Education RISC Report.

Accordingly, for all of the reasons discussed above, the charges of willful neglect of

duties, persistent negligence in the performance of duties, and persistent and willful violations of or failure to comply with school laws of the Commonwealth and School District policy are sustained, because the District has proven these charges.

## CONCLUSION AND ORDER

1. The School District has the obligation to provide staffing for the students it serves, and that its employees faithfully and dutifully discharge the duties of their employment.

2. Alyssa Wright has committed the offenses of willful neglect of duties, persistent negligence in the performance of duties, and persistent and willful violations of or failure to comply with school laws of the Commonwealth and School District policy

3. Termination of Alyssa Wright is the only form of proper punishment and no lesser form of discipline is appropriate.

## ADMINISTRATIVE RECOMMENDATIONS

The Hearing Officer considered the Administration's recommendation that Alyssa Wright be terminated from her employment with the School District. Having thoroughly considered the recommendation of the Administration as well as the Stipulation, the evidence and arguments of the Parties, the Hearing Officer recommends, and the Board enters, the following Order:

1. Alyssa Wright is hereby terminated from her employment with the Central Bucks School District effective immediately. The Administration is directed to provide a copy of this Adjudication to her and to take appropriate action pursuant to this Adjudication.

**By Order of the Board of School Directors of the Central Bucks School District**

DATED: <u>August 21, 2025</u>

Susan Gibson,
President, Board of School Directors of the
Central Bucks School District