## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALYSSA WRIGHT | : | |
| 4720 Franklin Circle | : | |
| Pipersville, PA 18947 | : | |
| | : | **CIVIL ACTION** |
| Plaintiff, | : | |
| | : | No.: 2:25-cv-05392-NIQA |
| | : | |
| v. | : | |
| | : | |
| CENTRAL BUCKS SCHOOL DISTRICT | : | **JURY TRIAL DEMANDED** |
| 20 Welden Drive | : | |
| Doylestown, PA 18901 | : | |
| and | : | |
| SUSAN GIBSON, *individually* | : | |
| 20 Welden Drive | : | |
| Doylestown, PA 18901 | : | |
| and | : | |
| KAREN SMITH, individually | : | |
| 20 Welden Drive | : | |
| Doylestown, PA 18901 | : | |
| and | : | |
| ROB DUGGER, individually | : | |
| 20 Welden Drive | : | |
| Doylestown, PA 18901 | : | |
| and | : | |
| RICK HARING, individually | : | |
| 20 Welden Drive | : | |
| Doylestown, PA 18901 | : | |
| and | : | |
| HEATHER REYNOLDS, *individually* | : | |
| 20 Welden Drive | : | |
| Doylestown, PA 18901 | : | |
| and | : | |
| DANA FOLEY, *individually* | : | |
| 20 Welden Drive | : | |
| Doylestown, PA 18901 | : | |
| and | : | |
| DANIEL KIMICATA, *individually* | : | |
| 20 Welden Drive | : | |
| Doylestown, PA 18901 | : | |
| and | : | |
| JENINE ZDANOWICZ | : | |
| 20 Welden Drive | : | |

Doylestown, PA 18901         :
                                      :
           Defendants.           :
_____:

## FIRST AMENDED CIVIL ACTION COMPLAINT

Plaintiff, by and through her undersigned counsel, hereby avers as follows:

## I.      INTRODUCTION

1.      This action has been initiated by Alyssa Wright (*hereinafter* referred to as "Plaintiff") against Central Bucks School District, Susan Gibson, Jenine Zdanowicz, Karen Smith, Rob Dugger, Rick Haring, Heather Reynolds, Dana Foley, and Daniel Kimicata (*hereinafter* collectively referred to as "Defendants") for violations of Title VII of the Civil Rights Act of 1964 ("Title VII - 42 U.S.C. §§ 2000, *et. seq*.), for First Amendment Retaliation, for violations of the Pennsylvania's Whistleblower Law ("PWL" - 43 P.S. §§ 1421 *et. seq*.), for breach of contract, and other applicable law(s).

2.      Plaintiff asserts she was wrongfully and/or unlawfully suspended <u>and</u> terminated from her employment by Defendants. As a direct consequence of Defendants' unlawful actions, Plaintiff seeks damages as set forth herein.

## II.      JURISDICTION AND VENUE

2.      This Court, in accordance with 28 U.S.C. § 1331, has jurisdiction over Plaintiff's claims because this civil action arises under laws of the United States.  There lies supplemental jurisdiction over Plaintiff's state-law claims because they arise out of the same common nucleus of operative fact(s) as Plaintiff's federal claims.

3.      This Court may properly maintain personal jurisdiction over Defendants because Defendants' contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial

justice, satisfying the standard set forth by the United States Supreme Court in <u>International Shoe Co. v. Washington</u>, 326 U.S. 310 (1945) and its progeny.

4.    Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district, and in addition, Defendants are deemed to reside where they are subject to personal jurisdiction, rendering Defendants residents of the Easter District of Pennsylvania.

5.    Plaintiff is proceeding herein under the Title VII, and she has properly exhausted her administrative remedies by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and by filing the instant lawsuit within ninety (90) days of receiving a notice of dismissal and/or right to sue letter from the EEOC.

### III.    **PARTIES**

6.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7.    Plaintiff is an adult individual, with an address as set forth in the caption.

8.    The Central Bucks School District, a/k/a CBSD ("Defendant CBSD," where referred to individually) is the third largest school district in Pennsylvania (of more than 500 school districts), spans 120 square miles, operates through 23 schools, and maintains a student census of approximately 17,000 students per annum.

9.    Susan Gibson ("Defendant Gibson") is the President of Defendant CBSD's School Board. Heather Reynolds ("Defendant Reynolds") is the Vice President of Defendant CBSD's School Board. Rob Dugger ("Defendant Dugger"), Rich Haring ("Defendant Haring"), Dana Foley ("Defendant Foley"), Daniel Kimicata ("Defendant Kimicata"), Jenine Zdanowicz

("Defendant Zdanowicz"), and Karen Smith ("Defendant Smith") are Members of Defendant CBSD's School Board.

10.     The eight (8) individuals identified in Paragraph 9 are collectively hereinafter referred to as the "Board Members" and are being sued as to their individual assets and in their individual capacities.

11.     Defendant Board Members specifically orchestrated, undertook, and participated directly in all adverse actions against Plaintiff as outlined in this lawsuit. At all times relevant herein, Defendants acted by and through their agents, servants and employees, each of whom was directly involved in adverse actions taken against Plaintiff as outlined in this lawsuit.

## IV.    FACTUAL BACKGROUND

12.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

### [A] Plaintiff work history and role with Defendant CBSD

13.     Plaintiff was hired by Defendant CBSD in or about June of 2021; and in total, Plaintiff was employed by Defendant CBSD for approximately four (4) years.

14.     Defendant CBSD spans more than 120 miles and is comprised of 23 schools across nine (9) municipalities. This is the third largest school district (of nearly 500) within the Commonwealth of Pennsylvania.

15.     Plaintiff served as the Director of Pupil Services ("DPS") for CBSD during her approximate 4-year tenure.

16.     As a DPS, Plaintiff was responsible for the oversight of all 23 schools in the district, as well as students placed in educational programs *outside of* the district. Her role was global, strategic, and systemwide. Plaintiff did not operate from or report to any individual

school; rather, she was at all times based at the district's administrative office at 16 Welden Drive,  Doylestown, PA 18901 and supervised a vast infrastructure of student support services.

17.     Plaintiff's (global) responsibilities included oversight of all special education services, all gifted education programs, and all students served under Chapter 15 of Pennsylvania law.

18.     Plaintiff directly supervised 11 administrators and a central office support team. The Pupil Services department includes more than 275 teachers and over 460 paraprofessionals and support staff as well as nurses, Central Registration, counselors, behavior analysts, social workers, school psychologists and program specialists.

19.     Plaintiff also served as the Title IX Coordinator for every student within Defendant CBSD, managing issues of sexual harassment, discrimination, and equity in compliance with federal law.

20.     Given the scope and complexity of her responsibilities, it was never Plaintiff's role to monitor the daily activities within a specific classroom in any individual school. There had always been a sizeable network of management overseeing specific schools and classrooms relative to special education at Defendant CBSD.

### [B] Plaintiff had a 5-year employment contract with Defendant CBSD

21.     On June 25, 2023, Plaintiff (and Defendant CBSD) executed a "Director of Pupil Services Employment Contract" (hereinafter, the "Contract"). In accordance with the Contract:

  a.  Plaintiff was to be employed as the DSP "for a term of five (5) years."

  b.  Plaintiff was to receive compensation of "not less than $185,000," which had been increased during her tenure (and which was exclusive of pension or retirement contributions, and other benefits).

  c.  Plaintiff could only be terminated "for cause," as defined in Title 24 P.S. Education § 11-1122. Cause as defined in § 1122 states:

(a) The only valid causes for termination of a contract heretofore or hereafter entered into with a professional employe shall be immorality; incompetency; unsatisfactory teaching performance based on two (2) consecutive ratings of the employe's teaching performance that are to include classroom observations, not less than four (4) months apart, in which the employe's teaching performance is rated as unsatisfactory; intemperance; cruelty; persistent negligence in the performance of duties; wilful neglect of duties; physical or mental disability as documented by competent medical evidence, which after reasonable accommodation of such disability as required by law substantially interferes with the employe's ability to perform the essential functions of his employment; advocation of or participating in un-American or subversive doctrines; conviction of a felony or acceptance of a guilty plea or nolo contendere therefor; persistent and wilful violation of or failure to comply with school laws of this Commonwealth, including official directives and established policy of the board of directors; on the part of the professional employe . . .

*See* Title 24 P.S. Education § 11-1122

**[C] <u>On Saturday, November 16, 2024, at 5:29 PM, an email was sent to school management of Defendant CBSD containing an attachment of an interview summary with a faculty member expressing concerns about the mishandling of children in a special education classroom.</u>**

22.    On Saturday, November 16, 2024, at 5:29 PM, Christine Trawinski ("Trawinski" – HR Manager) sent (and directed) an email to four (4) high-level management personnel: (1) Kathleen Veisz ("Veisz" – Manager of 4 schools, including Jamison Elementary School); (2) Nadine Garvin ("Garvin" – Assistant Superintendent of Defendant CBSD); (3) Robert Freiling ("Freiling" – Director of Human Resources); and (4) Dave Heinman ("Heinman" – Principal of Jamison Elementary School). Trawinski copied two (2) additional people: (5) Steven Yanni ("Yanni" – Superintendent); and (6) Alyssa Wright ("Plaintiff" – Director of Pupil Services).

23.    The aforesaid email contained an attachment of a "Meeting Summary" with Alyssa Klein ("Klein"), an employee who worked with Rachel Ausspring ("Ausspring") and Gabby McDaniel (McDaniel") within a specific classroom in Jamison Elementary School (hereinafter, the "Jamison Classroom").

24.    The attachment (to the 11/16/24 email at 5:29 PM) was two pages, and in summary, it identified a student with the initials JP was allowed to sit naked, self-stim, masturbate, was subject to water restrictions, was required to remain in his workstation, was yelled at, did not have his own spit cleaned up around him while he was required to continue working, JP walks on wood chips in the playground hurting his feet, and that – as to some other students – there is excessive hitting, toilet sitting, and crying occurring.  For purposes of brevity, this is the overall gist and points within the meeting summary.[1]

25.    In sum though, Klein, who worked with McDaniel and Aussprung in the Jamison classroom, (according to the 11/16/24 email and attachment) reported concerns that McDaniel and Aussprung were mishandling students (within the Jamison classroom).

**[D]** **Students within the Jamison classroom were autistic and typically had significant mental health disabilities, creating tremendous challenges to care for such students effectively.**

26.    The type of students in the Jamison classroom and other similar special education classrooms within Defendant CBSD locations often exhibit:

- Limited social skills;
- Difficulty with or an inability to effectively communicate;
- Consistent rocking or hand flapping;
- Spitting, drooling, or other similar verbal behaviors;
- Yelling, screaming or verbal outbursts;
- Self-injurious behavior;
- Self-stimming (masturbation);
- Disrobing (clothing removal);
- Aggression that manifests itself in many ways such as biting, kicking, hitting, or in other ways;
- Extreme anxiety, inability to sleep, cognitive challenges, impulsivity, and a host of other behavioral traits; and

---

[1] Neither the specific classroom, nor the student names are referenced herein for privacy purposes.

- Bladder and bowel dysfunction, underactive bladder, overactive bladder, urological conditions, incontinence, and severe constipation.

27.    The summary of an interview with Klein that Trawinski's attached to her 11/16/24 email had identified some typical behaviors of students within the Jamison classroom (*irrespective of* proper or improper care). And handling such students prone to severe behavioral problems is of course very challenging for faculty (regardless of level of experience or tenure).

### [E] <u>Defendant CBSD's highest levels of human resources management and administration decided (*without* Plaintiff's involvement) to retain McDaniel and Aussprung in teaching capacities (without placing them on leave) pending further investigation.</u>

28.    As part of termination proceedings against Plaintiff, Defendant CBSD obtained a Sworn Declaration from Trawinski. Trawinski (Manager of Human Resources) confirmed under oath that a decision to retain McDaniel and Aussprung was made by high-level management **not involving Plaintiff**. In her sworn declaration, Trawinski wrote:

6. Later in the day, a meeting was held with Ms. McDaniel, Mr. Freiling, Dr. Garvin, Kathleen Veisz, the Supervisor of Special Education, and Principal Heineman. The purpose of the meeting was to allow McDaniel to respond to the allegations made by Ms. Kline. Mr. Freiling's notes from the conversation that occurred during the meeting

7. During the meeting, I read line by line the information as reflected in District Exhibit 5 and provided Ms. McDaniel the opportunity to respond. McDaniel provided an explanation for each of the concerns raised by Ms. Kline. As McDaniel explained her

8. After the meeting, there was a caucus where Mr. Freiling, Dr. Garvin, Principal Heineman, and Ms. Veisz convened to discuss whether McDaniel should be placed on administrative leave. It was unanimously decided that McDaniel should not go on administrative leave at that time until further information was gathered. After the caucus, the Superintendent of Schools, Dr. Steven Yanni, and Ms. Wright were called and provided with an update on the decision to keep Ms. McDaniel in the classroom pending the investigation. Ms. Veisz did not raise any concerns from a special

29.     The three excerpts above from Trawinski's sworn declaration pertained to a meeting on November 15, 2024 (1 day before the 11/16/24 email was circulated) held by Freiling, Garvin, Veisz, and Dave Heinman ("Heinman" – Principal of the Jamison School).[2]

30.     Cathy Rossi ("Rossi") was hired as an interim Human Resources Director. As part of termination proceedings against Plaintiff, Defendant CBSD obtained a Sworn Declaration from Rossi. In her sworn testimony (as to the 11/15/24 meeting with Klein), Rossi testified:

> 12. After the meeting with McDaniel, Trawinski, Freiling, Veisz, Heineman, and Garvin gathered to decide whether McDaniel should be placed on administrative leave during the investigation. A unanimous decision was made not to place McDaniel on administrative leave until further information was gathered. Afterwards, Wright and the Superintendent of Schools, Dr. Steven Yanni, were called over the phone to update them on the decision not to place McDaniel on administrative leave.

31.     The **decision** to retain (and not place McDaniel or Aussprung on administrative leave) was decided by Garvin (the Assistant Superintendent), **someone who Plaintiff reported to and was managed by** within Defendant CBSD. Those deciding with (and or giving input to) Garvin included the Jamison Elementary Principal (Heinman), who oversaw the entire elementary school and Freiling (the Director of Human Resources who oversaw nearly 3,000 faculty / management / staff within Defendant CBSD). Plaintiff had **no authority** over *any* of these high-level leaders within Defendant CBSD – and as Trawinski swore under oath – Plaintiff was merely told of their final decision (without her input or involvement).

32.     Moreover, Trawinski – who was actually part of the investigatory interview with Klein – represented that such faculty "provided an explanation for each of the concerns." This ostensibly convinced Heinman, Garvin, and Freiling to not even believe administrative leave was

---

[2] Paragraphs 6 - 8 of the Trawinski Declaration are not recited in full.

necessary for McDaniel or Aussprung (permitting them to continue working in the classroom with students).

> **[F]  By mid-November of 2024, Defendant CBSD's human resources department (with the coordination of the Assistant Superintendent, Superintendent, and/or Solicitor) was conducting a "confidential" investigation (not involving Plaintiff or hundreds of other management-level employees).**

33.    Trawinski swore under oath in her Declaration (referenced above) that *only* human resources was responsible for and conducting "confidential" investigation. In particular, she testified:

> 11. From November 18, 2024 – November 20, 2024, Mr. Freiling and I interviewed the individuals that had regular contact with the special education classroom as was shared by Ms. Veisz. The decision was made to only have Mr. Freiling and myself conduct the interviews to promote confidentiality and provide an environment where staff would feel comfortable sharing information as a supervisor would not be

34.    Trawinski wholly acknowledged under oath that Plaintiff was not part of any factfinding(s) or interview processes.[3]

> **[G]  On Wednesday, November 20, 2024, Plaintiff was informed by Yanni (the Superintendent of all of Defendant CBSD and whom she was managed by) that he made a Childline complaint to report allegations lodged by Klein.**

35.    It is **undisputed** that a Childline report was made **on 11/20/24** by the Superintendent (Yanni) – the (then) Chief Executive Officer of Defendant CBSD – about allegations in the Jamison classroom. This is **only 2-3 business days** after a Saturday night email was disseminated (only days earlier).

36.    Yanni's Childline complaint also prompted a police investigation by the Warwick Police Department. Yanni, Garvin, and Defendant CBSD's human resources department

---

[3] Paragraphs 11 of the Trawinski Declaration is not recited in full.

coordinated and handled all aspects of the Warwick police investigation arising out of the 11/20/24 Childline complaint. Plaintiff *did not participate* in police-related communications.

37.     Pursuant to 23 Pa. C.S.A. § 6311, a Childline complaint must be lodged based upon enumerated suspicions of suspected child abuse (as school employees, faculty, staff, management, and officials are "mandated reporters").[4] This is an agency-based complaint that typically prompts a police investigation (as occurred herein). This was done by Yanni (the Superintendent). Yanni's Childline complaint and the resultant police investigation had become common knowledge and a topic of discussion amongst many.

*38.     Between (Saturday night at 5:29 PM on) 11/16/24 and 11/20/24 (several business days later), Plaintiff had only been informed: (a) Klein raised some concerns; (b) Klein gave explanations to the concerns; (c) higher-level (and other) management not involving Plaintiff made the decision to permit McDaniel and Aussprung to continue working without temporary suspension or leave; (d) that human resources management was conducting its own "confidential" investigation; and (e) the highest-level overseer of Defendant CBSD made a Childline complaint (prompting a police investigation).* This is all incapable of being disputed.

### [H] Defendant CBSD's Human Resources Department Moved Very Slow and Was Very Ineffective.

39.     Defendant CBSD's human resources management concluded its "confidential" investigation on November 22, 2024, *but took 21 days* to prepare and send anyone within Defendant CBSD an update or summary of the investigation concluded nearly three weeks earlier.

---

[4] ChildLine is part of a mandated statewide child protective services program designed to accept child abuse referrals.

40.     In her Sworn Declaration (and testimony), Rossi testified:[5]

> 23. The Jamison Investigation concluded on November 22, 2024. On December 12, 2024, a report with the findings of the investigation was shared with Wright (hereinafter referred to as the "December 12th Report"). The December 12th Report validated that a student was

41.     Rossi's testimony confirms: (a) it took Human Resources nearly three weeks to generate a Memorandum based upon an already-concluded investigation that ended on 11/22/24; **and** (b) that the 12/12/24 Report generated only related to <u>the same prior concerns</u> relayed by Klein (already the subject of a Childline complaint and a Warwick police investigation).

42.     On December 12, 2024, a 5-page (human resources) "Memorandum" about Klein's (mid-November 2024) concerns was prepared and copied <u>to 8 people</u>: (1) Yanni, Superintendent; (2) Garvin, Assistant Superintendent; (3) Plaintiff, Director of Pupil Services; (4) Heineman, Principal for Jamison Elementary School; (5) Theresa Everett ("Everett"), Human Resources Manager; (6) Trawinski, Human Resources Manager; (7) Cara Alderfer ("Alderfer"), CBEA President; and (8) Deneen Dry ("Dry"), Nurse and CBESPA President.

43.     Completely corroborating that Plaintiff had no involvement in any investigation, interviews or factfinding, the 12/12/24 Memorandum confirmed her only involvement was directing an employee (Dry) to mention any concerns she had to human resources (on 11/14/24). Dry's concerns related (only) to Klein feeling like she had interpersonal problems with faculty and the Principal and that her job was in jeopardy (so naturally such issues were an HR matter).

44.     Freiling, the Director of Human Resources (and highest-level HR personnel within Defendant CBSD), identified (in his 12/12/24 Memorandum) ***the only action(s) being undertaken*** as a result of Klein's mid-November 2024 concerns were various policy creation(s),

---

[5] Paragraph 23 of her Declaration is not recited in full.

increased observation(s), and additional training(s). Again, this was <u>without the input</u> or involvement of Plaintiff.

        **[I]** **<u>By December of 2024 (and thereafter), Plaintiff was questioning the highest-levels of management within Defendant CBSD asking why if there is a criminal investigation faculty the Jamison classroom was not placed on leave.</u>**

45.     Plaintiff talked with numerous management-level employees (whom she did not supervise or who supervised her) such as Yanni and Garvin (the Superintendent and Assistant Superintendent respectively). In such dialogue, she was verbally questioning why during a criminal investigation the Jamison faculty were being permitted to continue teaching (and were not placed on leave).

46.     In addition to verbally raising such issues, Plaintiff was emailing all levels of management about such concerns. Plaintiff for example sent the following emails to Yanni (Superintendent), Garvin (Assistant Superintendent), Edward Diasio (Solicitor), and Freiling (Director of HR):

**<u>Email Example #1</u>**

**WRIGHT, ALYSSA** <ALWRIGHT@cbsd.org>        Sat, Dec 28, 2024, 9:50 AM

to GARVIN, NADINE, YANNI, STEVEN, Edward Diasio, FREILING, ROBERT ▾

Hi all,

I have a question... Has any consideration been given to keeping Gabby and Rachel out now that there is an open criminal investigation? I don't know how any of that works, but I was thinking about that after reading these emails.

**Email Example # 2**

WRIGHT, ALYSSA <ALWRIGHT@cbsd.org>

to VEISZ, KATHLEEN, HEINEMAN, DAVE, GARVIN, NADINE, FREILING, ROBERT, YANNI, STEVEN ▼

Hi all,

I still want to go back to the idea of putting her out.  Is there a reason we aren't?

> **[J]  Between late December of 2024 through March of 2025, Plaintiff was complaining to Defendant CBSD officials and management about the entity as a whole being inept, moving too slow, and downplaying suspected abuse (among other concerns).**

47.     On December 26, 2024, Klein's actual written submission (from mid-November of 2024) to Defendant CBSD was released to certain management (such as Plaintiff). It was lengthy, *Trawinski had downplayed the allegations in her email summary*, and the sheer breadth of the concerns Plaintiff learned about more fully between 12/12/24 – 12/26/24 troubled her.

48.     Plaintiff believes that Klein submitted a 7-page written complaint of abuse on or about November 17, 2024, to Defendant CBSD's human resources management. Despite that such allegations involved a special education classroom (under Plaintiff's global purview), Defendant CBSD's human resources management did not share the actual written complaint from Klein for nearly 47 days (until 12/26/24).

49.     Between December 2024 – March of 2025, Plaintiff was being very vocal about: (a) her belief(s) that Jamison classroom faculty should have been suspended or placed on leave; (b) her belief(s) that Defendant CBSD was moving too slow and not taking appropriate actions; and (c) that she believed Defendant CBSD higher-level management (with the assistance of the then Solicitor – Edward Diasio) were downplaying and concealing the full extent of "abuse" *that was coming to light* in the Jamison classroom. She made these serious concerns known to *inter alia* Yanni.

50.    In the December 2024 – March 2025 timeframe, Plaintiff felt she was being retaliated against, excluded, ostracized, and treated in an antagonistic manner for proverbially making noise and complaining (about illegality, wrongdoing, and child abuse).

**[J]** **By February of 2024, Plaintiff was trying to meet or talk with Susan Gibson ("Gibson"), the President of Defendant CBSD's Board who refusing to entertain any discussion with Plaintiff.**

51.    On or about February 26, 2025, Plaintiff texted the President of Defendant CBSD's School Board (Susan Gibson – "Gibson"). The text chain was as follows:



52.    As of February 26, 2025, Plaintiff was being retaliated against by Yanni and Freiling (the Superintendent and Director of Human Resources) - - two of the highest officials in all of Defendant CBSD. She had no place to meaningful place to turn, so she sought relief from Defendant CBSD's School Board (which is supposed to oversee matters within Defendant CBSD).

53.    However, *Gibson declined to communicate with Plaintiff on behalf of the Board* and suggested she either complain to the people retaliating against her or talk with Defendant CBSD's lawyer (Peter Amuso – "Amuso") who was simultaneously communicating with the CBSD Board and the management to whom she was complaining. Plaintiff was left in an arena with no meaningful redress. Defendant CBSD as a whole was handling things <u>very poorly</u>.

### [K] <u>On March 3, 2025, Plaintiff made a formal 13-page written complaint (through counsel) to Defendant CBSD's Board, management, and counsel.</u>

54.    On March 3, 2024, Plaintiff submitted a 13-page whistleblower complaint (through her counsel) directly to the following individuals:

- Yanni (Superintendent);

- Freiling (Director of Human Resources);

- Leigh Dalton, Esq. ("Dalton" - investigator appointed by Defendant CBSD);

- Diasio (Solicitor and counsel of Defendant CBSD); and

- Gibson (President of Defendant CBSD's School Board).

55.    The letter contained explosive and expansive allegations, including but not limited to:

(a) "legal complaints" and threats of "litigation" by Plaintiff;

(b) A request that "CBSD reverse course and promptly cease concealing abuse and neglect;"

(c) Heinman (Principal of Jamison Elementary) was attempting to terminate and "retaliate" against Klein (because she was a whistleblower), which is unlawful;

(d) Defendant CBSD was downplaying and diluting Klein's allegations of abuse to make them seem non-serious;

(e) Heinman had an improper relationship with faculty in the Jamison classroom wherein, leading Heinman to help conceal abuse and shield such faculty;

(f) Investigations into abuse or neglect were being impeded and there was a lack of cooperation;

(g) Defendant CBSD failed to properly investigate or remedy gross misconduct by Defendant CBSD leadership and officials;

(h) Concerns that abuse and neglect had occurred that were not being disclosed, remedied, and which was perpetuated (including by retention of abusive and negligent faculty by not placing them on leave);

(i) Defendant CBSD was letting leadership give input into decisions who had conflicts of interest and inappropriate relationshions;

(j) Yanni (and other management was misleading police in a police investigation and making false statements during legal investigations;

(k) Yanni was lying publicly about what truly transpired within the Jamison classroom, even to an affected parent of an abused or neglected child;

(l) Yanni was blanketly retaliating against Plaintiff for her opposition to his concealment and improprieties (in many specified ways);

(m) Yanni's own husband was engaging in right-to-know requests from Plaintiff's former employer(s) in *what appeared to be a planned effort to smear Plaintiff*; and

(n) Yanni (or others) was attempting to impede Plaintiff's ability to communicate with agencies such as the Pennsylvania Department of Education ("PDE").

56.    Plaintiff's letter also summarized concerns she had of "sexual harassment" and abuse concealment. Her March 3, 2025, whistleblower complaint to Defendant CBSD also stated verbatim:

In the last six (6) months (through today), Wright has engaged in the following statutory or constitutionally protected activities:

**(1)** **Complaints about sexual harassment by Karen Smith ("Smith")**. Wright verbally complained on numerous occasions that Karen Smith (a well-known Board Member who repeatedly conducts herself inappropriately in a public forum) was publicly disparaging her to community members both verbally and in writing and in essence claiming she only obtained her employment contract because of "*quid pro quo*" for alleged sexual favors. Smith publicized numerous iterations of her claims. Wright even memorialized such concerns to you and Freiling dated October 17, 2024. Wright demanded remedial action and District support for what she called "sexual harassment." This is statutorily protected activity under Title VII and Title IX. **No meaningful remedial action was undertaken by CBSD.**

**(2)** **Complaints about sexual harassment by Kevin Marton ("Marton")**. Marton was a principal, charged with 2 felonies (later reduced wherein he was given probation). CBSD permitted Marton to return to work, <u>created</u> a job for him so he could remain paid in full, and let him resume working for CBSD in August of 2024 with an active criminal no contact order. He is Wright's ex-husband who was – from her vantage point – stalking her and wanting to reconcile. Wright complained on numerous occasions that he was not permitted to have contact with her legally and you created opportunities to allow him to be present in the same location as her, and that she viewed this as ongoing sexual harassment. Despite repeated (and ongoing) complaints, **no meaningful remedial action was undertaken by CBSD.** This is statutorily protected activity under Title VII and Title IX (and Wright even complained such action(s) and inaction(s) of CBSD was a "Title IX" violation.

*See* Plaintiff's March 3, 2025, Whistleblower letter, at p. 11, attached hereto as "Exhibit A."

57.      Plaintiff complained about <u>many</u> whistleblowing and First-Amendment protected concerns (explained more *infra*), in addition to concerns she had been the victim of "sexual harassment" (not properly handled, investigated, or remedied by Defendant CBSD). Plaintiff concluded her letter by stating: "This letter is intended to serve as a sweeping indictment of how CBSD has completely mishandled all aspects of the abuse allegations . . .". Plaintiff's March 3, 2025, letter (Exhibit A) is incorporated herein in full by reference, as protected concerns

expressed therein underly her retaliation claims in this lawsuit (in addition to those predating her 3/3/25 letter). This letter is hereinafter referred to as the "3/3/25 whistleblower complaint."

### [L] Plaintiff's 3/3/25 whistleblower complaint caused a significant disruption within Defendant CBSD.

58.    **Prior to** March 3, 2025, Defendant CBSD **and** its Board as a whole could be described as nothing but an utterly slow-moving, inactive failure. In particular, Defendant CBSD **and** its Board:

(a) Failed to remove 2 accused child abusers, even during the pendency of an investigation (permitting their continued work around and with children).

(b) Failed to properly oversee its own leadership or management, which lacked any meaningful oversight.

(c) Was supposedly conducting an investigation, but any investigation should have been prompt, expedited, and effective. To the contrary, Defendants floundered in a purported investigation mode for nearly 6 months.

(d) And despite numerous complaints about certain leadership engaging retaliation (confirmed by many witnesses), Defendants did nothing and undertook no remedial action(s).

59.    In sum, **prior to** March 3, 2025, Defendants were a do-nothing entity and Board who watched serious problems unfold and continue as if they were an audience in a reality TV show (instead of a Board with oversight obligations to intervene and promptly remedy problems, or to dictate an expedited investigations).

60.    **After** March 3, 2025, Defendants held emergency Board meetings, expanded an "investigation," demanded results of an investigation sooner, and Plaintiff was identified as a whistleblower in communications and publications publicly within Defendants, in the news, and publicly.

**[M]** <u>**Plaintiff was placed on administrative leave on or about May 2, 2025 (and ultimately terminated in late August of 2025).**</u>

61.     Plaintiff had dedicated nearly three decades of her life to education at many levels and enjoyed an exemplary career.

62.     In Plaintiff's approximate (total) four (4) years of employment within Defendant CBSD, Plaintiff had never been counseled, disciplined, or subject to any progressive warning(s).

63.     Within approximately 61 calendar days <u>or</u> 45 business days of Plaintiff's 3/3/25 whistleblower letter, Plaintiff was placed on administrative leave (as of May 2, 2025) ***and never permitted*** to return to work (pending termination, which in fact occurred in late August of 2025).

**[N]** <u>**The reasons given for Plaintiff's termination from employment are – from an objective standpoint – false, totally unbelievable, and a malicious misapplication of legal text (as explained i*nfra*).**</u>

64.     As aforesaid, Plaintiff was placed on an involuntary leave of absence effective on or about May 2, 2025. At this time, Plaintiff was provided with no information as to why she was being placed on administrative leave.

65.     Defendants' rush to place Plaintiff on involuntary leave was a complete catastrophe and did more harm than good (as was par for the course with Defendant CBSD and its Board). Plaintiff oversaw pending IX investigations, was in the middle of numerous legal matters for and on behalf of Defendant CBSD and was handling time-sensitive special education programs and matters.

66.     Placing Plaintiff on leave abruptly with no warning(s) and no access to information or to communication with staff or management jeopardized the welfare of children, programs, and numerous other matters (even compromising the quality of pending investigations for which Plaintiff was handling from a Title IX standpoint). In fact, Defendant CBSD ***never***

*once* sought information from Plaintiff about any pending matters to transition or facilitate in a rush to get rid of her (letting such matters falter).

67.    Plaintiff was then left in the proverbial dark for nearly 48 calendar days (from May 2, 2025) until on or about June 18, 2025, when she was presented with a "Statement of Charges," hereinafter the "SOC." *See* SOC, attached hereto as "Exhibit B."

68.    Defendants rushed to retaliate against Plaintiff such that they didn't care about harming everything she was handling at the snapshot in time, didn't care to even get information to transition highly-sensitive matters, and then had to take nearly seven (7) weeks to drum up reasons to purportedly justify Plaintiff's prior removal and potential (anticipated) termination from employment.

### The Specific Reasons Given for Plaintiff's Termination

69.    Defendant's SOC listed the sole reasons for which Plaintiff was terminated. *See* Exhibit B. The SOC was comprised of 56 numbered sentences or paragraphs. The SOC can be summarized accurately as <u>three</u> separate categories of allegations of misconduct against Wright:[6]

> **Allegation 1** – Plaintiff should have been on notice of potential child abuse in a specific classroom at Jamison Elementary School <u>between October 11, 2024, through November 20, 2024</u>, and should have reported such concerns to Childline. *See* SOC, at ¶¶ 16-43.
>
> **Allegation 2** – Plaintiff received findings from Human Resources on December 12, 2024, validating abuse and restraints in the Jamison Elementary School Classroom and her failure to report unlawful restraints mentioned in the December 12, 2024, to the Pennsylvania Department of Education constituted willful misconduct. *See* SOC, at ¶¶ 44 – 52.
>
> **Allegation 3** – Plaintiff participated in a speaking engagement on March 18, 2025, without approval which was neglect of her duties, and which interfered with her job performance. *See* SOC, at ¶¶ 53-56.

---

[6] Paragraphs 1-15 of the SOC merely identify general legal principles and Wright's job position.

### i. **Allegation # 1 was a complete pretext for Plaintiff's termination.**

70.     Within the SOC, Defendant CBSD expressly relied near exclusively upon purported references to conversations Plaintiff had with <u>three people</u> between 10/11/24 – 11/15/24: (1) Veisz; (2) Vanessa Carey ("Carey" – a Behavioral Analyst); and (3) Dry. The reliance was to supposedly demonstrate that from discussions Plaintiff had with **some of hundreds of her various reports** that she may have been on notice of potential abuse in the Jamison classroom.

71.     All three (3) of these witnesses provided sworn testimony (via lengthy sworn declarations) that the SOC was false and misleading, and they <u>disputed ever discussing</u> such concerns with Plaintiff as alleged in the SOC. *See* Declarations of Veisz, Carey, and Dry (attached hereto respectively as Exhibits "C," "D," and "E").

72.     A review of Declarations from Veisz, Carey, and Dry irrefutably show: (a) no objective person could have been on notice of any possible abuse (in Plaintiff's role); (b) Plaintiff was extremely attentive and proactive about <u>any</u> matters; and (c) witnesses referenced herein went as far to say that assertions in the SOC about alleged conversations with Wright <u>were actually "false</u>."

73.     The Declarations of Veisz, Carey and Dry thus illustrate that Defendants knowingly and intentionally inserted false allegations into the SOC to lodge against Plaintiff for purposes of removal and termination.

74.     Plaintiff was required to have "reasonable cause to suspect that a child is a victim of abuse" where § 6311(b) **focuses on knowledge from** "contact with the child," "direct" care, or when a "specific disclosure" is made "to the mandated reporter that an identifiable child is the

victim of child abuse." This <u>high level</u> of knowledge <u>or</u> contact was not imparted upon Plaintiff, as the crux of the Statute requires.

75.    As explained *supra*: (a) Defendant CBSD received a complaint from Klein directly on or about November 15, 2024; (b) Defendant CBSD's human resources performed a "confidential" investigation; and (c) shared a snippet of some of Klein's concerns with various management on November 16, 2024 (a Saturday night).

76.    As of November 16, 2024, Garvin (Assistant Superintendent), Freiling (Director of HR), and the School Principal (of Jamison Elementary School) decided **with no involvement of Plaintiff** that: (a) they believed there were reasonable explanations by Jamison faculty about abuse allegations; (b) they decided to keep such faculty working (in lieu of temporary leave); and (c) they were going to investigate further before coming to any conclusion. **None of this** involved Plaintiff (or hundreds of other management-level employees overseeing programs or aspects of Defendant CBSD).

77.    Nonetheless, ***within just a few business days*** (on November 20, 2024), a Childline complaint was lodged by Yanni (the Superintendent), which prompted a full police investigation by the Warwick Police Department of allegations lodged by Klein. It is undisputed that Yanni (the Chief Executive Officer of Defendant CBSD and Superintendent) initiated a Childline complaint on November 20, 2024.

78.    In an effort to fabricate a rationale for Plaintiff's termination pretextually, Defendants *intentionally manipulated the text of the mandated reporting law* in the SOC to falsely justify Plaintiff's termination from employment.

79.    In ¶ 12 of the SOC issued by CBSD's counsel and the Board Members, they cite § 6311(c) and the entire section of the law (about mandated reporting) **except for the last**

**sentence** that was **intentionally and maliciously omitted** stating: "***This chapter does not require more than one report from any such institution, school, facility or agency."*** Defendants intentionally deleted the only applicable and relevant sentence in § 6311(c) with the intent to falsely and pretextually terminate Plaintiff.

80.    Defendants also maintained in the SOC that Plaintiff failed to initiate a Childline complaint after Yanni through the issuance of a December 12, 2024, Memorandum by Freiling. But the Memorandum was just an internal recommendation about matters moving forward based upon the same complaint(s) of Klein dating back to mid-November of 2024. Thus, there was nothing new to report to Childline.

81.    Defendant CBSD's SOC reads as if it expected all 3,000-plus approximate staff, supervisors, managers, directors, and leadership of Defendant CBSD to make Childline reports ***despite that*** the Superintendent did so and despite that there was already a pending police investigation. But that is not legally required, expected, or typical.[7]

82.    It is gravely concerning that Defendants: (1) intentionally deleted or omitted the most critical section of the statute at issue in this case in the SOC; (2) maintained (contrary to law) that Plaintiff failed to initiate a Childline complaint in mid-November through December of 2024 (when the Superintendent already did so, obviating the requirement of mandated reporting **for hundreds of other managers**, including Plaintiff); and (3) never once in its SOC identified there was a Childline complaint already initiated and a police investigation already pending.[8]

---

[7] If a high-level manager makes a report of abuse or neglect in a nursing home setting, dozens of nurses or other staff are not expected to make a repetitive report (as a matter of law).

[8] With the assistance of Amuso, Defendant Board Members thus knowingly, maliciously, and intentionally deleted the only portion of the Statute relevant in its SOC and then falsely claimed Plaintiff failed to initiate a Childline complaint contrary to the specific statutory text while never once referencing in the SOC a pending police investigation or a prior Childline complaint. This conduct is absolutely outrageous and illustrative of a design to railroad Plaintiff under false circumstances.

ii. **Allegation # 2 was a complete pretext for Plaintiff's termination**.

83.    The second categorial assertion by Defendants is that Plaintiff failed to report a "restraint" identified in the 12/12/24 Memorandum from Freiling (along with addressing other matters relative to the IEP of the student(s).

84.    In the SOC (at ¶ 47), Defendant CBSD states:

> 47.    Wright failed to report the unlawful restraints validated in the December 12th Memorandum on December 12, 2024 to the Pennsylvania Department of Education in accordance with 22 Pa. Code Section 133(c)(5), which constitutes incompetency, willful neglect of duties, and persistent and willful violation of District policy and the law.

85.    Defendants' Allegation 2 is verifiably false for **three (3) irrefutable reasons**. First, there was no "unlawful restraint" (or restraint at all *as defined in the law*) identified **in the 12/12/24 Memorandum.** 22 Pa. Code § 14.133 in its entirety only discusses proper use of restraints, what constitutes a "restraint," that use of restraints (as defined therein) should be documented, and that any data of restraints are subject to reporting (**quarterly**) as prescribed by Department of Education ("DOE").

86.    In the 12/12/24 Memorandum, the **only** (1-sentence) reference to restraints was:

- **Use of Restraints**: Multiple reports indicate the Educational Assistant was observed restraining students by placing a student in their workstation then maneuvering other tables or stations in a manner to limit the student from eloping or violently pushing the tables into other students or staff. Multiple reports indicate that on occasion the Educational Assistant was observed sitting on top of the table or placing their feet upon the legs of the table to achieve this restraint.

87.    Defendants claimed (in the SOC) that this single sentence in the 12/12/24 Memorandum about restraints makes Plaintiff liable for not issuing documentation to the DOE. But, even according to §133, "placing a student in his or her workstation" is not a "restraint." § 133(ii) expressly ***excludes* from the definition of "restraint**" any "brief holding," efforts to

"calm or comfort," and efforts to "guid[e] a student or eligible young child to an appropriate activity" . . . or "to safely escort her from one area to another." ***Bringing a student to his or her work station is not a "restraint" (as a matter of law).***

88.    Additionally, § 133 actually defines a "restraint" as the "__application of physical force__, with or without the use of any device, for the purpose of restraining the free movement __of a __ student's or eligible young __child's body__." *See* § 133(b)(i). Moving some furniture so as to avoid a child from attacking another child or faculty sitting on a desk poised to prevent harm to or by an autistic child is also not within a legal definition of a restraint. *By law, a restraint is __only__ the use of __force__ by a person or with equipment __upon the body of a child__*.

89.    There was __never__ any "restraint" as defined by law, let alone an "unlawful restraint" *listed or identified in the 12/12/24 Memorandum*. Walking a student to his or the desk and/or moving furniture to avoid injury to another student is unequivocally **not** a restraint under § 133. This can be verified easily by: (a) a review of the aforesaid restraint regulations; or (b) simply looking at the dropdown menu of an online RISC report form which identifies only significant bodily contacts that can constitute a reportable restraint. Thus, nothing in the 12/12/24 Memorandum triggered a reportable "restraint."

90.    One of the very problems with Defendants' inept handling of any investigations and having permitted its human resources to conduct a confidential investigation is that such human resources does not know about, understand, or apply laws or regulations governing children in special education with physical or mental health disabilities. This poor handling prompted Freiling (an HR Director) to identify something as a "restraint" (inarticulately) in the 12/12/24 Memorandum that was not a restraint as defined by reporting regulations.

91.    Findings issued much later than the 12/12/24 Memorandum did indicate that improper restraints may have been used in the Jamison classroom, but nothing in the 12/12/24 Memorandum triggered any DOE reporting for any personnel of Defendants (or included later-revealed restraints).

92.    Second, restraints are not reported when they occur (**if** they do occur). The actual text of §133(c)(5) states: "(5) School entities shall maintain and report data on the use of restraints as prescribed by the Secretary. The report shall be reviewed during cyclical compliance monitoring conducted by the Department."

93.    Reporting of any restraint incidents with schools is done on a quarterly basis. Plaintiff was a global overseer of 23 schools. It was not her responsibility to report restraints to the DOE on a quarterly basis, or at all. The job is performed by a Program Specialist. Melissa Donofrio ("Donofrio") was the Program Specialist handling district-wide DOE reporting until February of 2025. Then the role was assumed after her departure by Elise Viscuso ("Viscuso"), the new Program Specialist. Plaintiff has never in her four (4) years of employment at Defendant CBSD submitted any reports to the DOE about restraints. It just wasn't her job or role. *And there have been restraints at virtually all of CBSD's schools, **all** reported by the Program Specialist.*

94.    Defendant CBSD disseminated a policy which has nothing to do with Plaintiff regarding collection, compilation and reporting of restraints districtwide. The building supervisor (typically a principal) signs any documentation, and all reporting is done through Viscuso. The CBSD policy (for all of its schools) is as follows (verifying Plaintiff's non-involvement):

 **CENTRAL BUCKS SCHOOL DISTRICT**

### Physical Restraint Report Procedures

Restraints to control acute or episodic aggressive or self-injurious behavior may be used only when a student presents an imminent risk of physical harm to him/herself or others and only when less restrictive measures, including de-escalation techniques, have been used by personnel.

A physical restraint in an educational program occurs when an adult uses physical force for the purpose of restraining the free movement of a student's body.

- ☐ Following the restraint, when the student is safe, have the student evaluated by the nurse. Nurse will document visit in Infinite Campus.
- ☐ At the conclusion of the incident, call the student's parents and provide the following information:
  - ○ Explanation of incident including setting events, behavior, and de-escalation tools
  - ○ Restraint
  - ○ Recovery of the student
- ☐ Offer Parents an IEP meeting or an IEP waiver form
  - ○ *Important:* An IEP meeting needs to be held within 10 school days of the restraint unless the parent signs a waiver form
  - ○ If the parent requests a waiver form, but does not return it signed, *three* documented attempts to get a signed waiver from the parent need to be recorded.  If, after the 3rd attempt, the parent has still failed to return a signed waiver, an IEP meeting *must* be held within 10 school days of the restraint. Invite the parent to the meeting and hold it within the 10 days regardless of response.
  - ○ If the student does not currently have a Positive Behavior Support Plan, the IEP team will convene.
- ☐ Notify building level Administrator and Supervisor
- ☐ Complete a Critical Incident Report (CIR) Form  *Note:* requires Administrator/Supervisor signature
- ☐ Scan and email the Critical Incident Report Form and signed IEP waiver (if applicable) to Elise Viscuso at eviscuso@cbsd.org
- ☐ Once you have held the IEP meeting or received back the signed waiver, complete the Physical Restraint Recording Form v2 Updated for CPI in FORMS (this information is submitted to the state).  Be sure the information on the form matches the information on your CIR.  A link to the form can be found here:   https://forms.office.com/r/rxN1pQhhcm

A printout of the Physical Restraint Recording Form, Critical Incident Report Form, and a signed waiver, if applicable, will be placed into the student's cumulative file at the ESC.

02/2025 EV

95.     Defendants falsely alleged that there was a reportable "restraint" as defined by law visible in the 12/12/24 Memorandum. There was no reportable incident in that Memorandum. And Wright would not have been involved in such reporting **even if** there was a reportable incident. Defendants' SOC assertions are tantamount (by analogy) to claiming a Chief Financial Officer ("CFO") was negligent because a payroll clerk (whose job it was to handle payroll) failed to process a check properly for a company employee.

96.     But lastly (and third), Plaintiff ***would not have had sufficient information even if there was a restraint*** <u>or</u> it was her job to perform DOE reporting. Plaintiff was kept out of any investigation, factfinding, and other details. A RISC online quarterly report is not able to be made <u>unless every single part of the online form is completed for submission</u>. The online form is *very comprehensive* and requires information such as: (1) grade; (2) age; (3) student's disabilities; (4) an explanation of the specific incident(s); (5) the Antecedent explanation; (6) the behavioral concerns at issue; (7) what types of de-escalation techniques were used before a restraint occurred; (8) exact dates of restraints; (9) physical location of restraint; (10) type of restraint used; (11) the exact number of seconds and minutes of any restraints used; (12) all staff present or involved with the restraints; (13) specific injuries from the restraint to the student; (14) a detailed description of injuries to the student; (15) training certifications of involved faculty doing the restraint; (16) whether law enforcement was notified; (17) a contrast of restraints as set forth in the IEP; and (18) other information. The <u>only people</u> who had this information were HR, the Superintendent, and the Assistant Superintendent. There cannot be any reasonable assertion, implicitly or explicitly, that Wright did anything wrong.

### iii. **Allegation # 3 was a complete pretext for Plaintiff's termination.**

97.    To illustrate the retaliatory nature of Defendants, it lodged within the SOC a kitchen-sink style rationale that one reason for Plaintiff's pretextual termination was her engaging in a speaking engagement <u>on March 18, 2025</u>. The SOC states:

> 53.    Wright's contract states as follows: "The Director shall devote her full time, attention, energy, skills, and labor to her employment as Director of Pupil Services during the term of this Contract and any lawful extensions. The Director may undertake consultative work, speaking engagements, and other services related to her profession, <u>provided that such activities do not interfere with the performance of the duties</u> of the Director of Pupil Services under this Contract, and provided that <u>such activities are approved in advance in writing by the School Board</u>, which approval shall not be unreasonably withheld or delayed."

> 54.    Wright engaged in speaking engagements on March 18, 2025 without approval of the Board. **(See Exhibit E, hereinafter referred to as the "March Speaking Engagement").**

> 55.    Wright improperly engaged in outside speaking events and commitments while persistently neglecting her duties as the Director of Pupil Services.

98.    Plaintiff did in fact participate in a webinar on "March 18, 2025" at 7:00 PM ET." The webinar was well after work hours, well after any duties she had to perform within Defendant CBSD, and not in conflict with her duties of Defendant CBSD. Moreover, it was a (no-cost) free webinar wherein Plaintiff made no income simply to help mentor or educate fellow educators. Despite this, Defendants continuing in the vein of utter falsity in their SOC implied Plaintiff's activities <u>interfered with</u> her performance of her job duties.

99.    When asserting the kitchen-sink styled rationale for Plaintiff's termination herein, Defendants knowingly provided this false justification for Plaintiff's termination. By way of examples only (and further elaboration):

> (1) Plaintiff never communicated directly with the Board about any employment matters, HR questions, or terms and conditions of my employment. Plaintiff followed the chain of command. The one-time Plaintiff tried to report child abuse concealment to the Board; Plaintiff was rejected from any communication(s) and in fact redirected to HR and Yanni (or counsel for CBSD). Yanni had in fact also instructed that he be the only conduit to the Board for management within CBSD. Claiming Plaintiff was supposed to get direct "approval" from the Board for anything is a blatant fallacy.

(2) Plaintiff was approved in prior years for similar speaking events by a prior Superintendent, just as she was approved for the March 18, 2025, event. Yanni had even signed Plaintiff's professional credentialing certification (on February 20, 2025) to participate in consulting if Plaintiff had desired (wherein he explained it was of no concern).

(3) It has been known throughout Defendant CBSD that Plaintiff was an adjunct professor at the University of Pennsylvania for the past two (2) years. Yani and Plaintiff had discussed this in the past as well. This was not approved by the Board Members directly, as Plaintiff always followed her chain of command.

(4) At any point in time, Plaintiff properly obtained approval from the highest executive of Defendant CBSD (who was a direct liaison to the Board and spoke for the Board, as the Board did not communicate directly with staff, faculty or administrative professionals). In sum, Plaintiff has never done anything wrong. Plaintiff always erred on the side of over disclosure and transparency.

### [O]  Plaintiff was singled out for termination in a disparate manner further evidencing blatant retaliation.

100.    Yanni (Superintendent) and Heinman (Principal) were removed from Defendant CBSD prior to Plaintiff via SOCs (and have termination proceedings pending). Yanni: (a) misled police; (b) concealed abuse or neglect; (c) downplayed allegations; (d) lied to parents about allegations; and (e) handled many aspects of his job improperly. Heinman: (a) intimidated witnesses; (b) tried to conceal abuse or neglect; (c) had an improper relationship with a faculty member accused of abuse attempting to shield her; and (d) impeded cooperation with investigations. A comparison of their conduct is inapposite to that of Plaintiff. These two individuals were of course culpable of misconduct and were justifiably terminated, as they were directly involved in aspects of a child abuse investigation and/or communications with law enforcement.

101.    Plaintiff was however a throw-in *for a retaliatory termination* for made-up and falsified pretextual reasons. This is evidenced by Defendants' s*elective enforcement* and administration of discipline or termination against others. By way of examples only:

(1) Nadine Garvin ("Garvin") was identified by an agency as misleading police, failing to contact Childline, and for other misconduct. Defendants represented that Garvin was involved as a police contact, part of investigations, and knew of allegations of abuse or neglect. Garvin was not disciplined or terminated, and she never received an SOC (as did Plaintiff). And Garvin directly handled all aspects of any investigation and was intimately aware of the "confidential" investigation of human resources. Despite actually engaging in gross misconduct, she was treated far more favorably than Plaintiff.

(2) Defendants <u>claim</u> in their SOC against Plaintiff that Kathleen Veisz (Veisz), a special education manager overseeing four (4) schools (including Jamison), knew of abuse or neglect, was involved in factfinding, and was involved in decision-making relative to retention of Aussprung and McDaniel. Yet, Defendants issued Veisz a warning and required retraining on mandated reporting.

(3) Defendants <u>claim</u> in their SOC against Plaintiff that Deneen Dry (Dry), a staff nurse and Union President, knew of abuse and neglect before Plaintiff (in mid-2024). Yet, Defendants never warned, disciplined, terminated or issued an SOC to Dry for not calling Childline or engaging in mandated reporting.

(4) Trawinski (Human Resources Manager) who was intimately involved with Freiling's investigation, concealment, and coordination with Yanni to cover up abuse (and who failed to make a Childline report) was not issued an SOC, disciplined or terminated. Unlike Plaintiff, she decided to retire with no consequences entitling her to benefits denied to Plaintiff.

(5) Defendants <u>claim</u> Cara Alderfer (a Teacher and CBEA Union President) was on the phone during the fact finding 11/15/24 and was an alleged witness to supposed discussions of abuse allegations by Klein. To Plaintiff's knowledge, she was not disciplined, placed on leave or terminated by CBSD. Nor was she subjected to an SOC.

(6) Defendants <u>claim</u> Kathy Moelter (a Teacher and CBEA Union Representative) was present in the room during the fact finding on 11/15/24 and was a witness to supposed discussions of abuse allegations. To Plaintiff's knowledge, she was not disciplined, placed on leave or terminated. Nor was she subjected to an SOC.

(7) Defendants <u>claim</u> Vanessa Carey ("Carey" - a Behavioral Analyst) was aware of abuse allegations in October and November of 2024 (even within Plaintiff's SOC). She never made a Childline report. She was not disciplined, retrained, terminated or subjected to an SOC.

102.     All of the above individuals knew of abuse allegations directly or before Plaintiff was to learn about anything. Unlike Plaintiff, several of them actually failed to intervene, take any action, or call Childline (as contended by Defendants). Yet, none of them were subjected to termination. And in fact, other than Veisz, none of them were even subjected to retraining or discipline.

103.     To Wright's knowledge, even the Board Members were being updated about abuse allegations. "A mandated reporter" also includes: "An individual paid or unpaid, who, on the basis of the individual's role as an integral part of a regularly scheduled program, activity or service, is a person responsible for the child's welfare or has direct contact with children." *See* § 6311(a)(7)(emphasis added). **Yet, not a single Board Member initiated a Childline complaint**.

104.     Edward Diasio (Solicitor for Defendants) did not contact or make a Childline report despite being involved in discussions about abuse allegations. A "mandated reporter" also includes: "An attorney affiliated with an agency, institution, organization or other entity, including a school or regularly established religious organization that is responsible for the care, supervision, guidance or control of children." *See* § 6311(a)(11) (emphasis added).

105.     Many other people and employees did not make Childline reports despite having **more information** than Plaintiff (and much sooner), yet they were not counseled, terminated, or even so much as retrained. *Plaintiff, a nearly 3-decade consummate professional who chose to speak up (because of who she is) in the face of abuse downplaying and concealment, had her entire career sacked based upon an SOC that is not actually grounded in law or fact.*

### [O]  The snowball effect of Defendants' retaliatory behaviors continued unmitigated.

106.     Plaintiff initiated a 3/3/25 whistleblower complaint spanning 13 pages. In the nearly 2 months predating her involuntary leave, Defendants never provided Plaintiff with any

response(s), findings, or conclusion(s) to her complaints. In fact, Plaintiff was denied such a conclusion or finding even through termination (and thereafter).

107.    In Plaintiff's 3/3/25 whistleblower complaint, Plaintiff wrote:

> Complaints about sexual harassment by Karen Smith ("Smith"). Wright verbally complained on numerous occasions that Karen Smith (a well-known Board Member who repeatedly conducts herself inappropriately in a public forum) was publicly disparaging her to community members both verbally and in writing and in essence claiming she only obtained her employment contract because of "quid pro quo" for alleged sexual favors. Smith publicized numerous iterations of her claims. Wright even memorialized such concerns to you and Freiling dated October 17, 2024. Wright demanded remedial action and District support for what she called "sexual harassment." This is statutorily protected activity under Title VII and Title IX. No meaningful remedial action was undertaken by CBSD.

108.    Despite that Plaintiff made repeated complaints of sexual harassment and inappropriate actions by Smith (including within her 3/3/25 whistleblower complaint), Defendants didn't even consider or require having Smith abstain from directly deciding to remove and terminate Plaintiff.

109.    Defendants entirely botched the suspension process, as constitutional principles and protections required Plaintiff *to be paid until she received hearing*. Yet, Defendants cut off Plaintiff's pay upon charging her in June of 2025 with a fictional SOC, constituting a clear pre-hearing deprivation of due process. *See* Count III *infra*.

110.    Plaintiff was not paid, constituting a pre-hearing deprivation of due process on suspension, and she was retaliatorily removed from her job and terminated (in violation of numerous laws, protections, and contrary to her contract protections).

111.    Defendants had never raised any concerns with Plaintiff's performance or handling of any matter(s) within Defendant CBSD in October, November, or December of 2024, or in January, February, or March of 2025 (a period of 5-6 months predating her whistleblower

complaint). And Plaintiff was removed from work in May of 2025 without so much as a discussion on issues that might be the subject of an SOC.

**Count I**
**Violations of Title VII of the Civil Rights Act of 1964 ("Title VII")**
**(Retaliation)**
**- Against Defendant CBSD Only -**

112.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

113.    Plaintiff made internal complaints of "sexual harassment" verbally and again embodied in her 3/3/25 whistleblower complaint.

114.    A determinative factor in Plaintiff's job removal and subsequent termination from employment was such protected activities.

115.    Plaintiff's job removal and subsequent termination constitute violations of Title VII, and Plaintiff properly exhausted her administrative filing(s) with the Equal Employment Opportunity Commission ("EEOC") before timely filing this lawsuit.

**Count II**
**Violations of Pennsylvania's Whistleblower Law ("PWL" - 43 P.S. §§ 1421 *et. seq.*)**
**(Retaliation)**
**- Against All Defendants -**

116.    Plaintiff was an "employee" as defined by §1422, as she was "a person who perform[ed] a service for wages or other remuneration under a contract of hire, written or oral, express or implied, for [her] employer."

117.    Defendant CBSD was at all times an "employer" as defined by §1422, as it is a "school district." And "individual liability" is expressly authorized under the Pennsylvania Whistleblower Law. *See Ingram v. Dunbar,* 2024 U.S. Dist. LEXIS 174204, at *13 (W.D. Pa. 2024)("the Pennsylvania Whistleblower Law allows for individual liability").

118.    Plaintiff made good-faith reports of "wrongdoing" to protect herself, the public, and children.

119.    Plaintiff's original job removal and subsequent termination for reporting "wrongdoing" constitutes violations of the Pennsylvania Whistleblower Law.

**Count III**
**<u>Violations of Due Process Rights</u>**
**<u>(under state and federal constitution), through 42 U.S.C. § 1983</u>**
**(Failure to Pay During Suspension)**
**- Against All Defendants -**

120.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

121.    Plaintiff was initially suspended with pay on or about May 2, 2025, but by June of 2025, Defendants <u>ceased paying</u> Plaintiff once they ostensibly figured out what to document as purported reasons for Plaintiff's job removal (via the SOC).

122.    Plaintiff was not given the opportunity to assert via brief any response to charges against her until July 15, 2025 (for a decision made via hearing by the Board Members) on August 21, 2025. Plaintiff was then notified of her termination or about August 25, 2025, via email.

123.    Plaintiff had property and due process entitlements prior to removal from her job without pay. In *Moorehead v. Sch. Dist. of the City of Allentown*, 2023 U.S. Dist. LEXIS 66450, at *56 (E.D. Pa. 2023), a School District converted an involuntary paid leave to an involuntary leave prior to a hearing. In *Moorehead*, the court explained this is clearly a violation of an employee's due process entitlements and rights. *Id*.

124.    In *Moorehead*, the court explained "courts in this Circuit consistently find that absent extraordinary circumstances, a public employee with a property interest in their job **is**

**entitled to a hearing prior to an unpaid suspension or termination**." *Id*, citing *Schmidt v. Creedon*, 639 F.3d 587, 596 (3d Cir. 2011); *Vatner v. Bd. of Trs. of the Univ. of Med. & Dentistry of N.J.*, 2015 U.S. Dist. LEXIS 13135 at *34 (D. N.J. 2015).

125.    Defendants mishandled many aspects of anything related to child abuse allegations and Plaintiff's leave. Defendants' incompetence and intent to retaliate thus culminated in irrefutable due process violations of Plaintiff (in violation of her constitutional rights).[9]

**Count IV**
**First Amendment Retaliation (through 42 U.S.C. § 1983)**
**(Retaliation)**
**- Against All Defendants -**

126.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

127.    Plaintiff engaged in numerous complaints that constitute First Amendment protected activities.

128.    Plaintiff was removed from her job and terminated for engaging in First Amendment Protected Activities.

129.    Defendants' actions constitute violations of Plaintiff's constitutional rights, and in particular, the First Amendment of the United States Constitution.[10]

---

[9] The Board Members specifically participated in and undertook the actions alleged in this Count against Plaintiff. They are individually liable. Plaintiff also asserts Monell liability against Defendant CBSD. An action by Board Members constitutes a representation of "policy" and ratification of "policy" sufficient to hold Defendant CBSD liable in addition to such individual Board Members. See Moorehead v. Sch. Dist. of the City of Allentown, 2023 U.S. Dist. LEXIS 66450, at *24 (E.D. Pa. 2023)(a decision by a School Board is sufficient to invoke Monell liability of the District as a whole).

[10] The Board Members specifically participated in and undertook the actions alleged in this Count against Plaintiff. They are individually liable. Plaintiff also asserts *Monell* liability against Defendant CBSD. An action by Board Members constitutes a representation of "policy" and ratification of "policy" sufficient to hold Defendant CBSD liable in addition to such individual Board Members. *See Moorehead v. Sch. Dist. of the City of Allentown,* 2023

## Count V
## <u>Breach of Contract</u>
### -Against Defendant CBSD only -

130.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

131.    Plaintiff entered into an employment contract whereby Defendant CBSD could only terminate her for "cause" identified statutorily.

132.    In her nearly 3-decade career, Plaintiff was never warned or disciplined, <u>including in 4 years at Defendant CBSD</u>. Plaintiff was not even provided with an opportunity to explain, respond or to even know what allegations were going to be lodged against pre-May 2025 job removal.

133.    § 11-1122 only permits a termination for cause whereby a "professional employee" engages in "immorality, incompetency, intemperance, cruelty, persistent negligence, mental derangement, . . . or persistent and willful violations of the school laws of this Commonwealth."

134.    While Plaintiff contends she **<u>did nothing wrong at all,</u>** the legislature "intended to protect tenure except for serious charges" and even proving negligence requires a District to demonstrate a continued course of conduct "***in the face of warnings by superiors***." *See Lauer v. Millville Area Sch. Dist.*, 657 A.2d 119, 121 (Pa. Commw. Ct. 1995).

135.    Plaintiff was not warned, not given any opportunity to cure, and she engaged in no-caused based rationale for her termination. Plaintiff thus sues herein for breach of contract as to her job removal, non-pay, and termination. *See e.g. Moffitt v. Tunkhannock Area Sch. Dist.*, 2013 U.S. Dist. LEXIS 181603, at *21 (M.D. Pa. 2013)(a plaintiff is permitted to sue a school

---

U.S. Dist. LEXIS 66450, at *24 (E.D. Pa. 2023)(a decision by a School Board is sufficient to invoke *Monell* liability of the District as a whole).

district for breach of contract where her terms of employment are governed by § 1122 and she asserts not having engaged in a cause-based reason for her separation).

136.    Defendant CBSD breached its contract with Plaintiff.

**Count VI**
**Violation of the PA Wage Payment and Collection Law (WPCL)**
**-Against Defendant CBSD only –**

137.    Plaintiff signed an employment contract, which set forth her Compensation and Benefits.

138.    Plaintiff's employment contract identified certain fringe benefits, in pertinent part as follows:

Act 93 Group Benefits. The Director shall, in addition to the compensation and benefits specifically set forth in this Contract, be entitled to receive, at the expense of the School District, the same benefits as a twelve (12)-month administrator as set forth in the agreement between the Central Bucks School District Board of School Directors and the Act 93 School District Administrators for the period beginning on July 1, 2022, and ending on June 30, 2025.

and

Unused Vacation. Any accumulation of vacation days shall be governed by the provisions of the Act 93 Agreement

6.    Under the WPCL, fringe benefits, including vacation pay are "wages" as defined therein. *See* 43 P.S. § 260.2a.[11]

7.    Under Act 93, explicitly incorporated into Plaintiff's employment contract by reference, Plaintiff was entitled to earned vacation time, and to "receive pay in lieu of all vacation time" upon separation.

---

[11] "'[A]ny other amount to be paid pursuant to an agreement with an employe' constitutes fringe benefits, which in turn constitute wages under the WPCL." *Toppy v. Passage Bio, Inc*., 2022 PA Super 190, 285 A.3d 672, 690; *see also Shaer v. Orthopaedic Surgeons of Cent. Pennsylvania, Ltd.*, 2007 PA Super 371, 938 A.2d 457, 465 (Pa. Super. 2007) ("severance pay and other separation related contractual arrangements are indeed covered by the WPCL").

8.      Upon Plaintiff's separation, she asked for pay out of her earned and accrued vacation.

9.      Defendant CBSD declined based upon the fact that Plaintiff was terminated for "cause"; however, there is no provision in Plaintiff's contract, nor Act 93  Central Bucks School District Personnel Practices and Compensation Plan governing Non-Bargaining Unit Professional Staff that indicates Plaintiff would forfeit earned unused vacation time if she was terminated for cause.

10.      Defendant cannot establish a good faith dispute as to Plaintiff's request for these fringe benefits, and thus is entitled to liquidated damages under the WPCL.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.      Defendants are to promulgate and adhere to a policy retaliation and constitutional violations in their workplace;

B.      Defendants are to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, and benefits.  Plaintiff also expressly seeks reinstatement to her prior job position while being made whole for all losses.

C.      Plaintiff is to be awarded actual damages, as well as damages for the pain, suffering, and humiliation caused by Defendants' actions;

D.      Plaintiff is to be awarded punitive damages as permitted by applicable law in an amount believed by the Court or trier of fact to be appropriate to punish Defendants for their willful, deliberate, malicious, and outrageous conduct and to deter Defendants or other employers from engaging in such misconduct in the future;

E.    Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate;

F.    Plaintiff is to be awarded the costs and expenses of this action and a reasonable attorney's fees as provided by applicable federal and state law; and

G.    Plaintiff is to receive a trial by jury.


Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**


By:    _/s/ Christine E. Burke_____
      Ari R. Karpf, Esq.
      Christine E. Burke, Esq.
      Eight Neshaminy Interplex, Suite 210
      Trevose, PA 19053
      215-639-0801 (P)
      215-639-4970 (F)


Dated: November 26, 2025